KAMALA D. HARRIS, SBN 146672
Attorney General of California
ALBERTO L. GONZALEZ, SBN 117605
Supervising Deputy Attorney General
CATHERINE WOODBRIDGE GUESS, SBN 186186
Deputy Attorney General
  1300 I Street, Suite 125
  P.O. Box 944255
  Sacramento, CA 94244-2550
  Telephone: (916) 445-8216
  Fax: (916) 322-8288
  E-mail: Catherine.Woodbridge@doj.ca.gov
*Attorneys for Defendant Kimberly Granger*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

FRESNO DIVISION

| | |
|---|---|
| SCOTT R. JAMES,<br><br>                              Plaintiff,<br><br>v.<br><br>KIMBERLY GRANGER,<br><br>                              Defendant. | 1:13-CV-0983 AWI SKO<br><br>**OPPOSITION TO PLAINTIFF'S MOTION TO AMEND**<br><br>Date:         May 27, 2015<br>Time:        9:30 a.m.<br>Courtroom: 7<br>Judge:       Magistrate Judge Sheila K. Oberto<br>Trial Date:  May 17, 2016<br>Action Filed: June 26, 2013 |

I. **INTRODUCTION**

Defendant Deputy Attorney General Kimberly Granger opposes Plaintiff's Motion for Leave to file Third Amended Complaint on the basis that the motion is brought in bad faith because it has no legal basis. Defendant Granger intends to file a Rule 11 Motion for Sanctions because the Motion for Leave to Amend and the Third Amended Complaint are brought for the purpose of harassing Ms. Granger. There is no legal basis for the claims and the factual allegations are contradicted by testimony of the parties, including Plaintiff's own testimony.

///

1

## II. NO LEGAL BASIS FOR CLAIMS

While the policy of amendment is liberal, courts may decline to grant leave to amend if there is strong evidence of "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment, etc." *Foman v. Davis*, 371 U.S. 178, 182, 83 S. Ct. 227, 9 L. Ed. 2d 222 (1962). In this case, Plaintiff seeks a fourth bite at the apple. He alleges a single cause of action against Deputy Attorney General Kimberly Granger and proposed Defendant Stephen Lindley. However, Plaintiff's factual allegations are contradicted by his own testimony. Moreover, the sole cause of action alleged against proposed Defendant Chief Lindley is barred as a matter of law.

Plaintiff seeks to add Bureau of Firearms Chief Stephen Lindley to the action. As alleged in the Third Amended Complaint, Chief Lindley is sued in his official capacity. Third Amended Complaint ¶ 5. It is well established that a § 1983 claim cannot be brought against a state official in his official capacity. State officials acting in their official capacities are not "persons" within the meaning of § 1983. *Hafer v. Melo* 502 U.S. 21, 25 (1991). A suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. *Brandon v. Holt*, 469 U.S. 464, 471 (1985). As such, it is no different from a suit against the State itself. See *Kentucky v. Graham*, 473 U.S. 159, 165-166 (1985); *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989). Consequently, the Third Amended Complaint fails to state a claim against Chief Lindley and is obviously brought in bad faith.

In addition, Plaintiff's allegations relative to Ms. Granger directly conflict with his deposition testimony. Plaintiff alleges a class of one claim. He asserts that others similarly situated are provided a letter asking that prohibited person to voluntarily relinquish their weapons. However, Plaintiff testified that he has "no proof" that the State of California has a practice of sending people a letter to relinquish their weapons. Deposition of Scott James at 91:5-9, attached as Exhibit 1. In fact, Plaintiff admits he is not aware of anyone similarly situated who was subject to the alleged disparate treatment. Deposition of James at 85:9-13. Plaintiff thus has no factual basis for his claims and no reasonable likelihood of proving the merits of his claim.

Plaintiff also alleges in the Third Amended Complaint that Ms. Granger "directed agents where to search and when." Third Amended Complaint ¶ 17; see also ¶ 24. Plaintiff alleges that Ms. Granger "advised officers to undertake a criminal investigation of Mr. James." Third Amended Complaint ¶ 21; see also ¶ 27. Additionally, Plaintiff contends that "Ms. Granger advised officers to arrest and question him after having refused to allow Mr. James to be accompanied by his attorney." Third Amended Complaint ¶ 22.

Each of these allegations is contradicted by testimony from both Plaintiff and Ms. Granger. Plaintiff admits he has no facts that Ms. Granger was supervising the search of his home. Deposition of James at 88:6-8, attached as Exhibit 1. In fact, Plaintiff admits that on the day of the search, he could not hear anything Ms. Granger said, nor did he communicate with her. Deposition of James at 53:11-16; 56:2-7; 77:16-25; 88:23-89:20. Plaintiff also admits that Ms. Granger did not prepare the search warrant. Deposition of James at 81:17-20. The only conclusion that can be drawn from the factual disparities between the Third Amended Complaint and the evidence established in discovery is that Plaintiff seeks leave to amend for the purposes of undue delay, bad faith or dilatory motive, and to invoke undue prejudice on Ms. Granger and Chief Lindley.

