1  Leonard C. Herr, #081896
   Ron Statler, #234177
2  HERR PEDERSEN & BERGLUND LLP
   Attorneys at Law
3  100 Willow Plaza, Suite 300
   Visalia, California  93291
4  Telephone:  (559) 636-0200
   Email:  lherr@dhlaw.net
5
6  Attorneys for Plaintiff: SCOTT R. JAMES
7
8                **UNITED STATES DISTRICT COURT**
9               **EASTERN DISTRICT OF CALIFORNIA**
10
11  SCOTT R. JAMES,                      CASE NO.: 1:13-cv-00983-AWI-SKO
12       Plaintiff,                      **REQUEST FOR JUDICIAL NOTICE**
13       v.
14  KIMBERLY GRANGER, an                 **Date:**      **August 3, 2015**
    individual; STEVE LINDLEY, an        **Time:**      **1:30 p.m.**
15  individual,                          **Courtroom:**  **2**
16       Defendants.                     **Trial Date:**   **May 17, 2016**
17                                       **Action Filed:** **June 26, 2013**

18      Plaintiff Scott James, by and through his attorneys, requests under Rule
19  301 of the Federal Rules of Evidence, that this Court take judicial notice of the
20  transcript of proceedings in the Tulare County Superior Court, February 8, 2013,
21  attached as Exhibit A and which is attested to by Certified Court Reporter Lesia
22  Mervin, by her signature on July 20, 2015, and from which excerpts are attached
23  to the Declaration of Leonard C. Herr filed this same day.

24  Dated: July 20, 2015        HERR PEDERSEN & BERGLUND LLP
25
                                By: /s/ Leonard C. Herr
26                                   LEONARD C. HERR
                                     Attorneys for Plaintiff
27                                   SCOTT R. JAMES

28  F:\Client Files\James, Scott (1369-00)\1369.12 James v. Granger\Motions\Rule 11 Motion filed 7-3-15\RFJN.doc

LAW OFFICES
HERR PEDERSEN
& BERGLUND LLP
Attorneys at Law
100 Willow Plaza
Suite 300
Visalia, CA  93291
(559) 636-0200

EXHIBIT "A"

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF TULARE

DEPARTMENT 5          HON. JOSEPH A. KALASHIAN, JUDGE

THE PEOPLE OF THE STATE
OF CALIFORNIA,                )
                              )
          Plaintiff,          )
                              )
          vs.                 )     NO. VCF 260879
                              )     1538.5 Motion
SCOTT RAY JAMES,              )
                              )
          Defendant.          )
_____ )


Visalia, California                    February 8, 2013

REPORTER'S TRANSCRIPT

(Pages 1 through 127)


APPEARANCES:

 For the Plaintiff:     TIM WARD
                        DISTRICT ATTORNEY
                        BY: AFREEN KAELBLE, DEPUTY
                        County Civic Center, Rm 224
                        Visalia, CA  93291

 For the Defendant:     RICHARD RUMERY
                        Attorney at Law
                        1320 W. Center
                        Visalia, CA  93291


LESIA J. MERVIN, CSR #4753, RMR, CRR
Tulare County Superior Court

## CHRONOLOGICAL INDEX

WITNESS:                                                    PAGE:

LUKE POWELL
            DIRECT EXAMINATION              4
            CROSS-EXAMINATION              64
            REDIRECT EXAMINATION          83
            RECROSS-EXAMINATION           95

SCOTT JAMES
            DIRECT EXAMINATION           102

* * * * *

1                        February 8, 2013

2                           (Open Court)

3                THE COURT:   Scott James.

4                MS. KAELBLE:   Afreen Kaelble for the People.

5                MR. RUMERY:   Richard Rumery on behalf of

6    Scott James, who is present in court out of custody.

7                THE COURT:   This is the defendant's 1538.5

8    motion.

9                MS. KAELBLE:   Your Honor, we were in court on

10   this motion last week and you asked that we have the

11   officer here.  He is here.  He is available to testify.

12   However, this case is very similar to the other 1538

13   motion that was on earlier this morning where the

14   motion regarding the search warrant had already been

15   heard in front of the judge who issued the search

16   warrant and the preliminary hearing had been held.

17                Now under 1538.5(i) they're bringing a

18   second 1538.5 motion.  Earlier it did not seem we

19   needed to do an evidentiary hearing.  It should have

20   been done based on the information presented to Judge

21   Hillman previously.  That is outlined in my motion that

22   was filed with the Court on Pages 3 through 5.  I just

23   wanted to bring that to the Court's attention again

24   before we continue with any testimony or anything like

25   that.

26                THE COURT:   Mr. Rumery?

1          MR. RUMERY:  Your Honor, in the renewal of
2    this motion, I point out why the ruling previously made
3    by Judge Hillman was incorrect.  He stated that there
4    was a good faith dispute between the State of
5    California Department of Justice and Mr. James as to
6    whether or not he could own or possess firearms,
7    because of that good faith dispute that he was denying
8    the motion.

9          I point out in the renewal motion that
10   that rationale does not apply when the allegation is
11   made that the information that was in the search
12   warrant was false.  And so this exception does not
13   apply to a search warrant where the information
14   provided to the magistrate was false.

15         THE COURT:  Anything further?

16         MS. KAELBLE:  Your Honor, I don't even think
17   we get to the point where he's saying that he found
18   that there were any false statements made by the
19   officer.  He didn't even find a need to hear evidence
20   at that hearing.  He went based on our arguments, based
21   on the motions and opposition that he had been
22   presented.  Based on that he didn't even find that the
23   defense had met the burden of establishing that there
24   were false statements made.  He didn't even get to the
25   point where he needed to hear any additional evidence
26   about that.

1          So that's our position, that defense
2   hasn't even established.  They've made some allegations
3   that there are false statements and that there's
4   disregard for the truth.  However, they haven't
5   provided any evidence to support that.  These are just
6   statements being made by them.

7          If you look at the exhibits that have
8   been provided by the People and compared to the
9   transcript, which the defense included in their motion,
10  you will find, as we've outlined in our opposition,
11  that the statements which were made are not misleading.
12  They were true statements of the law and true
13  statements of the information that have been provided
14  to this officer prior to writing the search warrant.

15          THE COURT:  And I reviewed those.  I'm going
16  to allow testimony.  So if you would call your first
17  witness.

18          MR. RUMERY:  Do you want me to call him?
19          THE COURT:  Yes.
20          MR. RUMERY:  We would call Agent Powell.
21                  **LUKE POWELL**,
22          Produced as a witness on behalf of
23          the Defendant, having been first duly
24          sworn, testified as follows:
25   ///
26   ///

1                          DIRECT EXAMINATION
2    BY MR. RUMERY:
3              Q.    Good morning.  Could you state your full
4    name and spell your last name?
5              A.    Luke Powell, P-O-W-E-L-L.
6              Q.    Mr. Powell, how are you currently
7    employed?
8              A.    I'm currently a sergeant with the Carmel
9    Police Department.
10             Q.    How long have you been with the Carmel
11   Police Department?
12             A.    Ten months.
13             Q.    Prior to being with Carmel Police
14   Department, where were you employed?
15             A.    California Department of Justice.
16             Q.    I'm sorry?  What?
17             A.    California Department of Justice.
18             Q.    And what was your position with
19   California Department of Justice?
20             A.    Special agent assigned to the bureau of
21   firearms.
22             Q.    And how long did you hold that position?
23             A.    Approximately three years.
24             Q.    And prior to that were you employed?
25             A.    Still with the state.  I worked Bureau
26   of Narcotics.

```
 1              Q.   Also with the Department of Justice?
 2              A.   Yes.
 3              Q.   How long were you with the Department of
 4    Justice before you went to Carmel?
 5              A.   Five years.
 6              Q.   Were you a law enforcement officer
 7    before starting with the Department of Justice?
 8              A.   Yes, I was.
 9              Q.   Where was that?
10              A.   National City Police Department.
11              Q.   That's in Southern California?
12              A.   Yes, sir.
13              Q.   How long were you with National City?
14              A.   Eight years.
15              Q.   Is that your entire law enforcement
16    career now, National City, Department of Justice, and
17    now city of Carmel?
18              A.   Ten months with the Riverside Sheriff's
19    Department.
20              Q.   Okay.  So you also -- prior to National
21    City, you worked with Riverside Sheriff's Department?
22              A.   Yes, sir.
23              Q.   Thank you.  Anything else in terms of
24    your law enforcement background?
25              A.   No.
26              Q.   So I take it prior to your law
```

1   enforcement background you went through a school?

2         A.    The police academy.

3         Q.    Okay.  And where was that?

4         A.    Southwestern College.

5         Q.    Now, on October 13, 2011, were you

6   involved with a search here in the city of Visalia?

7         A.    Yes.

8         Q.    At Mr. James' house?

9         A.    Yes.

10        Q.    Where was that house?

11        A.    It was in the city of Visalia.  I don't

12  know the address.

13        Q.    Do you know the address?

14        A.    No, I don't know.

15        Q.    Do you have your report there with you?

16        A.    Yes, I do.

17        Q.    Could you look that up real quick?

18        A.    630 West Cherry Court, Visalia.

19        Q.    And what was the basis for the search

20  warrant?

21        A.    We were looking for documentation, proof

22  that Mr. James had attempted to purchase firearms in

23  the past during his prohibition period.

24        Q.    Was there also an intent to look for

25  guns?

26        A.    Yes.

1          Q.   Okay.  Did you learn -- how did you
2    learn that Mr. James may have guns at his house?
3          A.   Following a civil deposition I was
4    informed by the deputy attorney general that was
5    involved in that civil deposition that James may be in
6    possession of firearms.
7          Q.   And who was that deputy attorney
8    general?
9          A.   Kimberly Granger.
10         Q.   What was the date that Miss Granger
11   provided you about guns at Mr. James' house?
12         A.   It will be July 26, 2011.
13         Q.   What was the date of the deposition?
14         A.   July 25th, the day before.
15         Q.   Okay.  Now, on July 26th, had you had an
16   opportunity to review the transcript of the deposition?
17         A.   Not in its entirety, no.
18         Q.   Was the transcript prepared on
19   July 26th, the day after the deposition?
20         A.   That, I don't know.
21         Q.   Did you ever review the transcript of
22   the deposition?
23         A.   Not the entire thing, no.
24         Q.   How much of it did you review?
25         A.   Five to ten pages of it.
26         Q.   Was there -- were you keyed in to

```
 1   certain things to review?
 2           A.   I just reviewed Mr. James' testimony.
 3           Q.   Well, wasn't the whole deposition his
 4   testimony?
 5           A.   Again, I don't know.  I didn't look at
 6   the whole thing.  No idea.
 7           Q.   Huh?
 8           A.   I have no idea.  I didn't look at the
 9   whole thing.
10           Q.   Were you ever provided with a copy of
11   his deposition transcript?
12           A.   No, not the entire thing.
13           Q.   What were you provided with?
14           A.   Five to ten pages.
15           Q.   Who provided that?
16           A.   Deputy Granger.
17           Q.   When did she provide that to you?
18           A.   About the 26th.
19           Q.   You're saying she provided you with
20   pages of the deposition transcript the day after the
21   deposition was heard?
22           A.   About that time, yes.
23           Q.   You say you reviewed it then?
24           A.   Yes, sir.
25           MR. RUMERY:  Your Honor, I'd like to offer as
26   an exhibit the reporter's certification.  I do
```

1  believe -- let me just look here real quick -- it may
2  be attached to the deposition as an exhibit. But --
3  it's attached as an exhibit, but it's not signed.  I'd
4  like to offer as an exhibit the signed reporter
5  certification as to the date she prepared the
6  transcript.

7        MS. KAELBLE:  Your Honor, I'd object.
8  There's no foundation as to what this document is.

9        MR. RUMERY:  Official business record, your
10 Honor.

11       THE COURT:  We'll have it marked at this
12 point as Defendant's A.

13       MR. RUMERY:  I would ask the Court to take
14 notice of the date of that, because he's saying that he
15 looked at the transcript, the 26th, and that date is
16 different than what he's testifying to.

17       Q.    After you say you reviewed portions of
18 the transcript, what did you do next?

19       A.    I reviewed multiple law enforcement
20 databases to confirm the information I was provided.

21       Q.    When you say you reviewed multiple law
22 enforcement databases to confirm the information you
23 were provided, what information were you trying to
24 confirm?

25       A.    If Mr. James had purchased firearms in
26 the past, if he may be in possession of them currently,

```
 1  what his prohibitions were.
 2            Q.   Okay.  What databases did you review?
 3            A.   One of the databases is referred to as
 4  AFS, Automated Firearms System, that will compile any
 5  information or data on firearms purchases.
 6            Q.   Go ahead.
 7            A.   In that database I believe I located
 8  three firearms registered to Mr. James.
 9            Q.   Okay.  And you said that was AFS, you
10  said?
11            A.   Yes, sir.
12            Q.   Okay.  And all that data search just
13  shows you whether somebody owns or possesses firearms;
14  correct?
15            A.   Correct.
16            Q.   What other databases did you search?
17            A.   The criminal history database.
18            Q.   What does that show?
19            A.   Any type of arrest or convictions for
20  misdemeanors, felonies, and mental health committals.
21            Q.   Okay.  What's that program called?
22            A.   It's CII.  It stands for Criminal
23  Information -- I can't remember what the second I is.
24  I'm sorry.
25            Q.   Okay.  So that's a criminal history.
26  Now, is that criminal history just for California or is
```

1    that nationwide?

2              A.    It's just California.

3              Q.    Okay.  Is there any kind of a nationwide

4    history that you can search?

5              A.    Yes.

6              Q.    What's that called?

7              A.    I did not check that system.

8              Q.    Okay.  Just so we can truncate this a

9    little bit, the only system you searched for criminal

10   history for Mr. James was California?

11             A.    Yes.

12             Q.    Nothing else was searched?

13             A.    Yes.

14             Q.    You do have available to you, as a

15   police officer, more resources where you can get a

16   nationwide search if you wanted to; correct?

17             A.    Correct.

18             MS. KAELBLE:  Objection; relevance.

19             THE COURT:  It's already in.  Go ahead.

20   BY MR. RUMERY:

21             Q.    Did you do any other searches?

22             A.    Yes, the APPS, additional database,

23   Armed Prohibited Person System.  What that database

24   does is crosschecks criminal history convictions with

25   firearms purchasing history.  Then it would populate

26   that system if there's a match between the two

```
 1  different categories.
 2  BY MR. RUMERY:
 3          Q.   Was there anything found on APSS
 4  regarding Mr. James?
 5          A.   If I could refer to my report I could
 6  give you a better answer.  Through that database I
 7  found that Mr. James attempted to purchase firearms
 8  within the past during his prohibition period.
 9          Q.   During what?
10          A.   His prohibition period.
11          Q.   What was the prohibition period?
12          A.   It began in '96 through current.
13          Q.   Through current?
14          A.   Yes.
15          Q.   You say he's prohibited?
16          A.   Yes, sir.
17          Q.   And on what basis do you say he's
18  prohibited?
19          A.   He's prohibited after a '96 arrest and a
20  subsequent conviction for 242 battery.
21          Q.   Now, during your criminal history of the
22  CII, did you ever find a conviction on his record for
23  273.5?
24          A.   No, sir.
25          Q.   So there is no conviction for domestic
26  violence through CII, is there?
```

1          A.    The conviction is for 242, battery.
2          Q.    My question is, there is no conviction
3    through CII for domestic violence, is there?
4          A.    I can't answer that as a yes or no
5    answer.
6          Q.    Did you see a 273.5 when you did the CII
7    check?
8          A.    Under the arrest, yes.
9          Q.    Just the arrest?
10         A.    Yes.
11         Q.    Did you see a conviction?
12         A.    No.
13         Q.    After you say you reviewed a deposition
14   transcript, did you get any additional information from
15   Kimberly Granger?  Strike that.
16              After you did the criminal history
17   review, did you go over that with Kimberly Granger?
18         A.    Not to my knowledge.
19         Q.    After you did the AFS search, did you go
20   over that with Kimberly Granger?
21         A.    No.
22         Q.    After you did the APSS search, did you
23   go over that with Kimberly Granger?
24         A.    No.
25         Q.    Now, did you look through any of the
26   Department of Justice records to determine Mr. James'

1  eligibility to own or possess firearms?

2         A.   Just additional apps database which I

3  already stated.

4         Q.   At the time that you reviewed the

5  deposition of Mr. James, were you aware that he had

6  filed a Complaint or not really a lawsuit, but a writ

7  of mandate with the Court?  Were you aware of that?