### III. CONCLUSION

Because the Motion for Leave to Amend and the Third Amended Complaint are brought for the improper purpose of undue delay, bad faith or dilatory motive, and to invoke undue prejudice on Ms. Granger and Chief Lindley, and are clearly barred by existing law. The motion should be denied.

Dated: May 1, 2015

Respectfully submitted,

KAMALA D. HARRIS
Attorney General of California
ALBERTO L. GONZALEZ
Supervising Deputy Attorney General

*/S/ Catherine Woodbridge Guess*

CATHERINE WOODBRIDGE GUESS
Deputy Attorney General
*Attorneys for Defendant Kimberly Granger*

SA2013309877

3

# *Scott R. James v. Kimberly Granger*

## USDC, Eastern District, Case No. 1:13-cv-00983-AWI-SKO

## Exhibit 1

Certified Copy

# In the Matter Of:

## JAMES vs. GRANGER

1:13-CV-0983 AWI SKO

## SCOTT RAY JAMES

*January 26, 2015*



800.211.DEPO (3376)
*EsquireSolutions.com*

```
 1   door and --
 2        Q    Luke Powell?
 3        A    Luke Powell -- and sat me on the couch, and
 4   Ms. Granger was right there.
 5        Q    Did you have any conversation with Ms. Granger
 6   at that time?
 7        A    When I saw her, I just took my head and said, I
 8   can't believe it came to this.
 9        Q    And did she respond?
10        A    She just had a smile on her face.
11        Q    Did you have any conversation with her at any
12   time that day?
13        A    No.
14        Q    Did you hear her have a conversation with
15   anyone else that day?
16        A    I heard her talking, but I couldn't hear what
17   she was saying.
18        Q    Did you observe her while she was inside your
19   house?
20        A    I couldn't really see what was going on because
21   they had me in the living room, and I just knew there
22   was at least eight different faces coming and going and
23   searching the house or doing everything, doing what they
24   were doing.
25        Q    Well, you indicated that once you got inside
```



1    A    No.
2    Q    And you couldn't hear her speak to anyone else
3    at your house?
4    A    They were loud. There was a lot going on and
5    people walking around back and forth. So I couldn't
6    really hear nothing. And my dogs were going berzerk in
7    the backyard.
8    Q    What -- were you asked to do anything while the
9    agents were searching your house?
10   A    To stay there, sit there, and then at one point
11   they took me in a guest bedroom and tried to question
12   me.
13   Q    Who tried to question you?
14   A    Agent Powell. And then there was another
15   agent, but I don't know what his name was.
16   Q    Was Ms. Granger present?
17   A    Not that I can recall.
18   Q    Anything else that occurred?
19   A    They tried to video -- or audiotape it, and I
20   just politely said, sorry, I can't give any statement.
21   Q    Okay. And anything else that occurred while
22   you were at the house and the agents were there
23   searching?
24   A    They asked if I could open up the safe.
25   Q    Who asked you?



```
 1     A     My belief --
 2           MR. STATLER: Objection. Because I think we're
 3   getting into confusing combinations of legal conclusions
 4   and factual bases for the litigation.
 5           MS. GUESS: All right.
 6     Q     Let me back up and finish out another line of
 7   questioning. Let's go back to the search itself.
 8           Were you arrested following the search?
 9     A     Yes.
10     Q     By whom?
11     A     Agent Luke Powell.
12     Q     Was Ms. Granger present when you were arrested?
13     A     I always had the handcuffs on, so I don't know
14   if they made that decision when I was actually arrested,
15   but when I walked outside, I don't recall seeing her.
16     Q     Okay. So the answer is no, she wasn't present
17   when you were put under arrest?
18     A     I don't know, because I wasn't really looking
19   around who was really around. I kind of -- I was really
20   embarrassed because a lot of my neighbors were outside,
21   and I just -- just didn't pay attention. I kind of --
22     Q     Did you see Ms. Granger?
23     A     I didn't see her.
24     Q     Did she tell you you were under arrest?
25     A     No.
```



```
 1   your criminal appearances?
 2        A    Not that I can recall.
 3        Q    Did you ever --
 4        A    She was under subpoena.
 5        Q    Did you ever hear her testify in your criminal
 6   matter?
 7        A    No.
 8        Q    Do you have any information that she applied
 9   for the search warrant of your home that occurred back
10   in October of 2011?
11        A    All of the information on the search warrant,
12   it's all black and white.  All it states basically is
13   that Agent Luke Powell got the information the following
14   day or two days later after my deposition in July from
15   Ms. Granger.  He had testified that he had gotten parts
16   of the transcript like two days after my deposition.
17        Q    Is it your understanding that Ms. Granger
18   prepared the search warrant?
19        A    Prepared it for a magistrate, no.  That was all
20   done by Luke Powell.
21        Q    Have you seen a copy of your transcript from
22   July of 2011?
23        A    Yes.
24        Q    And during that deposition in July of 2011, did
25   you admit that you were in possession of firearms?
```