8         MS. KAELBLE:  Objection; relevance.

9         THE COURT:  Overruled.

10        THE WITNESS:  I was aware of the -- there was

11 a civil case going on, but I wasn't informed of the

12 nature of that civil case, no.

13 BY MR. RUMERY:

14        Q.   Kimberly Granger never told you the

15 nature of the civil case?

16        A.   No.

17        Q.   Did you ever review any documents from

18 that civil case?

19        A.   Just those five to ten pages from the

20 deposition.  That's all.

21        Q.   Anything else?

22        A.   No, sir.

23        Q.   Did you go through the Department of

24 Justice's own records regarding Mr. James during your

25 investigation?

26        A.   Just those databases I told you about.

1            Q.   Okay.  Did you ever come across -- your

2   Honor, I'm referring to Exhibit C of our motion.

3                Did you ever come across an April 18,

4   2008, letter written on Department of Justice

5   stationery to the sheriff's department regarding

6   Mr. James.  Do you remember that?

7            A.   It doesn't sound familiar.

8            Q.   Were you aware that Department of

9   Justice sent a letter, dated April 18, 2008, to Tulare

10  County Sheriff's Department saying Mr. James was

11  eligible to possess firearms?

12           A.   No, sir.

13           Q.   You never saw that?

14           A.   No, never saw it.

15           Q.   Did Miss Granger ever tell you about

16  this letter?

17           A.   Not to my knowledge.

18           Q.   Huh?

19           A.   No.

20           Q.   Not to your knowledge?  Okay.

21           THE COURT:  I'm sorry.  It was April 18,

22  2008?

23           MR. RUMERY:  Yes.

24           THE COURT:  From the Department of Justice?

25           MR. RUMERY:  From the Department of Justice.

26           THE COURT:  Read it.

1       MR. RUMERY:  I'll read the whole thing.  It's
2   addressed to the Tulare County Sheriff's Department CCW
3   coordinator.  This had to do with concealed weapons
4   permit.  "2404 Burrel Avenue, Visalia, California.  Re:
5   Carrying concealed weapon eligibility to possess
6   firearms."

7       Next line:  "Applicant:  Ray Scott
8   James."  It should be his middle name.  It's Scott Ray
9   James.

10      "Date of birth:  12/31/70.  CCI
11  Number 10501636."

12      Then the body of the letter says,
13  "Above-mentioned individual is eligible to possess
14  firearms; therefore, your agency is cleared to exercise
15  its discretion to issue a concealed weapon, CCW, to
16  this individual.  Enclosed for your convenience please
17  find a criminal history stat summary on this subject.
18  If you have any questions regarding this clearance,
19  please call the Firearms Licensing and Permits Unit at
20  916-263-8100."

21      It's stamped "received."  I can't really
22  see the date on here, but definitely 2008 by the Tulare
23  County Sheriff's Department.  It is from the Department
24  of Justice.  The agency is the Firearms Licensing and
25  Permits Unit from the Department of Justice.

26      Like I said, it is Exhibit C to our

```
 1              A.   No.
 2              Q.   If I showed you this, do you think it
 3    would refresh your recollection?
 4              A.   I have it in my notes.
 5              Q.   Can you look and see if it's 105016?
 6              A.   105016?
 7              Q.   Yes.
 8              A.   Yes.
 9              Q.   That's the same number that you had?
10              A.   Yes.
11              Q.   Thank you.  That helps.
12                   You got that information on July 26,
13    2011; correct?
14              A.   Yes.
15              Q.   What did you do with that information
16    after July 26, 2011?
17              A.   I began investigating the allegations.
18              Q.   What was your answer?
19              A.   I began investigating the allegations.
20              Q.   What did that entail?
21              A.   It started with the computer workups to
22    see if it was correct and accurate.  I began doing
23    background checks out to the businesses, trying to find
24    the point of sales where the firearms were attempted to
25    be purchased, trying to locate Mr. James' residence and
26    any vehicles associated with Mr. James.
```

1        Q.    Okay:  Did you do all that?

2        A.    Yes, sir.

3        Q.    How long did it take you to do?

4        A.    A couple days, a couple weeks.

5        Q.    Was it days or weeks?

6        A.    Well, from the point I received the

7   information from the point of receiving the search

8   warrant, it was a couple months.  So it happened within

9   that few-month period.

10       Q.    Then what did you do?

11       A.    Then ultimately authored a search

12   warrant, which was signed, and we served it in October.

13       Q.    Now, did anybody help you with preparing

14   that search warrant?

15       A.    No, sir.

16       Q.    Did you go over it with Kimberly

17   Granger?

18       A.    No, sir.

19       Q.    Did you have any discussions with

20   Kimberly Granger about the search warrant?

21       A.    Once the search warrant was signed and a

22   date was set for the search warrant service, I called

23   her and advised her of the date of the search warrant.

24       Q.    Between July 26th, when you got the

25   information from her and you got the search warrant

26   signed, did you have any further discussions with Miss

1    Granger about this case?

2            A.    The only communication we had after the

3    first initial phone call was she sent me an e-mail with

4    a copy of the civil transcripts, the section that I

5    explained earlier, five to ten pages.  That's it.

6            Q.    The deposition?

7            A.    Yes, sir.

8            Q.    And she's the one that gave you five to

9    ten pages?

10           A.    Yes.

11           Q.    So you didn't review the whole

12   deposition transcript, did you?

13           A.    You are correct.

14           Q.    Then you -- what was the date that you

15   got the search warrant signed?

16           A.    If I could refer to my report.

17           Q.    Yes.

18           A.    October 4, 2011.

19           Q.    That's the date it got signed?

20           A.    Yes, sir.

21           Q.    And then what date did you execute?

22           A.    October 13th.

23           Q.    Are you aware there is a law that

24   requires search warrants be signed and executed within

25   a ten-day period?

26           MS. KAELBLE:  Objection; relevance.

```
 1   BY MR. RUMERY:
 2            Q.   And returned.
 3            THE COURT:   Sustained.
 4            THE WITNESS:   Yes.
 5   BY MR. RUMERY:
 6            Q.   Are you aware that search warrants had
 7   to be executed and returned within a ten-day period?
 8            MS. KAELBLE:   Objection; relevance.
 9            THE COURT:   What's the relevance?
10            MR. RUMERY:   It goes to part of our argument,
11   part of the staleness.
12            THE COURT:   I'll allow it.
13            MR. RUMERY:   It wasn't returned in time.  It
14   wasn't returned --
15            THE COURT:   You're testifying.
16            MR. RUMERY:   I'm arguing.  I'm sorry.
17            THE COURT:   Go ahead.
18   BY MR. RUMERY:
19            Q.   Are you aware that there's a law that
20   says that search warrants are to be executed and
21   returned within ten days?
22            A.   Yes.
23            Q.   Okay.  And what was the date you
24   executed this warrant?
25            A.   I think I said the 13th.  Yes, the 13th.
26            Q.   So that's nine days after it was signed;
```

1    correct?

2              A.    Correct.

3              Q.    Was it your intent to follow it the

4    following day?

5              A.    To look at the calendar on the specific

6    date, but within the next court date, yes.

7              Q.    Okay.  Are you aware that this warrant

8    wasn't returned until November 3rd?

9              A.    Yes, sir.

10             Q.    Why was the delay until November 3rd?

11             A.    I don't have specific knowledge, but I

12   believe during this time I was injured at work and was

13   out of work for a period of time, and then had surgery

14   after that.

15             Q.    Did anyone tell you to delay filing the

16   return until November 3rd?

17             A.    No.

18             Q.    Did you have any discussion with

19   Kimberly Granger about waiting until November 3rd to

20   return the search warrant?

21             A.    No.

22             Q.    Are you sure of that?

23             A.    Yes.

24             Q.    Do you know if there was a hearing in

25   the civil case on November 3rd?

26             A.    Again, I have no knowledge of the civil

1  case.

2          Q.   Were you involved in any aspect of the

3  civil case at all?

4          A.   I received one subpoena for court

5  appearance a while back.  I'm just guessing when it

6  was.  I have no idea.

7          Q.   Was that for November 3rd?

8          A.   I have no idea.

9          Q.   Do you have that subpoena with you?

10         A.   No, I do not.

11         Q.   Well, on the day that you did return the

12  search warrant, November 3, 2011, did you go with

13  Kimberly Granger to any court appearances?

14         A.   I don't know.  I do not remember.  I've

15  been to one court appearance with Miss Granger.

16         Q.   In the civil case?

17         A.   I don't know if it was civil or

18  criminal.

19         Q.   In the James case?

20         A.   Yes.

21         Q.   Okay.  Now, you started gathering

22  information for this search warrant, you say, on

23  July 26th; correct?

24         A.   Yes.

25         Q.   Why did you wait until October 3rd or

26  4th to get the warrant signed?

1          A.    Because I'm working multiple cases at
2  one point in time.  And on the team I'm on we have five
3  to six other agents who were working multiple cases at
4  that point as well.  So we have different scheduling
5  conflicts that we need to take care of and coordinate
6  with everybody to get everything done.

7          Q.    Do you have a copy of your search
8  warrant in front of you?

9          A.    Yes, I do.

10          Q.    I'd just like to clarify a couple of
11  dates.  Tell me if this is one.  Under the section
12  that's entitled "Investigation of Search Warrant," do
13  you see that?

14          A.    Yes.

15          Q.    I think the first paragraph indicates
16  when you first started the investigation what you were
17  doing in this case; correct?

18          A.    Correct.

19          Q.    And that's July 26th?

20          A.    Yes, sir.

21          Q.    And doesn't -- turning to the next page,
22  the top of that page, doesn't that indicate that that's
23  basically when your investigation stopped when you did
24  all the computer searches?  See where it says
25  "July 28th"?

26          A.    Yes, I see that.

1          Q.    Is that when your investigation on this
2   matter stopped?
3          A.    That's correct.
4          Q.    Basically, your investigation only
5   encompassed three days: the 26th, 27th, and 28th.  You
6   got all the information you needed then; right?
7          A.    The initial information, yes.  I did
8   spot checks throughout the next few weeks.
9          Q.    Okay.  But you didn't add any of that
10  spot-check information in the investigation portion of
11  your search warrant after that, did you?
12         A.    That's correct, because nothing had
13  changed.
14         Q.    So there was nothing new?
15         A.    Correct.
16         Q.    Everything you had learned you had
17  learned by July 28th; correct?
18         A.    Correct.
19         Q.    And then you didn't get the search
20  warrant signed until July -- October 4th.  Why that
21  delay?
22         A.    Again, scheduling conflicts with other
23  members of the team.
24         Q.    You know that was at least 80 days
25  later; right?
26         A.    Yes, sir.

```
 1              Q.   Okay.  Are you aware that in preparing
 2   search warrants that information can be considered
 3   stale after 30 days?
 4              A.   Yes, sir.
 5              Q.   Okay.  And you're aware of that from
 6   your training; right?
 7              A.   Yes, sir.
 8              Q.   But yet you went forward with that
 9   search warrant on the 4th of October.  It got signed on
10   that date; correct?
11              A.   Yes.
12              Q.   Now, in that search warrant you made a
13   lot of statements; did you not?
14              A.   Yes, sir.
15              Q.   Okay.  Let me see if I can locate this
16   for you.
17              THE COURT:  We'll take a ten-minute recess.
18   Then we're going to come back.  I'm going to call the
19   walk-in matters and then we'll resume this.
20              MR. RUMERY:  That's fine.
21                        (Recess)
22              THE COURT:  We'll resume the Scott James
23   matter.  Mr. Powell, you're still under oath.  You're
24   still on the witness stand.
25              MR. RUMERY:  May I proceed?
26              THE COURT:  Yes.
```

1   BY MR. RUMERY:

2          Q.    Now, you prepared an affidavit to the

3   search warrant; correct?

4          A.    Yes, sir.

5          Q.    And you signed that under penalty of

6   perjury?

7          A.    Yes, sir.

8          Q.    In that you made a number of different

9   statements about this case; correct?

10          A.    Yes, sir.

11          Q.    Have you had a chance to review the

12   motion that I filed?

13          A.    Yes, sir.

14          Q.    Okay. I singled out certain statements

15   and I can identify where they are and the search

16   warrant, if you need to, okay?

17          The first -- was it your intent with

18   this search warrant to -- was it your intent to, like,

19   let the magistrate know that Mr. James had a domestic

20   violence conviction and, therefore, was not authorized

21   to own or possess firearms; correct? That was the

22   goal?

23          A.    My goal was to provide all the factual

24   data I had.

25          Q.    But you wanted to let this magistrate

26   know that Mr. James had a domestic violence conviction;

1   right?  Because the domestic violence conviction means
2   he couldn't own or possess firearms; correct?
3              MS. KAELBLE:  Objection; misstates the
4   information set forth in the search warrant.
5              THE COURT:  Overruled.
6              THE WITNESS:  That comes into bearing under
7   federal law, so yes.
8   BY MR. RUMERY:
9         Q.  So that was part -- that was your
10  intention to let the magistrate know that; right?
11        A.  Yes.
12        Q.  Thank you.  Okay.  The first paragraph
13  that I want you to focus in on, it's in the search
14  warrants under paragraph heading of "Investigation."
15  And it's the second paragraph down.  Do you say in your
16  declaration, "During the sworn testimony James admitted
17  to ownership and possession of firearms and
18  falsification or failure to divulge information on both
19  the Federal Alcohol and Tobacco Firearms ATM 4473 and
20  the state dealer's record of sale DRS firearms
21  licensing forms"?  Do you see that?
22        A.  Yes, sir.
23        Q.  Did you get that information from the
24  five to ten pages you say you read of his deposition,
25  or did Kimberly Granger give you that information?
26        A.  That was the information I was provided

```
 1   verbally.
 2           Q.    By?
 3           A.    Miss Granger.
 4           Q.    You never have reviewed the entire
 5   deposition, have you?
 6           A.    That's correct.
 7           Q.    So if you had read the entire
 8   deposition -- well, strike that.
 9                 Are you aware that in his deposition,
10   when asked about the forms that he signed, that his
11   answers almost consistently throughout was he doesn't
12   remember what he signed?
13           A.    Yes.
14           Q.    You're aware of that?
15           A.    Yes.  Not through all the questions, but
16   what I saw, yes.
17           Q.    Okay.  So isn't that statement that I
18   just read an incorrect statement, because he never did
19   say anything like that in his deposition, did he?
20           MS. KAELBLE:  Objection, lack of personal
21   knowledge.  He indicated he has not read the entire
22   deposition.
23           THE COURT:  Sustained.
24           MR. RUMERY:  He may?  He may not have read
25   the entire deposition, but he's the one who put this
26   statement in here.  We need to know the basis of where
```

1  he got this information.

2          MS. KAELBLE:  He already indicated he

3  received that information from the deputy attorney

4  general.

5          THE COURT:  That's my understanding.

6  BY MR. RUMERY:

7          Q.  Okay.  You did not get this information

8  from reading the deposition, correct, what you put in

9  here in this first paragraph?

10          A.  Yes.  This is what I was verbally given.

11          Q.  Okay.  And if you had read the

12  deposition, you would realize that Mr. James never

13  could remember what he's put on these forms?

14          MS. KAELBLE:  Objection; calls for

15  speculation.

16          THE COURT:  Sustained.

17          MR. RUMERY:  I'd ask the Court to take

18  judicial notice of that, because you have the entire

19  deposition.  If you read through that deposition,

20  you'll see that when asked about the particular forms,

21  Mr. James could not remember even the forms that he

22  filled out or what was on the forms, let alone how he

23  filled them out.

24          THE COURT:  I will do that.

25          MR. RUMERY:  Also, take judicial notice of

26  the fact that that first paragraph is false in the way

1  that it is worded to the magistrate.

2          MS. KAELBLE:  Your Honor, I'd object.

3  There's nothing false about it.  This is information

4  that he was provided.  It's just like when an officer

5  receives information from a CI.  They put that

6  information into the document.  This is the information

7  he was provided.  That was his belief at the time of

8  the search warrant.

9          THE COURT:  Well, I think it's relevant.  I

10  mean, if he was given improper information.

11          MS. KAELBLE:  Your Honor, I don't think the

12  Court can make a determination whether it's proper or

13  improper information.  When we get to cross-examination

14  and argument, I'll be able to point out other areas of

15  the transcript.

16          THE COURT:  No, I know that.  But I'm not

17  going to sustain the objection because you're alleging

18  that there's nothing false in here.

19          MS. KAELBLE:  Well, he's asking to take

20  judicial notice of the fact it's a false statement.