1    A    I believe just the one time.  There might have
2  been a hearing prior to that that didn't go through.  I
3  think it was just the one time, and that would have been
4  on that February 3rd day.
5    Q    When you had your deposition taken in the writ
6  matter, who did you think that Ms. Granger was
7  representing?
8    A    The Department of Justice, Attorney General.
9    Q    Are you aware of any other people that have
10 filed a writ on the same issue that you filed your writ
11 on?
12   A    I don't know.  I'm not sure about that.  Not
13 really, no.
14   Q    Are you aware of any other people where
15 Ms. Granger has acted as the attorney for the Department
16 of Justice on a writ matter, any writ matter?
17   A    Yes.
18   Q    Who?
19   A    Calguns.  And I think --
20   Q    Is that a person or a business?
21   A    That's the association, Calguns.  And then also
22 I think there's another one with the NRA, National Rifle
23 Association.
24   Q    And it's your understanding Ms. Granger acted
25 as the attorney for the Department of Justice?



```
 1        Q    McCartney, who lived at 2505 South Johnson
 2   Street, Visalia?
 3        A    Yes.
 4        Q    He told you he heard Ms. Granger speaking?
 5        A    Yes.
 6        Q    Okay.  My question is, what facts do you have
 7   that she was supervising the search?
 8        A    I don't really have any.
 9        Q    And what facts do you have that Ms. Granger was
10   at your home to obtain statements to use in the civil
11   case?
12        A    Other than the correlation between her and
13   Agent Powell communicating to obtain the search warrant
14   and for them both to be at the summary judgment hearing
15   in November, the day he filed the return of the search
16   warrant.
17        Q    Did you ever hear Ms. Granger directing the
18   agents how or where to search your home?
19        A    I heard some talk about what to look for, what
20   they're looking for, but again, it was loud.  I had my
21   dogs going berzerk, and then my back was to a lot of
22   them.
23        Q    My question is, did you hear Ms. Granger
24   directing Agent Powell where to search your home?
25        A    At one time I saw -- no, but then at one time I
```



```
 1   saw Luke Powell, Agent Luke Powell, and her looking at
 2   paperwork together, but I don't know what that paperwork
 3   was.
 4       Q   Did Ms. Granger ever refuse to let your lawyer
 5   speak to you while the search was going on?
 6       A   My lawyer wasn't allowed to come inside the
 7   home.
 8       Q   My question is, did Ms. Granger refuse any
 9   request you made to allow you to speak with your
10   attorney during the search?
11       A   I don't know.  I wasn't able to ask her that.
12       Q   So the --
13       A   And I didn't hear her, no.
14       Q   -- answer is no, she didn't refuse you?
15       A   Not to me.  I don't know if she told
16   Luke Powell, no, don't let him in.  I have no idea.
17       Q   I'm asking, did she ever refuse your request to
18   speak to your attorney during the search?
19       A   No.  I tried not to communicate with her at
20   all.
21       Q   On page 5 of the second amended complaint,
22   paragraph 7, I'll quote:
23               "During the February 8, 2013 hearing
24           during" -- quote -- "during questioning it was
25           revealed that if the State of California comes
```



1  a lot of these articles, on the news and videos that are
2  out there that talk about how people are not able to
3  have these -- any type of weapons, that they would send
4  agents out there and ask for them to turn them over.
5        Q    Okay.  So what I'm asking is, what information
6  do you possess that the State of California has this
7  practice of sending people a letter to relinquish their
8  weapons?
9        A    I don't have any proof.  I just know, just by
10 talking to Calguns or NRA, there's lots of different
11 people that they have said that they've received letters
12 like that or have received the, you know,
13 knock-knock-give-us-your-guns-type scenario.
14 BY MS. GUESS:
15       Q    So you didn't hear anyone testify during your
16 criminal case that it's the State of California's
17 practice to have people relinquish their guns in
18 response to a letter?
19       A    I don't know that 100 percent because I believe
20 Agent Powell did talk about that in his testimony or
21 talked about -- because we questioned, do you always get
22 a search warrant, and I think the question was brought
23 up that, no, we don't.  A lot of times we do door knocks
24 or we go out or we'll call people or we'll send a
25 letter.