21  I'm asking the Court not to do that.

22          THE COURT:  I'm not taking judicial notice of

23  that.  I have to read the deposition.  I haven't read

24  that yet.

25          MS. KAELBLE:  That's fine.

26          THE COURT:  Okay.

1  BY MR. RUMERY:

2       Q.   The second paragraph is also under the

3  -- under federal law.  Do you see that?

4       A.   Yes, sir.

5       Q.   "The federal Brady Act, 18 USC

6  922(g)(9), permanent ban disqualifying individuals from

7  possessing or purchasing or receiving a firearm

8  concerning a misdemeanor conviction of domestic

9  violence.  James is currently prohibited from firearms

10 possession for life pursuant to a arrest for PC 273 by

11 the Visalia Police Department, inflict corporal

12 punishment on spouse and subsequent conviction on

13 December 11th for 242 battery."  Do you see that?

14      A.   Yes, sir.

15      Q.   Earlier in that paragraph you say the

16 person is banned for life of purchasing or receiving

17 firearms because of a misdemeanor conviction of

18 domestic violence.  Do you see that in there?

19      A.   Yes, sir.

20      Q.   And you've already testified that when

21 you did your CII criminal history, which is the same

22 CII number on that letter that we read, that you did

23 not find a domestic violence conviction for Mr. James,

24 did you?

25      MS. KAELBLE:  Objection; misstates the

26 testimony.

```
1                    THE COURT:  Pardon?
2                    MS. KAELBLE:  Misstates the testimony.
3                    MR. RUMERY:  It doesn't misstate anything.
4                    THE COURT:  In what way does it misstate it?
5                    MS. KAELBLE:  He's already testified that he
6    found the 242 conviction and that there was a 273.5
7    arrest, and he's explained that under the federal law
8    that is considered the misdemeanor conviction for
9    domestic violence.
10                   THE COURT:  I don't recall the -- that he
11   testified to that.  But I'll allow you to ask the
12   question.
13                       (Record read)
14                   THE WITNESS:  Is it my turn to answer?
15   BY MR. RUMERY:
16           Q.   Yes.
17           A.     There was no conviction for domestic
18   violence, correct.
19           Q.   Thank you.  Yet in the first part of
20   this paragraph there's a strong implication that he's
21   banned for life because of a misdemeanor -- because of
22   a conviction for domestic violence; correct?
23           A.   Correct.
24           Q.   Okay.  And then you cite to the Brady
25   Act; right?
26           A.   Yes, sir.
```

```
 1            Q.   Do you know if a battery conviction, a
 2    simple battery conviction, violates somebody under the
 3    Brady Act?
 4            A.   Not for life.
 5            Q.   Thank you.  A battery conviction only
 6    precludes somebody for a ten-year period?
 7            A.   Yes, within the state.
 8            Q.   Correct.
 9            THE COURT:  Excuse me.  And did you know that
10    at the time that you wrote this statement of probable
11    cause?
12            THE WITNESS:  Yes, sir.
13            THE COURT:  Is there some reason you didn't
14    put that in?
15            THE WITNESS:  Under the federal law, if an
16    individual is arrested for a domestic violence crime
17    and later on in the court proceedings that arrest is
18    plea bargained down to some other type of misdemeanor
19    or lesser infraction, it's still carries the weight of
20    a domestic violence conviction under federal law.
21            THE COURT:  For life?
22            THE WITNESS:  Yes, sir.
23            THE COURT:  How about under state law?
24    California state law?
25            THE WITNESS:  No, ten years state law.
26            THE COURT:  So was there some reason you
```

1   didn't put that in there?
2           THE WITNESS:  I stated specifically that he's
3   for lifetime prohibition for lifetime federal.
4           THE COURT:  But not under state law; correct?
5           THE WITNESS:  Correct.
6           THE COURT:  Is there some reason you didn't
7   put that in there?
8           THE WITNESS:  It's somewhere -- I don't know
9   if it's in search warrant or in my actual arrest report
10  or crime report, but it is stated somewhere in here.
11  I'd have to find it.
12          THE COURT:  In the statement of probable
13  cause?
14          MR. RUMERY:  I can represent --
15          THE COURT:  I'm asking him.
16          THE WITNESS:  I'd have to look.  It's
17  somewhere in one of the reports.
18          THE COURT:  I don't care about a report.
19  We're talking about the statement of probable cause.
20          THE WITNESS:  If you give me a minute, I'll
21  find it.
22          THE COURT:  Okay.
23          THE WITNESS:  Are you ready?
24          THE COURT:  Sure.
25          THE WITNESS:  On the next page of my search
26  warrant --

1           MR. RUMERY:  What?

2           THE WITNESS:  The very next page.

3   BY MR. RUMERY:

4           Q.   After investigation?

5           A.   Still in the Investigation section, but

6   if you flip the page over, go down -- I'll call it

7   seven paragraphs down.  It starts with "James' criminal

8   history showed."

9           Q.   Uh-huh.

10          A.   Okay.  In that paragraph it states

11  specifically that the state prohibition is for ten

12  years.  "His state prohibition ended on December 11,

13  2006.  Under the federal section of the federal Brady

14  Act, he has a permanent ban for life."  Does that

15  answer your question, sir?

16          THE COURT:  That answers that particular

17  question.  Continue on.

18          MR. RUMERY:  Can I make a point or argument

19  real quick?

20          THE COURT:  No, no argument at this point.

21  Argument afterward.

22  BY MR. RUMERY:

23          Q.   I'm looking at the third one, also on

24  that same page under "Investigation," second to the

25  last paragraph from the bottom of the page.  It starts

26  with the sentence -- the words "also during."  Do you

 1  see that?

 2          A.   Yes, sir.

 3          Q.   "Also during the sworn testimony, James

 4  admitted to failing to divulge a misdemeanor conviction

 5  for domestic battery on the federal ATF 4473 form, and

 6  failing to provide a street address on both the ATF

 7  4473 and state DROS forms.  Both federal and state

 8  forms James submitted an address that was different

 9  from his residential address.

10          Now, you did this CII criminal history.

11  Did you ever find a conviction for domestic battery?

12          MS. KAELBLE:  Objection; asked and answered.

13          MR. RUMERY:  No.

14          THE COURT:  Overruled.

15          MR. RUMERY:  We talked about domestic

16  violence.  Now the word "battery" is being used.

17          THE WITNESS:  No.

18  BY MR. RUMERY:

19          Q.   And isn't the domestic battery in the

20  243 area of the Penal Code?

21          A.   Yes, sir.

22          Q.   And you didn't find a 243 conviction for

23  Mr. James, did you?

24          A.   Correct.

25          Q.   Yet you said in the affidavit that he

26  has a misdemeanor conviction for domestic battery;

1  correct?  You said he failed to divulge a misdemeanor
2  conviction.

3          A.    On the federal form?  Yes.
4          Q.    For domestic battery?
5          A.    Yes.
6          Q.    And that's incorrect, isn't it?
7          A.    No.
8          Q.    If there's no conviction for domestic
9  battery, how do you spell does someone divulge that on
10 a federal form?

11         A.    Under the Federal Brady Act, it
12 specifically outlines what I just explained, sir, and
13 the definition of domestic battery.  That would fall
14 under the definition of domestic battery under the
15 federal form.

16         Q.    But if it's a conviction, doesn't it
17 have to be a conviction?

18         A.    He was convicted of a 242, and the
19 person he battered was his spouse.

20         Q.    But in terms of the conviction, it
21 wasn't domestic battery, was it?  It wasn't a 243;
22 right?

23         A.    Under state law you are correct.
24         Q.    Okay.  And so the statement in the
25 affidavit that he has a conviction for domestic
26 battery, that's incorrect, isn't it?

1              A.   No, sir.

2              Q.   Are you saying the Brady Act indicates

3    that a simple battery is a domestic battery?

4              A.   If the person you battered is a spouse,

5    yes.

6              Q.   Did you see a denial of him trying to

7    purchase a weapon at Big 5?

8              A.   Yes.

9              Q.   Did it correctly state that he had a

10   conviction for domestic violence, 273.5, and domestic

11   battery, 243?

12             A.   Let me just look at the form real quick.

13   I have it with me.

14             Q.   The denial letter?

15             A.   If I can read it specifically.  Is that

16   okay?

17             Q.   Doesn't it say 273.5 or 243?

18             A.   Yeah, this is canned verbiage that is

19   placed in these letters, yes.

20             Q.   That's what it says in that letter;

21   right?

22             A.   It also states specifically "Federal

23   Brady Act."

24             Q.   Okay.  But that was -- there wasn't a

25   conviction for 273.5 or 243, was there?

26             A.   At the state level, correct.

1          Q.    Paragraph 4, just at the top of the next
2     page, the middle of the next page.  Starting with the
3     word "possession."  Do you see that?
4          A.    Yes, sir.
5          Q.    The next thing you say in your affidavit
6     is, "The possession of any firearm or ammunition by
7     James is a violation of federal law 18 USC 922(g)(9),
8     permanent ban disqualifying an individual from
9     possessing, purchasing, or receiving a firearm pursuant
10    to a misdemeanor conviction of domestic violence."  Do
11    you see that?
12         A.    Yes, sir.
13         Q.    And Mr. James does not have a
14    misdemeanor conviction of domestic violence, does he?
15         A.    Under federal law, yes.  Under the
16    federal definition, yes.
17         Q.    What?
18         A.    Under the federal definition, yes.
19         Q.    Did you try to make sure that the
20    magistrate understood that you were trying to define
21    federal law versus state law?  Because under state law
22    he has no conviction for domestic violence?  Did you
23    try and point that out to the magistrate?
24         A.    Of course.  It says right here.
25    "Federal law 18 USC 922(g)(9).
26         Q.    But my point is did you also point out

1  to the magistrate, however, in California he has no
2  convictions for domestic violence or domestic battery?
3  Did you state that to the magistrate?
4          A.    In writing I did, yes.
5          Q.    Now, doesn't the Brady Act require a
6  conviction for domestic violence for the Brady Act to
7  come into play?
8          A.    It would be a conviction, yes, which he
9  has, a 242.
10         Q.    I'm talking about doesn't it require a
11  conviction for a domestic violation for the Brady Act
12  to come into play?
13         A.    What it specifically states is if you
14  have a battery conviction and the person you battered
15  is your spouse, it falls under domestic violence.
16         Q.    That's not what it says.
17         MR. RUMERY:  I'll ask the Court to take
18  judicial notice.  That's not what it says.  That's just
19  wrong.
20         THE COURT:  You can supply me with the
21  language later.
22         MR. RUMERY:  All right.  We'll make a copy.
23  Does the Court have access to 18 USC?
24         THE COURT:  I can have access.  If you have
25  it, it would certainly help me.
26         MR. RUMERY:  I don't have a copy of it with

1  me right now.

2           THE COURT:  Okay.

3           MR. RUMERY:  But that's not what the Brady

4  Act says.

5  BY MR. RUMERY:

6           Q.   Then it says on the federal law

7  specifically, the Federal Brady Act, reading the next

8  paragraph, which is down near the bottom of that same

9  page that you were on for Number 4.  "Under federal

10 law, specifically the Federal Brady Act, 18 USC 922

11 (g)(9), permanent ban disqualifying individual from

12 possessing, purchasing, or receiving a firearm pursuant

13 to a misdemeanor conviction of domestic violence.

14 James is currently prohibited from firearms and

15 ammunition possession for life."  Do you see where you

16 said that?

17          A.   Yes.

18          Q.   That's incorrect, isn't it?

19          A.   No.

20          Q.   Okay.  Did you point out to the Court

21 that he has no conviction for domestic violence, no

22 misdemeanor conviction for domestic violence?

23          A.   Yes.  But not in that paragraph.

24          Q.   The next paragraph --

25          A.   No, I'm sorry.  Yes, it is in that

26 paragraph.

1          Q.   You point out to the magistrate that he
2   has no misdemeanor convictions in California for
3   domestic violence, do you?  You talked about this
4   paragraph right here?
5          A.   Yes.
6          Q.   You did not, did you?
7          A.   Yes.
8          Q.   You did?
9          A.   You are correct.
10         Q.   So I'm correct about that?
11         A.   Yes.
12         Q.   Your next paragraph said, "Upon
13  reviewing," this is the next page, like the third
14  paragraph down.  It's kind of in the middle of the
15  paragraph.  "Upon reviewing the original documents, I
16  noted James listed his residential address as 4216
17  South Mooney Boulevard, Suite 350, and failed to
18  divulge a misdemeanor conviction for domestic battery
19  on the federal ATF 4473 form."  Where did you get that
20  information?
21         A.   From the form itself, a copy of the
22  form.
23         Q.   So you didn't see him indicating that he
24  had a misdemeanor conviction on that form; correct?
25         A.   Correct.
26         Q.   And as far as you know, again, you did

```
 1   that CII check.  He has no misdemeanor conviction in
 2   California for domestic violence; right?
 3            A.    Correct.
 4            Q.    So that's a false statement, isn't it?
 5            A.    No.
 6            Q.    Now, let me ask you about this 242 --
 7            THE COURT:  Hold on.  Why is that not a false
 8   statement?
 9            THE WITNESS:  Again, this is federal -- this
10   is a federal form.  So under federal law he is
11   prohibited for a domestic violence-related conviction.
12            THE COURT:  Right.
13            THE WITNESS:  Under this section I'm talking
14   about the federal form.  He violated federal law by
15   checking he had no convictions.
16            THE COURT:  Oh, the person would have to
17   understand the difference between the definition
18   federally of domestic violence conviction versus the
19   California definition?
20            THE WITNESS:  If I could read from the
21   federal form.
22            THE COURT:  Sure.
23            THE WITNESS:  Specifically, "Have you ever
24   been convicted in any court of a misdemeanor of
25   domestic violence."  So he wrote "no."  So his
26   misdemeanor battery, the person he battered, was his
```

1  wife.  So how could that not be a misdemeanor domestic
2  battery?

3          THE COURT:  I would think it would depend --
4  in California, as a judge, I don't label a 242 as a
5  domestic violence conviction.  I can see under federal
6  law where that might be, or is, in fact.

7          MR. RUMERY:  It's not.  I'm telling you does
8  not.

9          THE COURT:  Okay.  Well, we'll have to look
10  at that.  Go ahead.
11  BY MR. RUMERY:

12          Q.  You didn't point out to the magistrate
13  here that Mr. James -- I'm talking about just on this
14  section here, what we're talking about -- you didn't
15  point out to the magistrate that Mr. James might have
16  been mistaken in terms of the difference between what
17  you're claiming to be federal law and what he
18  understood to be state law, did you?

19          A.  I'm just stating the facts that were on
20  the form.

21          Q.  That's fine.  But you also know from
22  doing your CII check for California that Mr. James does
23  not have a domestic violence conviction, does he?

24          A.  On the CII?  Correct.

25          Q.  Were you aware in terms of your
26  investigation that in 2008 that battery conviction had

1  been expunged?

2          A.    I was not aware of that.

3          Q.    What is the effect of an expungement, if
4  you know, on the Brady Act, if you know?  If you don't
5  know, tell us you don't know.

6          A.    I wouldn't know that, no.

7          Q.    That's fine.

8          The next paragraph is Number 7 of the
9  motion.  Do you see where that is?  "James' act of
10  falsifying or failing to divulge information on the
11  state DRS form is a violation of P.C.
12  Section 12076(c)(1).  Any person knowingly furnishes
13  incorrect information for the electronic transfer of
14  firearm and James falsifying or failing to divulge
15  information on the federal, is a violation of 18 USC
16  922(g)(9), permanent ban disqualifying an individual
17  from possessing, purchasing, or receiving firearm
18  pursuant to misdemeanor conviction of domestic
19  violence."  Do you see that?

20          A.    Yes, sir.

21          Q.    So if James put on the state form -- let
22  me ask you this:  In terms of what you're declaring
23  here, is that he did not put on the state form that he
24  had a domestic violence conviction; right?

25          A.    No.

26          Q.    Is that what you're saying?

1        A.   No.   On the state form he did not use
2   his residential address.

3        Q.   And what does that form state in terms
4   of putting an address?

5        A.   It needs to be your residential address
6   at the time the firearm was purchased.

7        Q.   Does the form state "residence" or
8   does -- what does it state?

9        A.   On the front of the form it says "street
10  address."  On a subsequent page under the definitions
11  of each section, it states "street address" -- "your
12  residential address."  I'm sorry.

13       Q.   Does it say "street" or "residence"?

14       A.   "Residence."

15       Q.   Okay.  And so are you saying the false
16  information on the state form was that he didn't put
17  his residence address?  Is that what you're saying?

18       A.   Correct.

19       Q.   How come you didn't say that in this
20  paragraph, the false information was not putting the
21  correct address on the form?

22       A.   Because I stated it in another section.

23       Q.   But you didn't state it here, did you?

24       A.   It's already stated somewhere else in
25  the search warrant.

26       Q.   Your next paragraph is you say, "James'

1  criminal history showed 1996 conviction for PC 242,
2  battery."  You say in that paragraph, "Under the
3  Federal Brady Act, James is prohibited from firearms
4  and ammunition possession for life."  That's what you
5  declared to the judge?

6          A.   I believe so, but I don't know where
7  you're at.  I'm sorry.  I lost you here.

8          Q.   It's actually the very first paragraph
9  under your section entitled "Opinion."  Do you see
10 where it's "Opinion," in your search warrant?

11         A.   Yes.

12         Q.   The pages are not numbered.  So I'd
13 direct you to a page number if I could, but I can't.

14         A.   Yes, I'm with you.

15         Q.   The very first paragraph under
16 "Opinion."

17         A.   Yes.

18         Q.   Then the next paragraph, Number 9, you
19 said, "It is the belief of your affiant that James has
20 intentionally falsified to divulge information under
21 4473 and state DRS forms with the intent to illegally
22 gain possession of firearms, a violation of Penal Code
23 Section 12076(c)(1)."  Do you see that?

24         A.   Yes, sir.

25         Q.   What information are you saying that he
26 intentionally failed to divulge?

1      A.    Going back to him putting down his post
2  office box address as opposed to his residential
3  address on both the state and federal forms.  On the
4  federal form he didn't even put his suite number down.
5  So it's not even an entire address at all.  On the
6  federal form, again, the misdemeanor domestic violence
7  conviction specifically stating "no" on that one.  So
8  taking that into account.

9      Q.    Isn't the -- isn't what you're trying to
10 do with the magistrate in terms of getting this
11 affidavit approved, or your search warrant approved is
12 to convince the magistrate that he has a domestic
13 violence conviction, which he didn't divulge; correct?

14     A.    That is part of it, yes.

15     Q.    Okay.  And that's part of what you meant
16 by that paragraph, is that he didn't put down a
17 domestic violence conviction; correct?

18     A.    Part of it, yes.

19     Q.    Okay.  And like you've already
20 testified, under your CII research, there is no
21 domestic violence conviction in California, is there?

22     A.    Yes.

23         THE COURT:  I'm a little confused by those
24 questions.  So any battery conviction makes you under
25 the Federal Brady Act prohibited for life from owning a
26 firearm, any 242 battery?

1        THE WITNESS:  No.  If the original charge was

2   domestic-violence related, 273.5 or 243(e)(1) in

3   California law, in our California Penal Code, if that

4   was the original arrest and charge, and then later on

5   through court proceedings it's plea bargained down to a

6   lesser offense, like 242, under federal law it still

7   carries the weight.

8        THE COURT:  I understand that.  But any 242

9   conviction --

10       THE WITNESS:  If you were originally arrested

11  for 273.5 --

12       THE COURT:  Let's say you were arrested for a

13  242 and you're convicted of a 242.

14       THE WITNESS:  No, it would not be a lifetime

15  prohibition.

16       THE COURT:  But that's not what you say in

17  the first sentence under your opinion.  It says,

18  "James' criminal history showed a 1996 conviction for

19  PC 242 battery.  Under Federal Brady Act, 18 USC, James

20  is prohibited from firearms and ammunition possession

21  for life."  But that's not true.

22       THE WITNESS:  I've already explained up here.

23       THE COURT:  Yeah, but this is just by itself

24  you're saying a criminal history shows a conviction --

25  you don't even mention domestic battery in this

26  sentence.  You just say 242 battery conviction.

1        THE WITNESS:  So for future reference, you
2   would like me to reiterate all the points I've already
3   made in the opinion section?

4        THE COURT:  Well, you go to great lengths to
5   mention it every single time above, that it's a
6   domestic violence battery.  And then in your opinion
7   you don't mention that.  And when I was reading that, I
8   thought I guess any 242 battery conviction, then, is a
9   violation of federal law for life.  Apparently that's
10  not the case.  Okay.  Go ahead.

11        MR. RUMERY:  It's not.
12  BY MR. RUMERY:

13        Q.   The next paragraph I'll point out to you
14  is Number 10 in the motion, which is also under your
15  opinion section.  It's in the middle of the second
16  paragraph, starting with the word proof.  Do you see
17  that about halfway through that second paragraph.

18        A.   Yes.

19        Q.   "Proof of his illegal intention as
20  evidenced under federal ATF 4473 and state forms
21  documenting James' attempted purchase of a rifle on
22  January 7th from Big 5.  These documents showed James'
23  willingness to provide false information and
24  intentionally failing to divulge information on the
25  4473 and state DRS forms by illegal means."

26              Aren't what you're saying here is that

1  what he failed to put in these forms is he had a
2  domestic violence conviction?  Isn't that what you're
3  trying to communicate to the magistrate?

4          A.   Again, that's part of what I just
5  stated, yes.

6          Q.   Okay.  And you know that, as far as
7  Mr. James is concerned, he doesn't have a domestic
8  violence conviction; right?  So if he puts down, "No, I
9  don't have any domestic violence conviction," as far as
10 he's concerned, he's stating the truth; correct?

11         MS. KAELBLE:  Objection; calls for
12 speculation.

13         THE COURT:  Sustained.
14 BY MR. RUMERY:

15         Q.   Well, wouldn't you think that he would
16 be stating the truth if he put that down, if he knows
17 he doesn't have a domestic violence conviction?

18         MS. KAELBLE:  Objection; calls for
19 speculation.

20         THE COURT:  Sustained.
21 BY MR. RUMERY:

22         Q.   Were you aware at the time that you
23 wrote this affidavit that there was a civil matter
24 proceeding about his -- the legality of him owning or
25 possessing firearms; correct?

26         A.   I knew there was a civil matter with the

```
 1   state.  I didn't know what it was regarding.
 2            Q.  You're telling me Kimberly Granger
 3   didn't tell you what it was about?
 4            A.  If she did, I don't remember it.
 5            Q.  She didn't tell you he was trying to
 6   determine if he could own or possess firearms?
 7            A.  I had no knowledge of that.
 8            THE COURT:  Wait, wait.  So what was your
 9   understanding of why she told you on --
10            MR. RUMERY:  The 26th.
11            THE COURT:  -- July 26th, "This is what he's
12   testifying about"?  What did that mean to you?
13            THE WITNESS:  What I was informed is on the
14   26th I received a telephone call saying, hey, this guy
15   in your region -- because we have a region that we
16   cover -- was in a civil deposition yesterday.  He's
17   prohibited and he stated specifically he has guns.  So
18   I got his name, date of birth, his information, and I
19   ran criminal history, all that paperwork, to see if he
20   was prohibited and if he had firearms registered to
21   him.
22            THE COURT:  And she didn't tell you anything
23   else about why there was a deposition?
24            THE WITNESS:  I do not get involved in civil
25   matters.  I have no bearing on my case.
26            THE COURT:  Okay.  She didn't tell you that
```

1   he's disputing that he has a right to own the firearms.

2           THE WITNESS:  If she did, I did not take note

3   of it.

4           THE COURT:  Okay.

5   BY MR. RUMERY:

6           Q.   She was present on the day of the search

7   warrant; right?

8           A.   Yes.

9           Q.   What was the reason of her being

10  present?

11          MS. KAELBLE:  Objection; relevance.

12          THE COURT:  Overruled.

13          THE WITNESS:  I don't know.

14  BY MR. RUMERY:

15          Q.   Did you talk with her on that date?

16          A.   Yes.

17          Q.   What was her involvement in the search

18  warrant?

19          MS. KAELBLE:  Objection; relevance.

20          THE COURT:  Overruled.

21          THE WITNESS:  She was present but not an

22  active participant.

23  BY MR. RUMERY:

24          Q.   What was she doing?

25          A.   Present.  Just standing there.

26          Q.   Did she go over any paperwork with you?

```
 1          A.   Not to my knowledge, no.
 2          Q.   Did you review with her?
 3          A.   No.
 4          Q.   Did you consult her for any reason?
 5          A.   No.
 6          Q.   Ask her any questions?
 7          A.   No.
 8          Q.   Did she provide you with any
 9  information?
10          A.   No.
11          Q.   Did she tell you what she was looking
12  for?
13          A.   She didn't search.
14          Q.   Did she tell you what she hoped you
15  found?
16          A.   No.
17          Q.   She's not a law enforcement officer, is
18  she?
19          A.   No.
20          Q.   Based on your training, do you know if
21  it's a violation of a person's Fourth Amendment rights
22  if someone is present at a search warrant who has no --
23  a third party who has no reason to be there?
24          MS. KAELBLE:   Objection; relevance and beyond
25  the scope.
26               (Record read)
```

1          THE COURT:  Sustained.

2          MR. RUMERY:  It's just another potential --

3          THE COURT:  I sustained the objection.

4          MR. RUMERY:  -- suppression grounds, your

5   Honor.  That's why I asked the question.

6          THE COURT:  I sustained the objection.  Next

7   question.

8          MR. RUMERY:  I'm just trying to let you know

9   why I was going there so you can maybe change your

10  mind.  Sorry.

11  BY MR. RUMERY:

12         Q.   Did you know at the time if Mr. James

13  was being represented by an attorney?

14         MS. KAELBLE:  Objection; relevance.

15         MR. RUMERY:  It has to do with the search

16  warrant.

17         THE COURT:  In what way?

18         MR. RUMERY:  Was he present.

19         THE COURT:  The attorney?

20         MR. RUMERY:  Yes.  Leonard Herr.

21         MS. KAELBLE:  That's not relevant to whether

22  the search warrant -- whether there was probable cause

23  for the search warrant for the 1538.

24         THE COURT:  Sustained.

25  BY MR. RUMERY:

26         Q.   The next paragraph is near the bottom of

1  the first page under your opinion section. You say,
2  "Your affiant believes James will have retained
3  documentation, federal ATF 4473 and state DRS forms of
4  the previous seven attempted illegal purchases of
5  firearms at his residence, 630 West Cherry Court,
6  Visalia, California, 93277, further supporting the fact
7  of James' illegal intention of possessing firearms.
8  His signature on both federal and state forms certifies
9  the information provided by the purchaser is true and
10  correct, and any incorrect information can be
11  punishable understate P.C. Section 118(a) for perjury."
12  Do you see that?
13          A.   Yes, sir.
14          Q.   You had no information that Mr. James
15  had any of this documentation in his house, did you?
16          A.   This is my opinion.
17          Q.   But you had no information that he did,
18  did you?
19          A.   Correct.
20          Q.   The next paragraph, "Your affiant
21  believes copies of these California DOJ deny letters
22  will be in James' possession." Do you see that?
23          A.   Yes.
24          Q.   You had no information that was true
25  either; correct?
26          A.   Again, this is just my opinion.

1          Q.    Okay.  You had no information you could
2  back it up with to provide to the magistrate, could
3  you?
4          A.    Correct.
5          Q.    In your discussions with -- what was the
6  purpose of getting a search warrant in this case?
7          A.    To locate documents supporting the
8  attempted purchase of firearms and the seizure of any
9  illegal firearms in his possession.
10          Q.    Was there any discussion with Miss
11  Granger about trying to obtain that information through
12  any discovery requests in the civil case?
13          A.    Again, no.  I don't handle -- I don't
14  deal with the civil stuff.
15          Q.    Okay.  Was Granger's suggestion to you
16  to seek a search warrant?
17          A.    No.
18          Q.    Why was she talking to you the very next
19  day after the deposition?  Did she contact you?
20          MS. KAELBLE:  Objection; calls for
21  speculation.
22          THE COURT:  Sustained.
23          MR. RUMERY:  The question was did she contact
24  you.
25          THE COURT:  I'll allow that.
26  ///

1    BY MR. RUMERY:

2            Q.    Did she contact you?

3            A.    Through the chain of command, yes, she
4    did.

5            Q.    So she's the one that got ahold of you
6    the day after the deposition; correct?

7            A.    Through the chain of command.  She went
8    through her chain, which came down through my chain.
9    They told each of us to get ahold of each other.

10           Q.    In that conversation with her the day
11   after the deposition, was she communicating to you that
12   she wanted you to investigate further and seek a search
13   warrant?

14           A.    No.

15           Q.    Who authorized you -- who is the one
16   that instructed you to seek a search warrant?

17           A.    Myself.

18           Q.    Is there a normal resource Department of
19   Justice operates under when someone comes -- when it
20   comes to your attention that somebody might be
21   prohibited from having firearms, has firearms, or to
22   try and obtain firearms?  Is there a normal course of
23   procedure to send them a letter?

24           MS. KAELBLE:  Objection; relevance.

25           THE COURT:  Overruled.

26   ///

1  BY MR. RUMERY:

2          Q.    Did you try and make contact with him,

3  asking them to show you the weapons?  What's the normal

4  procedure?

5          A.    There's different avenues you can take.

6  And one of the avenues would be conducting a knock and

7  talk at the house.  So going up to the door and

8  knocking on the door and asking him, "Do you have these

9  guns?"

10          Q.    Did you do a knock and talk?

11          A.    Did not, no.

12          Q.    And what's the other avenues?

13          A.    Search warrant would be the other one.

14          Q.    Okay.  On this one you say it was your

15  idea to do the search warrant and no one suggested you

16  do this?

17          A.    Correct.

18          Q.    How did you get that conversation

19  assigned to you.  That was your assignment from Miss

20  Granger?

21          A.    Yes.

22          Q.    She assigned you?

23          A.    No, it came through my chain of command.

24          Q.    And that is?

25          A.    I have a supervisor and then it went

26  from the bureau chief down to the special agent in

1  charge and to the special agent supervisor, followed by
2  me.

3         Q.   And do you know if any of those people
4  above you had contact with Miss Granger?  That's only
5  if you know.

6         A.   Yes, I'm sure they did.

7         Q.   Okay.  Do you know was Miss Granger
8  invited to the search warrant?  Did you let her know it
9  was being executed?

10        A.   I don't know if I specifically told her,
11 but we had teams from San Francisco and Sacramento
12 present for the search warrant, and she is associated
13 with the Sacramento team.

14        Q.   You don't know how it was that she wound
15 up being there?

16        A.   She came down with the Sacramento team.

17        Q.   When you're preparing the search
18 warrants, did you also let the magistrate know that at
19 the same time you're seeking a search warrant, that
20 there was a civil matter proceeding in the courts?  Did
21 you let the magistrate know that?

22        MS. KAELBLE:  Objection; relevance.

23        THE COURT:  Overruled.

24        THE WITNESS:  No, because I didn't have
25 knowledge of it, either.

26 ///

1    BY MR. RUMERY:

2             Q.    You were in communication with Miss
3    Granger; correct?

4             A.    On the 26th, yes.

5             Q.    Let me ask you one other question.  On
6    the denial letter that we already talked about, the one
7    from Big 5 --

8             A.    Yes.

9             Q.    -- was that denial from Department of
10   Justice?

11            A.    Yes.

12            Q.    Was it quoting federal law or state law?

13            A.    It states both.

14            Q.    Okay.  And in that letter there is no
15   indication that the conviction actually was for the PC
16   242, does it?

17            A.    No, it does not specify.

18            Q.    When you were doing your investigation,
19   did you learn that in 2008 that Mr. James had a
20   concealed weapons permit?

21            A.    Not during the initial phases of the
22   investigation.  I think I learned that the day of the
23   search warrant.  I think Mr. James told me that.

24            Q.    So you didn't know it before the search
25   warrant was executed?

26            A.    That's correct.

1    Q.    When you were doing these various
2  checks, the AFS, ATFS, the CII, does that not come up
3  that the person has a concealed weapons permit?
4          A.    No.
5          Q.    It wouldn't come up on the ATFS?
6          A.    No.
7          Q.    Is there any other search mechanisms
8  that's available to you where that information would've
9  come up?
10          A.    I don't have any experience with CCW.
11  That happens in a different branch of the bureau under
12  a different branch.  They're all civilian employees
13  that work in that area.  I believe there is a way to
14  get to the CCW permits in the ABS database, but I don't
15  know how to do that.  That's under that civilian side
16  of the law -- Bureau of Firearms.
17          Q.    I think I touched on this before.  I
18  don't remember.  Are you saying the expungement of the
19  battery didn't show up, either, on the CII?
20          A.    No.
21          Q.    Huh?
22          A.    No.
23          Q.    Wouldn't that show up on somebody's
24  criminal history record?
25          A.    An expungement?  Yes.
26          Q.    It would?

1          A.    Yes.

2          Q.    And you're saying you didn't see that?

3          A.    No.

4          Q.    Didn't come up?

5          A.    No.

6          Q.    During your investigation did you know

7    anything about the expungement?

8          A.    No.

9          MR. RUMERY:    I don't have any further

10   questions at this time.

11                    CROSS-EXAMINATION

12   BY MS. KAELBLE:

13         Q.    You indicated that Miss Granger had

14   contact with you on July 26th of 2011.  Was that in

15   person or telephone?

16         A.    Telephone.

17         Q.    You indicated later on she e-mailed you

18   a few pages of the transcripts of the deposition; is

19   that correct?

20         A.    Correct.

21         Q.    And those pages of the transcript were

22   the only pages that you reviewed?

23         A.    Yes.

24         Q.    Was that -- so that was sometime after

25   July 26th, somewhere around there?

26         A.    Yes.

1    Q.   So you didn't have the last page of the
2 transcript with a signature from the court reporter; is
3 that correct?

4    A.   That's correct.

5    Q.   So you don't know if this was an
6 unofficial or official transcript that had been sent?

7    A.   Correct.

8    Q.   Now, you have received training from the
9 Department of Justice regarding the Brady Act; is that
10 correct?

11    A.   Yes.

12    Q.   Do you remember approximately when you
13 attended that training?

14    A.   It would have been at the start of my
15 time in Bureau of Firearms.  So you do the math.  It
16 would have been in 2009, possibly early 2010.

17    Q.   Okay.  And how much training did you
18 receive regarding the Federal Brady Act?

19    A.   It was an eight-hour course put on by
20 the Bureau of Alcohol, Tobacco, and Firearms.

21    Q.   And during that eight-hour class, what
22 did you learn relating to the definition of a
23 misdemeanor conviction of domestic violence?

24    A.   Okay.  The definition of the misdemeanor
25 conviction would have been the original arresting
26 charge would factor what the ultimate outcome of the

1   conviction would be.  So if the original charge arrest
2   was for domestic violence in the State of California,
3   273.5 or 243(e), no matter what the court proceedings
4   after that date were to take effect, and in this case I
5   think a plea bargain down to 242, it would still carry
6   the weight of a domestic violence misdemeanor
7   conviction.

8         Q.   Okay.  So then under the Federal Brady
9   Act, if a person has that sort of a conviction that
10  originated from 273.5 or 243(e), even if it was later
11  pled out as a 242, that would restrict a person from
12  possessing a firearm for the rest of their life; is
13  that correct?

14        A.   That is correct.

15        Q.   After this training on the Federal Brady
16  Act, over the next few years, as you were working at
17  the Department of Justice, is that the way the law was
18  explained to you?

19        A.   Yes.

20        Q.   And with regards to investigations, were
21  you involved in any other investigations relating to
22  this particular type of an issue or is this the first
23  one that you've come across with this issue?

24        A.   This is the first one I've ever seen a
25  242 on.

26        Q.   Okay.  In this particular case, prior to

1  writing the search warrant, did you see the copy of the
2  firearms denial letter that had been sent to Scott
3  James in January of 2011?  I can show it to you.
4          A.   Yes, the denial letter, I got that from
5  Big 5.
6          Q.   This is the one, it's attached to the
7  People's motion, People's Exhibit 1.  It's from the
8  Department of Justice to the defendant, dated
9  January 10th of 2011.  Do you have that?
10          A.   Yes.
11          Q.   So you have reviewed that letter prior
12  to writing the search warrant?
13          A.   Yes.
14          Q.   And in that letter you -- it explained
15  to the defendant that he was prohibited from purchasing
16  or possessing firearms due to the Federal Brady Act; is
17  that correct?
18          A.   That is correct.
19          THE COURT:  So I need some clarification.
20  This letter came from the California Department of
21  Justice?
22          MS. KAELBLE:  Yes.
23          THE COURT:  So in 2008 the same department
24  issues him a gun permit?
25          MS. KAELBLE:  I can get into that, your Honor
26  and clarify some of that information.

1          THE COURT:  I'm going to need some

2    clarification on that.  But we'll do that when we come

3    back at 1:30.  Why don't you report back at -- no,

4    report back at 1:30 and we'll decide what to do.

5                         (Recess)

6          THE COURT:  We'll resume the 1538.5 matter.

7    People versus Scott James.  You may resume the witness

8    stand.

9               You may continue.

10   BY MS. KAELBLE:

11        Q.    Before we took the break for lunch we

12   were talking about this 2008 letter from the Department

13   of Justice to the Tulare County Sheriff's Department

14   relating to a concealed weapons permit.  First of all,

15   when you run the defendant's CII number, does that give

16   you information about documents that have been sent out

17   from DOJ?

18        A.    No, it does not.

19        Q.    So were you aware of the concealed

20   weapons permit at the time when you wrote the search

21   warrant?

22        A.    No, I was not.

23        Q.    Okay.  Now, during your training at the

24   Department of Justice did you learn some information

25   about the enforcement of the Brady Act in approximately

26   2007 and 2008 and what was happening in California?

1          A.    Yes.

2          Q.    What did you learn during your training?

3          A.    Are you talking about maybe absence in

4    the Department of Justice at the time?  Is that what

5    you mean?

6          Q.    What was happening with regards to the

7    enforcement of the federal Brady Act in approximately

8    2007 and 2008 in California.

9          A.    There was a period during that time

10   where the Department of Justice was growing in size.

11   People were being transferred around, moved out of one

12   area into another area.  So during that time there was

13   a lapse where we actually had civilian employees that

14   were trained to do background checks for Brady Act

15   violations.

16         Q.    Okay.  So during that time if somebody

17   was, in fact, in violation of the federal Brady Act,

18   they could not have a firearm, was that something that

19   was getting missed during some of the checks in 2007

20   and 2008?

21         A.    Yeah, there's a possibility of that,

22   yes.

23         Q.    And later on in 2008 or in 2009 did

24   everybody start getting requalified at Department of

25   Justice again regarding the Brady Act?

26         A.    Yes.

1          Q.    And is that -- and you said you attended
2    training regarding the Brady Act in 2009 or 2010; is
3    that correct?
4          A.    That is correct.
5          Q.    So in 2011, when you were actually doing
6    this investigation with regards to the defendant, your
7    agency was actively enforcing the law under the federal
8    Brady Act?
9          A.    That's correct.
10          Q.    A misdemeanor conviction related to
11    domestic violence was excluding somebody from firearm
12    possession for life?
13          A.    Correct.
14          Q.    Now, when you were doing some
15    investigation into this case in July of 2011, when you
16    were doing your searches in the different databases,
17    what exactly did you learn with regards to whether the
18    defendant actually was successful in purchasing any
19    firearms?
20          A.    He was successful one time purchasing a
21    handgun.
22          Q.    What year was he successful in
23    purchasing that handgun?
24          A.    I want to say it was 2008.
25          Q.    Would it refresh your recollection if
26    you took a look at your search warrant?

1          A.    Yes.

2          Q.    I'll have you do that.

3          MR. RUMERY:  Could you identify where you're

4   looking?

5          THE WITNESS:  Right now I'm looking in my

6   actual search warrant, a copy of it.

7          MR. RUMERY:  Just tell me where you find it,

8   if you find anything.

9          THE WITNESS:  Okay.  Under the investigation

10  section, if you flip over one more page, towards the

11  top there's the indent with the Number 1.  This is

12  Kimber.  At the end of that line it shows a purchase

13  date of February 8, 2007.

14  BY MS. KAELBLE:

15         Q.    So that's one of the firearms that he

16  successfully purchased.  Were there also -- you

17  mentioned earlier that there were seven other attempts

18  to purchase firearms that were not successful; is that

19  correct?

20         A.    That is correct.

21         Q.    And those attempts were not successful

22  because he was prohibited because of the conviction; is

23  that correct?

24         A.    That's correct.

25         Q.    Was that because of the domestic

26  violence conviction under state law or federal law, if

1 | you know?

2 |        A.   I do know.  Let me just get the dates
3 | from the paperwork here.  The only reason why I say
4 | that is if it was within the ten years, it would have
5 | been a state prohibition.  Anything outside that ten
6 | years would have been federal.

7 |        Q.   So the conviction was in 1996.  So up
8 | until 2006 it would have been under state law?

9 |        A.   That's correct.

10 |        Q.   And after that it would have been under
11 | the federal Brady Act?

12 |        A.   Yes.  I have those dates now.

13 |        Q.   What were those dates where he attempted
14 | to purchase firearms?

15 |        A.   Okay.  So from the previous page we're
16 | on where it said "Kimber," let's flip over one more
17 | page.  The top paragraph, which starts with "revealed
18 | James."  So we have attempted purchase in '99, again in
19 | 2007, another one in 2007, another one 2007, another
20 | one in 2007, 2008, and then 2011.

21 |        Q.   Those seven attempts were unsuccessful
22 | because of the prior conviction?

23 |        A.   Correct.

24 |        Q.   And were you made aware of the fact that
25 | during the deposition the defendant had admitted that
26 | he still owned that Kimber firearm?

1          A.   Yes.

2          Q.   And you knew about that prior to writing

3   the search warrant?

4          A.   Yes.

5          MR. RUMERY:  Could I have that question?

6               (Record read)

7   BY MS. KAELBLE:

8          Q.   Now, when you were at the residence

9   serving the search warrant, was the defendant at the

10  residence?

11         A.   Not initially.

12         Q.   Okay.  Did you call him or did he come

13  out to the residence?

14         A.   Yes.

15         Q.   Did you give him a copy of the search

16  warrant when he was at the residence?

17         A.   Yes.

18         Q.   Did you also give him a copy of the

19  inventory of all the items that were seized during the

20  search warrant?

21         A.   Yes.

22         Q.   And are all those items the same items

23  that are listed in the return for the search warrant

24  that was later filed with the Court?

25         A.   Yes.

26         Q.   So all that information was provided to

1    the defendant on the day of the search?

2              A.    Yes.

3              Q.    Now, when you were with the Department

4    of Justice, if you were involved in search warrants,

5    what areas of the state did you do these searches and

6    investigations?

7              A.    My region where I would be assigned

8    cases out of was considered the Central Valley, which

9    came from Kern County.  So Bakersfield area all the way

10   to Stanislaus County, Monterey County, all the way east

11   to the Nevada state line.  But then we also work

12   closely with San Francisco and Sacramento.  And our

13   regions we would be working cases on would be anywhere

14   from Bakersfield to Oregon.

15             Q.    And typically did you all work together

16   as a team with the other officers from Sacramento and

17   San Francisco as well?

18             A.    Yes.

19             Q.    And some of those officers were present

20   during the search warrants that you conducted here in

21   Tulare County?

22             A.    Yes.

23             Q.    And during that time frame and

24   approximately August, September, October of 2011, were

25   you involved in searches pretty frequently?

26             A.    Yes.

1          Q.    Approximately how far often, if you
2    recall?

3          A.    We would be serving a search warrant, if
4    not weekly, every other week.

5          Q.    What other sorts of activities were you
6    involved in?  What other duties did you have?

7          A.    Most of our enforcement activity
8    consisted of surveillances.  Then also knock and talks
9    on residences.

10          Q.    Now, between July of 2011 and October of
11    2011 when you wrote the search warrant and had the
12    search warrant signed, did you recheck any of the
13    information that you found in the computer databases
14    during that time?

15          A.    Yes.

16          Q.    Why would you recheck that information?

17          A.    I want to say on a weekly basis, if not
18    weekly, every other week.

19          Q.    Okay.  So in the search warrant you
20    indicate that you did some searches into some databases
21    on July 28th of 2011.  So approximately every other
22    week up until the search warrant was signed you
23    continued to verify that that information was still
24    true?

25          A.    Correct.

26          Q.    At any point when you rechecked this

1    information did you learn anything new that was not
2    found on July 28th when you first did the search?
3         A.    No, no new information.
4         Q.    Okay.  Do you happen to recall exactly
5    when the last time was it you checked that information
6    prior to the search warrant on October -- being signed
7    on October 4th?
8         A.    The day I went to have the search
9    warrant signed.
10        Q.    So that same day you checked everything?
11        A.    Yes.
12        Q.    You verified all the information was
13   still accurate?
14        A.    Yes.
15        Q.    Did you also do any follow-up with
16   regards to the address on Mooney or the address on
17   Cherry Court?
18        A.    The same day.
19        Q.    The same day the search warrant was
20   signed?
21        A.    Yes.
22        Q.    Why wasn't that included in the warrant?
23        A.    I already had the search warrant printed
24   out at that time when I came down here to do the final
25   checks.
26        Q.    Did you verbally tell the judge that you

1    followed up and had done any of the further
2    surveillance or further investigation?

3              A.    I don't recall.

4              Q.    Now, in the opinion section of your
5    search warrant you indicated that you believed that the
6    defendant would have certain documentation, denial
7    letters, attempts to obtain firearms from the past.  Is
8    there anything, based on your training and experience,
9    that led you to form that opinion?

10             A.    Yes.  From my experience, people who are
11   into firearms as a passion, they tend to have very
12   detailed and accurate records of their firearms
13   purchases, their inventory, where those firearms are
14   located, who has possession of them at that time.

15             Q.    Now, when you obtained actual documents
16   that the defendant filled out at Big 5 Sporting Goods,
17   did you go over those documents in the search warrant?

18             A.    Yes, I did.

19             Q.    On those documents that's where you
20   found the discrepancies between his criminal record and
21   the information that he filled out; is that correct?

22             A.    That's correct.

23             Q.    And you indicated that he has a
24   misdemeanor crime of domestic violence on his record
25   based on the federal Brady Act definition; is that
26   correct?

1                    A.    That is correct.

2                    Q.    But he did not include that on the

3    paperwork that he filled out at Big 5?

4                    A.    That is correct.

5                    Q.    And then also prior to the -- prior to

6    writing the search warrant, getting the search warrant

7    signed, you also reviewed the firearms denial form

8    letter that had been sent to the defendant on

9    January 10th of 2011 by the Department of Justice?

10                   A.    Yes.

11                   Q.    And also the document that went to Big 5

12   Sporting Goods on January 10, 2011, telling them not to

13   release the firearm because he is prohibited from

14   having a firearm?

15                   A.    Yes.

16                   Q.    Did you also -- during your

17   investigation did you also obtain some other copies of

18   older denials saying that he's not eligible to possess

19   a firearm; is that correct?

20                   A.    Correct.

21                   Q.    Those are from some of the other stores

22   that were still in business?

23                   A.    Yes.

24                   Q.    During all of your training at the

25   Department of Justice, when you were working as a

26   special agent there, were you consistently taught that

1   under the federal Brady Act act certain individuals
2   with misdemeanor convictions relating to domestic
3   violence are permanently prohibited from possessing
4   firearms?

5                A.    Yes.

6                Q.    Was that your clear understanding at the
7   time when the search warrant was written and when you
8   asked the judge to sign it?

9                A.    Yes.

10               Q.    Was that your understanding at the time
11  the search warrant was executed as well?

12               A.    Yes.

13               Q.    Now, with regards to a concealed carry
14  permit, is there anything that you're aware of that
15  requires concealed carry permit issued by a county to
16  be entered into some sort of Department of Justice
17  database?

18               A.    My limited knowledge of CCW is -- how it
19  works is everything's almost done at the county level.
20  The only thing submitted to DOJ is the actual criminal
21  history check.

22               Q.    So the county asks for a criminal
23  history check.  Once that's done, a letter will go back
24  to the county?

25               A.    Correct.

26               Q.    So in this particular case you were not

```
 1    aware of a CCW permit from 2008 to 2010?
 2              A.   Correct.
 3              Q.   And your investigation was later on
 4    after this CCW expired; is that correct?
 5              A.   That's correct.
 6              THE COURT:  Could you read that back, please?
 7                   (Record read)
 8              THE COURT:  When did it expire?
 9              MS. KAELBLE:  Mr. Rumery --
10              MR. RUMERY:  It had been 2010.  It's a
11    two-year permit before you can renew it.  He got it in
12    2008.
13              MS. KAELBLE:  There's a copy of it attached
14    to Mr. Rumery's Exhibit A:  10/16/08 and expires
15    10/16/10.
16              MR. RUMERY:  I think it's Exhibit B.
17    BY MS. KAELBLE:
18              Q.   During your investigation did you go out
19    to this address at 4216 South Mooney Boulevard that was
20    put on the forms that the defendant filled out at the
21    Big 5 when he attempted to purchase a firearm?
22              A.   Yes.
23              Q.   Is that a residential address?
24              A.   No, it's not.
25              Q.   What is it?
26              A.   It's a UPS Store.
```

1          Q.     And did you also, during your
2   investigation, determine that his true residence was on
3   Cherry Avenue?
4          A.     Yes.
5          Q.     Did you go out to that location?
6          A.     Yes, I did.
7          Q.     You went out to that location prior to
8   the search warrant and then to actually serve the
9   warrant; correct?
10         A.     Yes.
11         MS. KAELBLE:   Just a minute, your Honor.
12   BY MS. KAELBLE:
13         Q.     Earlier during lunch break did you do a
14   little research to determine if you could find the
15   further definition of the misdemeanor crime of domestic
16   violence under 18 USC 922(g)(9)?
17         A.     Yes.
18         Q.     Okay.   And based on that information
19   I'll show you this document.   Is this the document that
20   you found to be consistent with the information that
21   you had been taught while you worked at the Department
22   of Justice at the training regarding the Brady Act?
23         A.     Yes, it is.
24         Q.     Okay.   According to that, does it
25   specifically say that the misdemeanor crime of domestic
26   violence actually has to be something such as a 273.5

1   or 243(e)?

2           A.   No, it does not.

3           MR. RUMERY:   Where are you looking?

4           MS. KAELBLE:   If you look at the bottom of

5   the first page, top of the second page.

6   BY MS. KAELBLE:

7           Q.   If you could just -- if you could read

8   the bottom paragraph of the qualifying offenses,

9   please.

10          A.   "Qualifying offenses as enacted the

11  statute defines misdemeanor crime of domestic violence

12  MCDV as any state or federal misdemeanor that has an

13  element, the use" -- "has an element, the use or

14  attempted use of physical force or the threatened use

15  of a deadly weapon committed by a current or former

16  spouse, parent, or guardian of the victim by a person

17  with whom the victim shares a child in common, by a

18  person who is cohabitating with or has cohabitated with

19  the victim as a spouse, parent, or guardian, or by a

20  person similarly situated to a spouse, parent, or

21  guardian of the crime."

22          Q.   If you could continue on to the next

23  page.   Does it further state this definition includes

24  all misdemeanors that involve the use or attempted use

25  of physical force, e.g., simple assault, assault and

26  battery, if the offense is committed by one of the

1    defined parties?

2            A.   Yes.

3            MS. KAELBLE:  Your Honor, I would ask that

4    that document be marked as People's Exhibit 1 and be

5    admitted into evidence.

6            THE COURT:  It will.

7            (People's Exhibit 1, Brady Act document,

8    received into evidence.)

9            MS. KAELBLE:  I don't have any other

10   questions at this time.

11           MR. RUMERY:  May I approach the witness?

12           THE COURT:  Yes.

13           MR. RUMERY:  I'm going to show him this.

14                    **REDIRECT EXAMINATION**

15   BY MR. RUMERY:

16           Q.   You're not the only one that did

17   research over the lunch hour.  I'd like to ask you to

18   look at that.  Do you see at the top it's interpreting

19   18 USC 922 (g)(1-9)?  Do you see that?

20           A.   Yes.

21           Q.   That's the section that you quoted in

22   your search warrant; correct?

23           A.   Yes.

24           Q.   And does that at the top say, "Firearm

25   possession prohibition"?  Do you see where it says that

26   at the top?

1          A.   Yes.

2               Q.   And then if you go down to Number 9, you

3     see Number 9 says -- first of all, is there nine

4     categories on this document?  Do you see nine different

5     categories?

6          A.   Yes, sir.

7               Q.   Different types of people that are

8     prohibited from possessing a firearm?  You see Number 9

9     says a person has been convicted of misdemeanor crime

10    of domestic violence?

11         A.   Yes.

12              Q.   And you see that that says the person

13    has to be convicted of that crime.  Do you see that?

14         A.   It does.

15              MR. RUMERY:  Your Honor, I'd ask to move this

16    definition in as an exhibit for the Court.

17              THE COURT:  It will be marked as Defendant's

18    B and received.

19              (Defense Exhibit B, document, was marked for

20    identification.)

21    BY MR. RUMERY:

22              Q.   At any point in your investigation --

23    this original arrest for domestic violence, who did you

24    understand that to be with?

25              MS. KAELBLE:  Objection; relevance.

26              THE COURT:  Sustained.

1 | BY MR. RUMERY:
2 |          Q.   I'm talking about -- well --
3 |          MR. RUMERY:  It's the core issue, your Honor.
4 | Ultimately just a battery conviction.  Who was it
5 | involving?
6 |          MS. KAELBLE:  Your Honor, we're not here to
7 | litigate whether or not --
8 |          THE COURT:  Yes, it was a 273.5.  That's
9 | undisputed that the charge is a 273.5.
10 |          MR. RUMERY:  I understand.
11 | BY MR. RUMERY:
12 |          Q.   Did you ever identify who the victim was
13 | in that case?
14 |          MS. KAELBLE:  Objection; relevance.
15 |          THE COURT:  Sustained.
16 | BY MR. RUMERY:
17 |          Q.   Did you ever talk to the victim in the
18 | case?
19 |          MS. KAELBLE:  Objection; relevance.
20 |          THE COURT:  I guess it could be relevant if
21 | it turned out it wasn't --
22 |          MS. KAELBLE:  We're not here to litigate
23 | whether or not it actually was a spouse or anything
24 | like that.  All we need to know is was there probable
25 | cause for him to believe, based on the items he
26 | reviewed --

1    THE COURT:  Correct.  I'm sustaining the
2 objection.

3    MR. RUMERY:  Your Honor, I do have for the
4 Court, which I'd like to offer as an exhibit, a
5 declaration from the wife.

6    THE COURT:  But none of that would have been
7 known to this officer.  It just goes to his good faith
8 belief.  I don't need to know that, because all the
9 officer knew, and I don't think the law requires him to
10 go beyond the charging allegations.

11 BY MR. RUMERY:

12    Q.   Do you know who the victim was in the
13 242 battery that Mr. James took a plea for?

14    MS. KAELBLE:  Objection; relevance.

15    MR. RUMERY:  No, it's not irrelevant.  If
16 it's not a spouse.

17    THE COURT:  Sustained.

18    MR. RUMERY:  If it's not a spouse, your
19 Honor, then it's not -- that's what the declaration
20 here would say.

21    THE COURT:  Can I see People's Exhibit 1?
22 Sustained.

23    MR. RUMERY:  On what --

24    THE COURT:  I don't think it's relevant.

25    MR. RUMERY:  Could I say why it's relevant?
26 They offered some writing that's from a resource

1  manual.  It's not the statute itself.  It's from some

2  resource manual, some interpretation by somebody.  We

3  don't even know.  Even if you go on to read that

4  paragraph that she cites to, it goes on to read, "This

5  interpretation is subject to litigation."  We don't

6  know the results of any litigation over this.  So this

7  is not anything that I think is relevant for the Court

8  to consider.

9           But my question was, does he even know

10 who the victim is on the 242 conviction?  That's all.

11 Does he know who the victim was?  Because if he doesn't

12 know and there's no evidence there was a spouse, then

13 this is irrelevant what she just offered.  So that's

14 why I was asking.

15           MS. KAELBLE:  Your Honor, it's just shifting

16 the issue from whether there's probable cause based on

17 the information that he possessed from the records that

18 he looked at, from looking at the rap sheet, from

19 looking at everything else.  It's shifting from that

20 into doing a complete new investigation into the old

21 crime to determine whether there was a factual basis

22 for it.  That's not required.

23           THE COURT:  Yeah.

24           MR. RUMERY:  I think there's got to be some

25 evidence or proof that there's a domestic violence.

26 All the stuff that we've seen so far are replete with

1  mistakes. I'll point out another one to him in just a

2  minute. But there's so much mistakes, misinformation

3  that's been throughout this case --

4          THE COURT: My ruling is I'm sustaining the

5  objection.

6  BY MR. RUMERY:

7          Q.  Going back to the January 10, 2011, DOJ

8  letter. Do you have that in front of you?

9          A.  The letter sent to Mr. James or the

10  letter sent to the store?

11          Q.  The letter sent to Mr. James.

12  January 10, 2011, letter.

13          A.  Yes, I have it.

14          Q.  And signed by a Jerry Kanelos,

15  K-A-N-E-L-O-S. Do you see that?

16          A.  Yes, sir.

17          Q.  Okay. On the bottom of the first page,

18  very last paragraph, she's indicating to Mr. James that

19  his request for firearm purchase was denied because he

20  has a conviction for 273.5 and 243(b)(1) of the Penal

21  Code; right?

22          MS. KAELBLE: Objection, misstates the

23  letter.

24          MR. RUMERY: I'm sorry. (E)(1). I thought

25  it said (b).

26          THE WITNESS: And it also states federal

1   Brady Act right after that.

2   BY MR. RUMERY:

3          Q.   I understand. But I'm looking at the

4   two Penal Code sections. Those Penal Code sections are

5   California law. You understood that to mean California

6   law?

7          A.   Yes, sir.

8          Q.   You know from doing your CII check,

9   correct, that there was no conviction on his record

10   for?

11          A.   Correct.

12          Q.   And there was no conviction for

13   243(e)(1)?

14          A.   Correct.

15          Q.   You know that information that's in that

16   letter is an error; correct?

17          A.   I wouldn't say it was an error, no.

18          Q.   You knew there was no conviction for

19   those things?

20          A.   But it states federal Brady Act. As

21   we've already stated, federal Brady Act would

22   incorporate a 242 if the person you battered was your

23   spouse.

24          Q.   Doesn't say that in that letter?

25          A.   But it says federal Brady Act.

26          Q.   It doesn't say 242?

1          A.    It doesn't.

2          Q.    It does say the two Penal Code sections

3    that are violations which you know are not on his

4    record; correct?

5          A.    That's for the ten-year prohibition.

6          Q.    For any prohibition.  Your CII showed at

7    no point did he have a conviction for 273.5?

8          A.    Correct.

9          Q.    Or 243(e)(1); right?

10         A.    Correct.

11         Q.    Now, you indicated earlier, when counsel

12   was asking you some questions about seven purchases

13   that were not successful, were those all handgun

14   purchases?

15         A.    I don't know if I can answer for all

16   seven of them.  I don't think I have the documents to

17   support that.

18         Q.    You don't know if those are for handgun

19   purchases or not?

20         A.    Let me just look in my notes here real

21   quick.  So far two rifles, one handgun, two handguns,

22   third rifle, and that's all the records I have.

23         Q.    Okay.  Do you know if in that time

24   period that these seven purchases were attempted, do

25   you know if Mr. James purchased any rifles without any

26   problem?

1          MS. KAELBLE:  Objection; relevance.

2          THE COURT:  Overruled.

3          THE WITNESS:  I know that he was denied for

4 the first of three rifles.  I do know that.

5 BY MR. RUMERY:

6          Q.   Do you know if he was not denied in

7 other purposes?

8          A.   No, I can't answer that.

9          Q.   Okay.  You also testified, when counsel

10 asked you some questions, that in your experience that

11 some passionate firearm people, the word you used, keep

12 complete records.  So based on that you thought maybe

13 Mr. James might have all those records, right, that you

14 indicated in your search warrant?

15          A.   Yes.

16          Q.   You didn't have any hard information or

17 anything to base it any knowledge that he had those

18 records, did you?

19          A.   The seven prior purchases of firearms?

20          Q.   Yes.

21          A.   He was presented a copy of the denial

22 letter each time.  My opinion, if he was one of these

23 firearms people that are truly into firearms, he would

24 retain documentation of those attempted purchases.

25          Q.   Did you know if he was one of those type

26 of people that you're defining as being a truly firearm

1   person?

2           A.   No, I have never met him before.

3           Q.   You have no idea what his passion level

4   is?

5           A.   That's correct.

6           Q.   You testified you read all but five

7   pages, maybe ten pages of his deposition. You don't

8   know if he was asked about what documents he may

9   possess or not during his deposition, do you?

10          A.   I don't recall.

11          Q.   Now, in your search warrant did you tell

12  the magistrate at any point that some of the

13  information you're providing to him you learned from a

14  deposition that was taken of Mr. James?

15          A.   Yes.

16          Q.   Where is that? Can you point that out

17  to me?

18          A.   The information?

19          Q.   No, where you told the magistrate that

20  it was from a deposition.

21          A.   Sure. In the search warrant.

22          Q.   Never mind. I see it here. I withdraw

23  that question.

24          A.   Okay.

25          Q.   Counsel was asking you questions that

26  between the time of July 26th, when you first started

1    gathering information and you testified earlier that
2    you kind of stopped gathering information on July 28th,
3    but then periodically you just kind of recheck to see
4    if some of the information was still accurate; right?
5           A.    To see if it had changed at all, yes.
6           Q.    What information were you rechecking to
7    see if it had changed?
8           A.    All the listed databases that I checked
9    the first time, and then doing spot checks of his
10   house.  So continuously driving by and making sure he
11   still lived there.
12          Q.    So that's the information you were
13   checking; right?  That's all the information you were
14   checking?  You said you went and made some spot checks
15   of his house?
16          A.    Yes.
17          Q.    Make sure he was still living there?
18          A.    Yes.
19          Q.    And how did do you that?  By seeing
20   similar vehicles?
21          A.    Yes.
22          Q.    And in your investigation, did you
23   identify the vehicles that he owned?
24          A.    Three vehicles.
25          Q.    Okay.  And so when spot checking the
26   house, you just checked to see if any one of those

1    three vehicles were at his house?

2           A.    Correct.

3           Q.    During that 80-day time period, did you

4    also try and make any determination if he still had any

5    handguns or any weapons at all in his house?

6           A.    I conducted the AFS check, which stated

7    he had three firearms registered in his name still.

8           Q.    But you said you got the information

9    about him owning guns from his deposition transcript;

10   right?

11          A.    Correct.

12          Q.    Okay.  And you didn't do anything

13   between July 25th and October 4th -- October 13th when

14   you executed the search warrant to determine if he

15   still had guns at the house; correct?

16          A.    Other than checking AFS, his CII,

17   database, and doing the spot checks?  No.

18          Q.    How come you didn't include that in your

19   search warrant that you had continued to check the

20   information to make sure certain things were still

21   accurate, such as where he was living, had no other

22   convictions?  How come that wasn't put in your search

23   warrant?

24          A.    If anything had changed from what was

25   stated in my search warrant, I would've updated it.

26          Q.    Kimberly Granger is the one that told

1  you that he possessed firearms; right?  You didn't read
2  that in any deposition transcript; correct?
3          A.    In his deposition he stated he had a
4  Kimber and more than five and less than ten rifles or
5  shotguns.
6          Q.    Is that part of the five or ten pages
7  you say you read?
8          A.    Yes.
9          Q.    You didn't remember reading that?
10         A.    Yes.
11         Q.    But Miss Granger had also told you back
12  on July 26th; correct?
13         A.    She may have.
14         MR. RUMERY:  I have no further questions.
15              **RECROSS-EXAMINATION**
16  BY MS. KAELBLE:
17         Q.    Real quick.  You knew from research of
18  the databases that he purchased the Kimber firearm in
19  2007; is that correct?
20         A.    Yes.
21         Q.    And you also knew from the deposition
22  that he still had it four years later in 2011; correct?
23         A.    Yes.
24         Q.    Was there any information that you had
25  been given that would make you believe that he would've
26  gotten rid of that firearm?

1           A.    No.

2           Q.    Is there anything in any of the

3    databases that you searched that indicated that that

4    firearm transferred over to somebody else?

5           A.    No.

6           Q.    Also, when you actually did the search,

7    did you find some documents relating to the defendant's

8    ownership of firearms during the search?

9           A.    Yes.

10          MS. KAELBLE:  I don't have any other

11   questions.

12          MR. RUMERY:  I have no further questions.

13          THE COURT:  Directing you back to your

14   statement of probable cause under the investigation

15   portion, on the second page of the investigation

16   portion you list three handguns.

17          THE WITNESS:  Yes, sir.

18          THE COURT:  Why did you list those?  What was

19   the reason you listed those?

20          THE WITNESS:  Those show that he purchased

21   those firearms.  Through the automated firearm system,

22   those firearms were never transferred out of his name,

23   meaning there was no legal transfer taking those

24   firearms out of his name.

25          THE COURT:  Okay.  So is it the Astra that

26   was purchased in 1992 that was before his conviction?

1    THE WITNESS:  Yes, sir.

2    THE COURT:  So that didn't raise any red

3    flags about how he received that or how he purchased

4    that?

5    THE WITNESS:  You are correct.

6    THE COURT:  Same with the 1994, SIG Sauer?

7    THE WITNESS:  Yes, sir.

8    THE COURT:  The Kimber that was a 2007, that

9    was after the 1996 conviction.

10   THE WITNESS:  Yes, sir.

11   THE COURT:  Did you wonder how he was able to

12   purchase that?

13   THE WITNESS:  Yes, sir.

14   THE COURT:  And did you do any research to

15   find out how he --

16   THE WITNESS:  Yes, sir, I called up to

17   Sacramento to our headquarters office and spoke to the

18   supervisor for the civilian employees that do all these

19   checks.  And that's when he explained to me the

20   situation that was happening back in 2007, with the

21   hiring and shifting of bodies and moving.  There was a

22   period of time where there was not someone trained on

23   federal Brady Act prohibitions.  So instead of

24   violating people's rights by continuing to do the

25   checks when no one was trained to, they stopped doing

26   the Brady Act checks for that period of time until they

1  could get more people trained on it, and then they
2  started implementing the checks again.
3          THE COURT:  So did you do this research
4  before you sought the search warrant?
5          THE WITNESS:  Yes, sir.
6          THE COURT:  And did that research indicate to
7  you that he did have a valid license issued to him?
8          THE WITNESS:  No.  That valid CCW never came
9  into play in my investigation.
10         MR. RUMERY:  Are you asking him about the CCW
11 or something else?
12         THE COURT:  Yes.
13         MR. RUMERY:  You're asking about CCW?
14         THE COURT:  Yes.
15         MS. KAELBLE:  I think I could maybe clarify
16 this a little bit.  It's not a question of -- the
17 investigation isn't based on whether he obtained the
18 gun legally or illegally.  It's just the question of
19 he's admitting that he was in possession of these
20 firearms, whether he obtained them when he could
21 legally obtain them like he did in 1992 and 1994.  Once
22 he obtained the conviction, he was no longer allowed to
23 have them.
24         During the deposition the AG's office
25 learned that he was still admitting to possession of
26 firearms.  As a result of that, they asked this agent

1  to do further investigation.  Whether he obtained a gun
2  in '07 or not, even though he shouldn't have, he
3  slipped through the cracks because they didn't have
4  properly trained people at the time.  That's really not
5  the issue, because he was provided other documents.  He
6  was provided notice that he wasn't able to have that
7  firearm.

8          That's the whole reason the civil
9  lawsuit was going on with the AG's office, the whole
10 reason for the deposition based on the fact that he was
11 continuously getting denied the ability to get
12 firearms, like in January of 2011 when he attempted to
13 make the purchase at Big 5.

14         So this investigation just has to do
15 with was he in possession.  There's probable cause to
16 believe that he was in possession of some firearms
17 based on the check where he's found to be the legal
18 owner of these three weapons that were never
19 transferred out of his possession, and then couple that
20 with the fact that at the deposition he admitted to
21 being in possession of additional firearms.

22         THE COURT:  I understand all that.  But he
23 had a permit in 2008, did he not?

24         THE WITNESS:  That was during the same time
25 that this -- that he purchased the Kimber.

26         MR. RUMERY:  That's when the letter from DOJ

1    went to the sheriff's department saying that he is
2    authorized.  That's Exhibit C.

3              THE COURT:  I'm aware of that.  We've already
4    covered that.

5              MS. KAELBLE:  So during that time frame when
6    they weren't actually doing the checks because they
7    didn't have anybody trained, he managed to get a
8    firearm and he put in his application for concealed
9    weapons permit.  That concealed weapons permit,
10   however, doesn't show up in any DOJ-type database.
11   Nothing that he's able to check.

12             It's not like when he runs this
13   defendant's CII number he gets a list of letters and
14   documents that have gone out.  He didn't have this
15   document.  He wasn't aware of that document at the time
16   he was writing the search warrant and doing the
17   investigation.  That came to light later on from the
18   defense once this case had already been filed.

19             THE COURT:  So if you are wondering whether
20   someone is legally in possession of a handgun, whether
21   or not they have a concealed weapons permit, what do
22   you do to find that out?

23             THE WITNESS:  If I was trying to determine if
24   someone had a legal CCW, I would contact the county and
25   check through their office.  If I was trying to figure
26   out if someone could possess a firearm legally, then I

1 │ can check the state database for that information.

2 │       THE COURT:  Is that what you did in this

3 │ case?  You checked the state database?

4 │       THE WITNESS:  Yes, sir.

5 │       THE COURT:  But the state database wouldn't

6 │ cover any concealed weapon permits issued by a county?

7 │       THE WITNESS:  You are correct.

8 │       THE COURT:  And you knew that at the time?

9 │       THE WITNESS:  I knew that I couldn't check

10 │ for a CCW, correct, through the state database.

11 │       THE COURT:  Okay.

12 │       MR. RUMERY:  Could you have checked it

13 │ through a county database?

14 │       THE WITNESS:  Yes, and I would have if I had

15 │ any connection that there was a CCW in his history.

16 │ But CCWs are a small minority of the population.  It's

17 │ not something you would check every time, because it

18 │ rarely comes up.

19 │ BY MR. RUMERY:

20 │       Q.  Did Miss Granger tell you there was a

21 │ CCW at issue here?

22 │       A.  I had no knowledge of a CCW.

23 │       Q.  She didn't say anything to you about

24 │ that?

25 │       A.  No.

26 │       MR. RUMERY:  I don't have any more questions.

```
 1              THE COURT:  I don't have any more questions.
 2              MS. KAELBLE:  Me neither.
 3              THE COURT:  Off the record a moment.  Let's
 4   trail this.
 5                   (Matter trailed)
 6              THE COURT:  We're back on the record with
 7   Mr. James.  Any other witnesses?
 8              MR. RUMERY:  I have a couple of real quick
 9   questions for him.
10              MS. KAELBLE:  I'd ask for an offer of proof.
11   He has no involvement in the writing of the search
12   warrant.
13              THE COURT:  What's the offer of proof?
14              MR. RUMERY:  It has to do with information
15   that was made available prior to the search warrant to
16   the state.
17              THE COURT:  Okay.  If it's brief, I'll allow
18   it.
19                        SCOTT JAMES,
20              Produced as a witness on behalf of
21              the Defendant, having been first duly
22              sworn, testified as follows:
23                   DIRECT EXAMINATION
24   BY MR. RUMERY:
25         Q.  Please state your full name and spell
26   your last name for the court reporter.
```

LESIA J. MERVIN, CSR #4753, RMR, CRR
Tulare County Superior Court

1              A.    Scott Ray James, II, J-A-M-E-S.

2              Q.    Were you involved with filing a civil

3    writ petition back in February 2011?

4              A.    Yes.  I hired Leonard Herr and his law

5    firm to file a writ against the State of California

6    Attorney General.

7              Q.    And the purpose of the writ was?

8              MS. KAELBLE:  Objection; relevance.

9              THE COURT:  Oh, it could be relevant.

10             THE WITNESS:  Clarification on my firearm

11   status.

12   BY MR. RUMERY:

13             Q.    Have you received -- you heard some

14   testimony from Mr. Powell that there had been some

15   rejections of firearm purchases.  Have you attempted to

16   purchase some firearms and got rejected?

17             A.    Yeah.  I had purchased firearms.  I had

18   received firearms, and then when we got the rejection I

19   had my attorneys go through an appeal process.  And

20   then that appeal process always kept leading us back to

21   the California DOJ having the record set as me being a

22   misdemeanor crime of domestic.

23             Q.    Did you file the writ to try and clear

24   that up and clarify that?

25             A.    Yes.  Under our personal investigation

26   we didn't have a clear denial letter that was recent,

1  so I went down to Big 5 to try to purchase the cheapest
2  long gun you could get to see if we could get a denial
3  letter.  I received the denial letter.  Within three
4  weeks we filed the writ against the state.
5          Q.   You've seen that letter that was
6  directed to you dated January 10, 2011, that indicated
7  you had convictions for domestic violence and domestic
8  battery; correct?
9          A.   Correct.
10          Q.   Did that cause you concern, too?  Is
11  that part of the reason for the writ?
12          MS. KAELBLE:  Objection; relevance.
13          THE COURT:  Overruled.
14          THE WITNESS:  Yes, it did, very much.  I was
15  enrolled in the police academy.  I had a lot of things
16  going on.  I had purchased weapons.  I had gotten the
17  CCW concealed weapons permit from the sheriff's
18  department.  With all of this going on, that was my
19  only recourse was to file a writ.
20          We were forthcoming with the Attorney
21  General Office's Kimberly Granger.  We gave her the
22  CCW.  We gave her all the letters we had from
23  correspondence between the AG and the sheriff's
24  department.  We were forthcoming with everything.  And
25  in my deposition that's why I did not deny having
26  firearms.  I mean, they should be the ones that know.

1   BY MR. RUMERY:

2         Q.   In the CCW permit, did you provide that

3   to Miss Granger before the date of your deposition of

4   July 25th, sir?

5         A.   Yes.

6         Q.   There's also some indication from

7   Officer Powell that in some of those forms that you

8   attempted to purchase the firearm that the address was

9   incorrect?

10        A.   Going to purchase firearms, the majority

11   of the firearms that I purchased during that time frame

12   was a company called Boa's Minnow Farm out of Woodlake.

13   The guy there's first name was Gill. I don't remember

14   his last name. You were instructed to have two to

15   three forms of ID that matched the same addresses. So

16   you had to have, like, your registration had to be an

17   address, your driver's license had to be an address, or

18   your insurance. And they had to have at least two to

19   three.

20        I always listed my P.O. Box as that

21   because of my profession, being a private investigator.

22   I didn't want somebody to obtain my personal address.

23   So whenever I filled out those forms, those were the

24   only identification. That's what I explained to the

25   dealer and the dealer said that was fine.

26        Q.   Did you think you were doing anything

1  improper or illegal at the time?

2           MS. KAELBLE:  Objection; relevance.

3           THE COURT:  Sustained.  It's not relevant.

4           MR. RUMERY:  I don't have any further

5  questions.

6           MS. KAELBLE:  I don't have any questions.

7           THE COURT:  Do we have in the record when the

8  lawsuit was filed?

9           MR. RUMERY:  Yes.  I can provide that as an

10 exhibit.  I was looking to see --

11          THE WITNESS:  February 2011.

12          MR. RUMERY:  I was looking to see if I had

13 that as an exhibit.  I can offer that as an exhibit,

14 the writ.  It does show it was filed February 15, 2011.

15 So we'll offer that.

16          THE COURT:  Could we have a stipulation that

17 that was the date?

18          MS. KAELBLE:  I don't really know what the

19 date was.  I don't know something that started before

20 then or not.

21          THE COURT:  We'll have it marked at this

22 point.

23          MR. RUMERY:  I did attach as exhibits -- I

24 did attach Lloyd Hicks' proposed judgment and then his

25 final judgment.  Those are exhibits.

26          THE COURT:  Okay.

1    MR. RUMERY: You know, where he basically
2 found that there is nothing that barred Mr. James from
3 possessing a firearm.

4    MS. KAELBLE: That's not what he found.

5    MR. RUMERY: That's what he found.

6    THE COURT: Do you have any questions?

7    MS. KAELBLE: No. Do you have any other
8 evidence?

9    MR. RUMERY: No.

10    MS. KAELBLE: Your Honor, in this case I'll
11 go through some portions in detail with regards to some
12 of the statements that they allege to be false or
13 misstatements of the law. Defense counsel listed out
14 some specific parts of the search warrant that they
15 claim misrepresented. But in reality --

16    THE COURT: Before you do that, let me ask
17 you this: Do you think a magistrate, when he's
18 presented with this type of search warrant, would want
19 to know that the target of the search warrant has filed
20 a lawsuit against the department? He's retained an
21 attorney and filed a lawsuit against the department to
22 clarify whether or not he can lawfully possess? Do you
23 think a magistrate would want to know that?

24    MS. KAELBLE: I don't know if that's really
25 relevant to the reasons behind the search warrant. I
26 can understand that that's kind of an interesting fact

1  in the way Mr. Rumery has presented it.  It appears
2  that it sound like there is some sort of conspiracy --
3          THE COURT:  No, I don't know if it's a
4  conspiracy.  But what if the outcome of the -- what if
5  the outcome of the litigation was that the finding was
6  that he could, in fact, possess the weapon?  What was
7  the rush here?
8          MS. KAELBLE:  Well, I think the issue is
9  during that time frame, in 2011 when this was
10 happening, he was not supposed to have a firearm.  It
11 had not been determined.  He had been told numerous
12 times with all these denial letters.  In January he was
13 told again you cannot have the firearm because of the
14 federal Brady Act because of the misdemeanor
15 conviction.  He was aware of that.  But he didn't take
16 any steps to take those firearms and give them to
17 somebody else or transfer them to somebody else to hold
18 on to.
19          It's not like he received the letter on
20 January 10th of 2011 and two days later they're at his
21 door trying to take his firearms away and saying you're
22 in violation of the law.  This is months later.  He had
23 plenty of time to deal with that issue and say, you
24 know what, I'm not sure if I can have these right now.
25 I better give them to somebody else to hold on to until
26 I'm sure that the law's on my side.

1          More definitely, in January of 2011
2  there was information in the deposition where he said
3  that he was trying to figure out what was happening on
4  that in 2011 he's been told you can't have these
5  firearms because of the Brady Act.  Sure, he has a
6  civil issue where he's trying to solve that problem and
7  trying to get clarification as to what the law covers.
8  But during that time he shouldn't have firearms in his
9  possession because he has been told in this letter that
10 he's not allowed to have them.  He's been told when he
11 went back to Big 5, look, we're not allowed to give you
12 this firearm because you're prohibited.  And he still
13 has got them in his possession.

14         THE COURT:  He turned those back?  I thought
15 he testified -- maybe I misunderstood that.  I thought
16 he got the weapon and then when the letter came he
17 turned it back.

18         MS. KAELBLE:  The weapon was never -- that
19 weapon that he attempted to buy in January had never
20 been turned over to him.  There was a hold and then he
21 got his money back.

22         THE DEFENDANT:  That's what started the writ.
23         MR. RUMERY:  The rejection happened in the
24 waiting period.

25         MS. KAELBLE:  During that time period he knew
26 he was in possession of these other weapons.  At

1  minimum these three that were registered in his name

2  plus during the deposition he explained that he owned

3  between -- or possessed between five and ten long guns

4  as well that don't have to be registered.

5          So we know that he has these firearms in

6  his possession.  And instead of doing something to make

7  sure that they're elsewhere, he's in violation of the

8  law, because under the Brady Act, as the officer

9  explained, clearly from the training, clearly from the

10  document that we entered into evidence as People's 1,

11  it's clear that their definition, if there's a

12  misdemeanor involving domestic violence, if there's a

13  violence, even if it's a 242, if it started out at

14  domestic violence, it will restrict you from having a

15  gun.

16          THE COURT:  But not under the state law.

17          MS. KAELBLE:  Not under the state law.

18          THE COURT:  Why do we have a state law?  Just

19  to confuse citizens so they get trapped with the

20  federal law when the Feds decide they want to?  I mean,

21  isn't it against the law to attempt to and fill out an

22  application for a weapon and it turns out you can't --

23  you gave false information in the application, why all

24  the times that this guy is trying to get a weapon,

25  apparently he wasn't supposed to, so he's committing a

26  violation of federal law seven, eight, nine, ten times,

1   eleven times?  Nothing happens to him.  He files a
2   lawsuit against the Department of Justice, bam, all of
3   a sudden the world falls down on this guy.  What's that
4   all about?

5        MS. KAELBLE:  Obviously, I don't work for
6   that agency.  I don't know how those things get
7   investigated.  I don't know how the forms get forwarded
8   typically from a dealer, once there's a denial, to an
9   investigator.  I don't know how that works.  I really
10  can't speak.  All I can say is in this particular case
11  it was brought to law enforcement's attention and as a
12  result they did an investigation and they determined
13  that there was probable cause to believe he was in
14  possession of weapons.

15       THE COURT:  While his lawsuit to try to
16  clarify the situation is ongoing.

17       MS. KAELBLE:  That is true, your Honor;
18  however, it's still a violation of the law.

19       THE COURT:  What about all these other
20  violations of the law for years that were going on
21  every time he attempted to get a gun and he wasn't
22  supposed to?

23       MS. KAELBLE:  Your Honor, like I said, I
24  don't know what was going on with that.  I can't speak
25  to what was happening in 2007 with regards to those
26  attempts to purchase firearms.

1          THE COURT:   Why did he only get five pages of
2     this deposition?  Why didn't he get the whole
3     deposition so he could find out what's going on here
4     before you author a search warrant?  This guy's
5     attempting to clarify a situation.  I mean, it clearly,
6     when you read it, this guy is stockpiling stuff and he
7     shouldn't be and he's trying to get other weapons and
8     he shouldn't be.  He's in clear violation of the law.
9          MR. RUMERY:   Meanwhile, between 2008 and or
10    he's got a concealed weapons permit.
11         THE COURT:   Then he's got a concealed weapon
12    permit that nobody even checks to see if he's got it.
13    What's going on?
14         MS. KAELBLE:   Your Honor, all -- we're only
15    here on the issue of whether or not there was probable
16    cause for the search warrant.
17         THE COURT:   No.  Whether it was done in good
18    faith.
19         MR. RUMERY:   Right.
20         THE COURT:   And whether there were material
21    admissions in the search warrant.
22         MS. KAELBLE:   Your Honor, from the
23    information presented by the investigator who did
24    the -- wrote the search warrant, he was not aware of
25    all this other information.  I don't think it's
26    reasonable to say that he should have known that all

1  these other things were happening.  This situation --

2          THE COURT:  That's like to the author of the

3  search warrant, just tell me enough.  I don't want to

4  hear all the other stuff.  I don't want to know

5  anything about why we have a lawsuit.  I don't know

6  what else was said in the deposition.  Just tell me

7  that he's got certain weapons.  Give me five pages and

8  tell me he's got certain weapons, that's all I want to

9  know, because that's all I want the magistrate to know.

10 I don't want to look to see if he had a weapons permit

11 issued by the county lawfully in 2008.  I don't want to

12 know that.  I don't want the magistrate to know that.

13         MS. KAELBLE:  I'm not sure if there was

14 anything in the deposition relating to the -- the

15 defendant testified that he provided some information

16 to the Attorney General's Office about the concealed

17 weapons permit.  But I don't know -- I honestly don't

18 know whether that information was really there, whether

19 that information was ever conveyed.

20              According to this officer it was never

21 provided to him.  I don't know if that's something that

22 you would reasonably -- that person would reasonably

23 think I need to ask about whether there's a concealed

24 weapons permit when you're getting these letters from

25 DOJ saying you're being denied, you can't have a

26 firearm.  I don't know if the next step would be let me

1   check with the county to see if there's a concealed to
2   carry permit.

3         THE COURT:  And I understand that.  Going
4   back to the search warrant under investigation, the
5   second paragraph.  It starts, "On Monday, July 25th,
6   Scott James appeared in Superior Court, State of
7   California, County of Tulare, for a civil deposition.
8   During his sworn testimony he admitted to ownership and
9   possession of firearms and falsification of failure to
10  divulge information."

11        It sounds like this guy's spilling his
12  guts out, like he's under some kind of examination, and
13  he admits it.  That's the whole reason for his lawsuit.
14  I mean, it sounds like for the first time, almost, this
15  guy admitting to all this.  It's just -- it's time
16  after time we're dealing with the federal law that he's
17  permanently banned for life.  And there's one little
18  sentence that talks about the state law where that's no
19  longer in effect by the time of the authoring of this
20  search warrant.

21        MS. KAELBLE:  Your Honor, with regards to the
22  comment about the state law, it would appear to me the
23  reason he doesn't need to include information about the
24  state law is the state law is not providing him
25  probable cause for the search.  The whole reason --
26        THE COURT:  Bingo.  Yeah.  Exactly.

1          MS. KAELBLE:  You don't expect --

2          THE COURT:  Let's forget about that.  Let's
3    not put that in there.

4          MS. KAELBLE:  He did include the fact of that
5    in 2006, but you're not going to talk about every
6    single other law that does not apply in this particular
7    situation.  You're not going to say we're searching
8    under this law, but we're not searching pursuant to
9    these ones because they don't apply.  That's not
10   something you'll normally find in any other search
11   warrant.

12              He does explain that this is under the
13   federal law.  He's clear when he explains that it's for
14   the 242 battery.  He doesn't say that he was convicted
15   of corporal injury on a spouse or spousal battery or
16   something like that.  He's clear throughout this search
17   warrant that this is for -- the final conviction was a
18   242 battery, and he mentioned that a number of times
19   throughout.  And based on his training, based on
20   everything he was taught while he was working at DOJ,
21   based on this eight-hour class and all subsequent
22   training on the job, that is the definition that they
23   are using.

24              Clearly they're using that definition
25   because that's why they have this civil lawsuit going.
26   They're still arguing with it.  But that is the

1  training they're providing to them.  This was done in
2  good faith.  This was not done with the intent to
3  misrepresent facts to the magistrate.

4            He's going based on what he's been
5  taught and what he's been told about what this Federal
6  Brady Act requires.  Under that act, the defendant has
7  a qualifying conviction that means he shouldn't have a
8  firearm.  Therefore, when he makes this admission
9  during a deposition about the firearm, that's -- that
10 gives us probable cause to believe a crime's been
11 committed.  Between that and the fact that there was
12 information that was not properly represented on the
13 forms that he filled out in January, that gave probable
14 cause.  And there's no indication that he intentionally
15 attempted to deceive the magistrate in any way.

16            MR. RUMERY:  The whole purpose of the
17 affidavit was to try to convince the magistrate, and he
18 says it over and over and over again on all the 12
19 different paragraphs that I highlighted from his
20 declaration, that he has a conviction of domestic
21 violence.  It says it in Number 2:  Conviction for
22 domestic, misdemeanor conviction of domestic battery.

23            Number 4, he's implying that he's got a
24 conviction that doesn't authorize him to be able to
25 possess firearms, and he admitted in his deposition
26 that he's got a firearm and you should sign the search

1   warrant.  All of these -- and we highlight it.  There's
2   one paragraph where he says domestic violence.  Then he
3   says he was arrested for domestic violence and
4   ultimately had a 242 conviction.  One paragraph.  All
5   the rest repeat over and over again that he's got a
6   conviction for domestic.

7                It was to convince the magistrate for
8   domestic violence and he admitted in his deposition
9   that he's got guns.  The whole thing was done in the
10  criminal matter to gain some advantage in the civil
11  case.  That's our personal belief.

12               What caused Mr. James a lot of concern
13  is when he got that January 10, 2011, letter, which was
14  attached to the District Attorney's reply, they list
15  domestic violence conviction that he doesn't have.  It
16  says you got a 273.5 and a 243(e)(1).  It doesn't say
17  anything about the Brady Act says that any arrests or
18  even a battery conviction could apply also.  It doesn't
19  say anything like that.  He sees these things for
20  convictions that he doesn't have.  And he believes that
21  the Department of Justice has got that information,
22  incorrect information.  We need to correct this, which
23  is why he filed the writ.

24               I agree with everything that the Court
25  said about the omission.  I do think that that is a
26  critical point that there is some information that

1  would have been pertinent at the time that was omitted.
2  That's another relevant issue.  And so denying the writ
3  or admitting the writ, I think is pretty important.
4              I think I put this in my brief in terms
5  of omission, but the April 18, 2008, letter to the
6  Tulare County Sheriff saying he can possess firearms
7  was not told to the magistrate.  I think that's an
8  important piece of information of the magistrate would
9  like to have known.  The magistrate would have seen
10  obviously there's some confusion here.  And if the
11  magistrate had been told that there was a writ filed,
12  he would understand why the writ was filed trying to
13  clear up that confusion, because it's obvious that
14  there's some confusion, you know, in terms of the
15  information that's in possession of the Department of
16  Justice.
17              Like I said, they put it in their letter
18  that he has a 273.5 and a 243(e)(1) conviction, which
19  is just not true.  Even Agent Powell testified that
20  that wasn't true.  Besides all the points and the
21  issues that the Court has raised, I agree with all of
22  that.  You know, what's been presented here and also
23  presented in our papers, I'd like to point out a couple
24  of other issues.
25              I did address this in my motion.  But
26  another very significant fact here was the staleness of

1  the search.  The warrant was based on stale
2  information.  Mr. James admitted in his deposition on
3  July 25, 2011, that he did still own firearms.  But the
4  agent did not seek the warrant until October 4, 2011,
5  even though he in his declaration admitted that he
6  learned the information.  And he even testified here
7  today that he learned the information between July 26th
8  and July 28th.

9             That's when he gathered all of his
10 information.  Yet he doesn't seek the search warrant
11 until October 4, 2011.  Then it wasn't even executed
12 until October 13, 2011.  That is exactly 80 days.
13 That's 80 days later.  I cite in my papers -- I
14 could've added a little bit more law, because I've seen
15 lots and lots of law on this.  Anything over 30 days is
16 stale.  This is 80 days.

17            There's also a violation in just the way
18 the whole warrant was executed, because it's
19 Section 1534 of the Penal Code indicates that a
20 warrant, once it's signed, is to be executed and
21 returned within ten days.  In this case the warrant was
22 obtained on October 4th.  It wasn't executed until
23 October 13th.  That's nine days later.  So to be within
24 the confines of Penal Code Section 1534, it had to have
25 been returned the next day, October 14th.  But it
26 wasn't returned and that's on the -- you can look at

1   the exhibit that's attached, Exhibit F, which is the
2   search warrant.  It shows that it was returned on
3   November 3, 2011, which is 31 days later.

4            So not only is it -- is the information
5   stale, but the execution of the warrant and the return
6   of the warrant also is outside the law.  So for all the
7   reasons that are set forth in our motion, for all the
8   reasons that were set forth in the testimony today, and
9   for all the argument that has been made, we would ask
10   the Court to grant our motion.

11            MS. KAELBLE:  Your Honor, with regards to the
12   issue of staleness, the officer testified that he was
13   continuously rechecking the databases to make sure that
14   the information was still current, that there weren't
15   any changes, that the firearms hadn't been transferred
16   to somebody else, that the address was still good.
17   When the defendant testified during the deposition, he
18   indicated that he still possessed a firearm that he had
19   purchased four years earlier.  There's no indication
20   that he was going to get rid of that gun in that
21   approximately two-month period between the time that
22   the deposition took place and the search warrant was
23   actually written and executed.

24            Furthermore, you had information from
25   the officer that during that time frame it was mainly
26   just a scheduling issue with regards to trying to make

1   sure that the proper personnel were available.   They

2   were working various areas throughout Northern

3   California to make sure they had the available

4   personnel to do the search warrant.   He continuously

5   updated to make sure that the information was current.

6   Therefore, it was not stale.

7                    Furthermore, with regards to the return

8   on the warrant, there is case law to indicate that

9   that's just administerial requirement.   In this case

10  the officer did testify that all of the information

11  that would have been included in the return that would

12  have been filed with the Court, that that information

13  had been provided to the defendant on the day of the

14  search warrant.   He received a copy of the search

15  warrant.   He also received the copies of the inventory

16  of the items that had been taken into evidence as a

17  result of the search warrant.

18                    While it was filed outside of the

19  ten-day limit, case law is clear that that alone does

20  not mean that the evidence should be suppressed.

21                    Furthermore, your Honor, I could go into

22  more detail with regards to the defense's comments

23  about false statements being made in the affidavit.

24  However, most of the information is included in detail

25  in our opposition.   I went through it step by step as

26  to each and every item that was mentioned.   I cited the

1  different pages in the transcript of the deposition
2  that established that the defendant did make the
3  statements that are talked about.  These are not false
4  statements.

5          It seems the biggest issue that they
6  have has to do with the fact that the definition of a
7  misdemeanor conviction of domestic violence.  From the
8  testimony it's clear that that's what he was taught as
9  a misdemeanor conviction for domestic violence under
10 the federal Brady Act.  There is no indication at all
11 that he was trying to deceive, that this was done
12 intentionally, or that he was making false statements
13 in order to obtain some sort of advantage in this case.

14         He provided the information that he had
15 based on his investigation.  This was not done with
16 some sort of reckless disregard for the truth.  They
17 cannot meet any burden showing that he intentionally
18 attempted to deceive the magistrate.  He was acting in
19 good faith.  He was providing information that he had
20 to the magistrate.  And there's no reason to grant this
21 motion in this case.

22         MR. RUMERY:  Your Honor, obviously I object
23 to everything she said.  It's our position that it was
24 reckless and that there was a lot of deception in the
25 search warrant affidavit.  But in terms of the
26 staleness, the most important issue on the staleness

1   issue was whether or not there are guns in his house.
2   The evidence from Agent Powell is that he learned from
3   the deposition on April 25th that he said that --
4   July 25th that he said that.

5          Then in terms of him obtaining the
6   information, when he said he was making sure Mr. James
7   still lived in the same house and that there was no new
8   convictions or any new action on the criminal database.
9   That's about all he did to check information.  But the
10  most critical piece of information is were there guns
11  in the house.  That's 80 days old.  With that, we would
12  submit.

13         MS. KAELBLE:  With regard to that specific
14  issue, he was checking the database to see whether
15  these weapons were still registered in the defendant's
16  name as well.  So that Kimber firearm that the
17  defendant testified about at the deposition, he's still
18  looking in the database.  And he's still finding
19  information that those three firearms listed in the
20  search warrant were still registered to the defendant,
21  that they hadn't been transferred elsewhere.  So that's
22  further evidence to follow up the fact that weapons --
23  there's probable cause to believe that weapons would be
24  found at that residence.

25         There is no issue with staleness in this
26  case.  If you look on Page 14 of our opposition, we

1  cite some cases which indicate that even information
2  that's 11 months old, depending on the nature of the
3  property, if it's the type of property that's likely to
4  still be in place, then it's not going to be considered
5  stale.

6           In this particular case we're talking
7  about weapons. The defendant had already had the
8  weapons for four years. It's not like it's something
9  that somebody obtains and gets rid of quickly. So
10 based on that, there's a good likelihood that the
11 evidence would still be in its place and it would not
12 be stale.

13         THE COURT: Okay. I don't think the
14 staleness is an issue. I do think there are material
15 omissions in the affidavit. Those omissions include
16 that the defendant in February of the year of this
17 search warrant had on his own initiated a lawsuit
18 against the department to clarify whether or not he
19 could possess these weapons and to clarify whether or
20 not he comes under 18 USC 922 (g)(9), a person who has
21 been convicted of a misdemeanor crime of domestic
22 violence.

23         And under People's Exhibit 1, on the
24 second page of that exhibit, "It's anticipated that
25 this issue will be subject to litigation," end of
26 quote, meaning whether or not it includes all

1  misdemeanors, including simple assault or simple

2  battery.

3             The search warrant is replete with

4  allegations that defendant is in violation of federal

5  law 18 USC 922(g)(9).  I don't want to belabor the

6  point.  The search warrant affidavit speaks for itself.

7  There's no mention of the fact that in 2007 or 2008 the

8  County of Tulare issued this man a valid concealed

9  weapons permit.  Certainly that would play into whether

10 or not there was a need for this lawsuit filed by

11 Mr. James to clarify his possession of these weapons.

12 He's never, at least from the record, tried to hide the

13 fact that he's possessed these weapons.

14            Then we have the clear conflict with the

15 federal Brady Act law and California law.  This

16 affidavit does not really speak to that conflict.

17 There's one sentence indication that I think it's the

18 ten-year period is lapsed under California law.  Never

19 mentioned again, but the violations of federal law are

20 spread out throughout this affidavit.

21            I just think there's too many material

22 omissions and lack of clarification as to actually what

23 is going on at the time this search warrant was

24 authored, so I'm granting the 1538.5 motion.

25            MR. RUMERY:  Thank you.

26            THE DEFENDANT:  Thank you, your Honor.

1          THE COURT:   You're welcome.

2

3

4              (Proceedings concluded.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

1    STATE OF CALIFORNIA )

2                       )   ss.

3    COUNTY OF TULARE    )

4

5              I, LESIA J. MERVIN, an Official Certified

6    Shorthand Reporter of the Superior Court of the State of

7    California, do hereby certify:

8              That the foregoing action was taken down

9    in stenographic shorthand writing and thereafter

10   transcribed into typewriting, pages 1 through 127, and

11   that the foregoing transcript constitutes a full, true,

12   and correct transcript of said proceedings.

13              Dated: July 20, 2015.

14

15

16

17

18

*Lesia J. Mervin*

20   _____
     LESIA J. MERVIN, CSR #4753
21   Official, RPR, RMR, CRR, FAPR

22

23

24

25

26