1   KAMALA D. HARRIS, State Bar No. 146672
    Attorney General of California
2   ALBERTO L. GONZALEZ , State Bar No. 117605
    Supervising Deputy Attorney General
3   CATHERINE WOODBRIDGE GUESS, State Bar No. 186186
    Deputy Attorney General
4    1300 I Street, Suite 125
     P.O. Box 944255
5    Sacramento, CA 94244-2550
     Telephone: (916) 445-8216
6    Fax: (916) 322-8288
     E-mail: Catherine.Woodbridge@doj.ca.gov
7   *Attorneys for Defendants Stephen Lindley and Kimberly*
    *Granger*

8

9                 IN THE UNITED STATES DISTRICT COURT

10              FOR THE EASTERN DISTRICT OF CALIFORNIA

11                           FRESNO DIVISION

12

| | |
|---|---|
| **SCOTT R. JAMES,** | 1:13-CV-0983 AWI SKO |
| Plaintiff, | **DECLARATION OF CATHERINE GUESS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |
| v. | Date:        December 7, 2015 |
| **KIMBERLY GRANGER,** | Time:        1:30 p.m. |
| Defendant. | Courtroom:  2 |
| | Judge:       The Honorable Anthony W. Ishii |
| | Trial Date:  May 17, 2016 |
| | Action Filed: June 26, 2013 |

21      I, Catherine Guess, declare:

22      1.      I am a resident of the State of California, employed by the State of California, Office

23   of the Attorney General, attorneys for Defendants in this action.

24      2.      Attached to my declaration as DX 1 is a copy of the relevant portions of the

25   deposition transcript of Scott James taken July 25, 2011.

26      3.      Attached to my declaration as DX 2 is the declaration of Luke Powell.

27      4.      Attached to my declaration as DX 3 is a copy of the relevant portions of the

28   deposition transcript of Stephen Lindley taken September 23, 2015.

1

1      5.     Attached to my declaration as DX 4 is the declaration of Stephen Lindley.

2      6.     Attached to my declaration as DX 5 is a copy of the relevant portions of the

3  deposition transcript of Kimberly Granger taken January 27, 2015.

4      7.     Attached to my declaration as DX 6 is the declaration of Kimberly Granger.

5      8.     Attached to my declaration as DX 7 is a copy of the relevant portions of the

6  deposition transcript of Luke Powell taken September 22, 2015.

7      9.     Attached to my declaration as DX 8 is a copy of the relevant portions of the

8  deposition transcript of Scott James taken January 26, 2015.

9     I declare under penalty of perjury that the foregoing is true and correct.  Executed this 3rd

10  day of November, 2015, at Sacramento, California.

11

12                              /s/ Catherine Guess
                                 Catherine Guess

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2

# *James v. Granger, et al.*

## USDC, Eastern District
## Case No. 1:13-cv-0983-AWI-SKO

# EXHIBIT DX1

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF TULARE

———————

SCOTT R. JAMES,                                    No. 11-241117

Petitioner,

vs.

THE STATE OF CALIFORNIA; OFFICE OF THE
ATTORNEY GENERAL OF THE STATE OF
CALIFORNIA; and KAMALA HARRIS, IN HER
OFFICIAL CAPACITY AS ATTORNEY GENERAL
OF THE STATE OF CALIFORNIA,

Respondents.

———————

DEPOSITION OF SCOTT R. JAMES

Taken at

Keleher's Certified Shorthand Reporters
2348 West Whitendale Avenue, Suite A
Visalia, California

Monday, July 25, 2011 at 9:05 A.M.

Reported by:

Traci A. Roldan, CSR #7566



**Certified
Copy**

KELEHER'S
Certified Shorthand Reporters
Bakersfield • Visalia • Fresno

800.635.6044

REPORTER'S CERTIFICATION


I, Traci A. Roldan, a Certified Shorthand Reporter in and for the State of California, holding Certificate No. 7566, do hereby certify:


That the foregoing witness was by me duly sworn; that the deposition was then taken before me at the time and place herein set forth; that the testimony and proceedings were reported stenographically by me and later transcribed into typewritten form under my direction; that the foregoing is a true record of the testimony and proceedings taken at that time.


IN WITNESS WHEREOF, I have subscribed my name this _1st_ day of ___August___, 2011.


_Traci A Roldan_

Traci A. Roldan, CSR #7566

1    Smith & Wesson?

2         A.    Yes, I believe so.

3         Q.    And do you recall purchasing an Astra nine

4    millimeter?

5         A.    Yes, and that was the Visalia P.D. took, yes.

6         Q.    So Visalia P.D. took the Astra nine millimeter

7    and the Smith & Wesson .357 caliber?

8         A.    Yes, and they took some rifles.

9         Q.    How many rifles did they take?

10        A.    One or two.   For sure one.

11        Q.    And do you still have the Kimber automatic

12   .45?

13        A.    Absolutely.

14        Q.    And do you still have the Sig Sauer .40

15   caliber?

16        A.    No, that was reported stolen some years back.

17   My vehicle was stolen and they took everything.

18        Q.    And the Astra nine millimeter, what happened

19   to that one?

20        A.    Visalia P.D. has it.

21        Q.    Do you know if they still have it or has it

22   been destroyed?

23        A.    You know, they gave it back to me -- they gave

24   me all the guns back, and then, I don't know, it was

25   like a week later somebody called me and says, oh, we

1 | made a mistake, you're prohibited from having firearms
2 | for ten years and I go I didn't know that, and that's
3 | when I figured out back then that, you know, after my
4 | '96 deal, that I was prohibited for ten years.  So then
5 | they gave me all kinds of pressure and said you gotta
6 | return these, so I returned them and I didn't get a
7 | lawyer or fight it at the time, I didn't have the money
8 | to deal with it, but so I don't know what they did with
9 | them, but I gave them back.

10     Q.   So Visalia took the Astra nine millimeters,
11 | the Smith & Wesson .357 and one or two rifles; is that
12 | correct?

13     A.   I believe so, yeah.

14     Q.   Okay.  Do you currently have any long guns?

15     A.   Yes.

16     Q.   And how many long guns do you have?

17     A.   I don't know, a few.

18     Q.   More than five?

19     A.   I believe so.

20     Q.   More than ten?

21     A.   No.

22     Q.   Shotguns or rifles?

23     A.   Both.

24     Q.   And do you recall the date of October 6th,
25 | 1996?

1   BY MS. GRANGER:

2      Q.   Do you have any reason to not believe that the

3   judge indicated to you that you were being charged with

4   abusing your wife?

5      A.   No.

6      Q.   Did the prosecutor ever discuss with you who

7   the victim of your crime was?

8      A.   No.

9      Q.   Did you discuss a plea bargain with the

10   prosecutor with respect to this incident?

11      A.   I don't recall.

12      Q.   Do you recall if you pled guilty?

13      A.   I don't recall.

14      Q.   Do you recall if you pled no contest?

15      A.   Do we know what I pled to?

16      Q.   I'm just asking.

17      A.   I'm not sure.

18      Q.   Okay.  Do you recall what you were ultimately

19   convicted of?

20      A.   I wasn't convicted.  I believe I pled to a 242

21   battery, but I don't want to say I was convicted.

22      Q.   Do you understand that a plea can result in a

23   conviction of a crime?

24      A.   Sure.

25      Q.   So you indicate that you pled to a plea of 242

1   battery?

2       A.    Yes.

3       Q.    When you said pled, what did you plead, guilty

4   or no contest?

5       A.    I want to say to the best of my ability was no

6   contest.

7       Q.    Just so you know, I'm not trying to trick you.

8       A.    Been a long day.

9       Q.    Just trying to get the information.

10           MR. STATLER:   If she starts trying to trick

11  you --

12           THE WITNESS:   You've got more information.

13           (The proceedings went off the record.)

14           MS. GRANGER:   Going back on the record.

15  BY MS. GRANGER:

16      Q.    Do you recall if this was a felony or

17  misdemeanor conviction?

18      A.    Misdemeanor.

19      Q.    What was your understanding of the reasons for

20  the facts supporting your plea to a violation of Penal

21  Code Section 242?

22           MR. STATLER:   Objection, I know what you're

23  getting at, but that was a little confusing.   Could you

24  re-ask the question?

25  BY MS. GRANGER:

1     Q.   In your form interrogatory responses you

2  indicated that you believed you were being convicted of

3  battering an unidentified person.  Do you recall

4  stating that in your form interrogatory?

5     A.   Something to the fact because I did not abuse

6  my wife.

7     Q.   So you agree that you were convicted of

8  battering an unidentified person?

9     A.   Yeah.

10     Q.   And is there anyone other than your wife with

11  respect to that incident on October 6th of 1996 that

12  could possibly be that unidentified person?

13     A.   Not that I recall.

14     Q.   Okay.  Do you recall admitting that your

15  spouse was the victim of the crime that you were

16  arrested for on October 6th, 1996?

17        MR. STATLER:  I'm sorry, vague as to time.

18  When did he --

19  BY MS. GRANGER:

20     Q.   Do you recall admitting in response to the

21  State of California's Request For Admissions that your

22  spouse was the victim of a crime that you were arrested

23  for on October 6, 1996?  If you don't, I can show you,

24  that's fine.

25     A.   I don't recall.

1     Q.    Okay.  I'd like to mark as exhibits next in

2   order two exhibits, the first one being Respondent's

3   Request For Admissions.

4          MR. STATLER:  Actually, if we're going to

5   start going through discovery, we've been going about

6   an hour, can we take a quick break?

7          MS. GRANGER:  No, that's fine.  If we could

8   finish this one thing.

9          MR. STATLER:  Sure.

10          MS. GRANGER:  And the next exhibit, please,

11   which goes along with it is Petitioner's Responses to

12   the Request For Admissions.

13          MR. STATLER:  So requests are 4 and responses

14   are 5?

15          MS. GRANGER:  Yes.

16          (Respondent's Exhibits 4 and 5 were marked for

17   identification.)

18   BY MS. GRANGER:

19     Q.    If you could look at Exhibit 4, Page 2,

20   Request For Admission Number 1.  Do you see that?  Do

21   you see that it states admit that the victim of the

22   crime you were arrested for on or about October 6 was

23   your spouse?

24     A.    Yes.

25     Q.    Do you see that?  And if you could look at

# *James v. Granger, et al.*

## USDC, Eastern District
## Case No. 1:13-cv-0983-AWI-SKO

# EXHIBIT DX2

1  KAMALA D. HARRIS, State Bar No. 146672
   Attorney General of California
2  ALBERTO L. GONZALEZ , State Bar No. 117605
   Supervising Deputy Attorney General
3  CATHERINE WOODBRIDGE GUESS, State Bar No.
   186186
4  Deputy Attorney General
   1300 I Street, Suite 125
5  P.O. Box 944255
   Sacramento, CA 94244-2550
6  Telephone: (916) 445-8216
   Fax: (916) 322-8288
7  E-mail: Catherine.Woodbridge@doj.ca.gov
   *Attorneys for Defendants Stephen Lindley and*
8  *Kimberly Granger*

9                IN THE UNITED STATES DISTRICT COURT

10              FOR THE EASTERN DISTRICT OF CALIFORNIA

11                        FRESNO DIVISION

12

13 | **SCOTT R. JAMES,** | 1:13-CV-0983 AWI SKO |
14 | | |
   | Plaintiff, | **DECLARATION OF LUKE POWELL IN** |
15 | | **SUPPORT OF MOTION FOR** |
   | | **SUMMARY JUDGMENT** |
16 | v. | |
   | | Date:        December 7, 2015 |
17 | **KIMBERLY GRANGER,** | Time:        1:30 p.m. |
   | | Courtroom:   2 |
18 | Defendant. | Judge:       The Honorable Anthony W. |
   | | Ishii |
19 | | Trial Date:  May 17, 2016 |
   | | Action Filed: June 26, 2013 |
20

21      I, Luke Powell, declare:

22      1.      I am a resident of the State of California and employed by the City of Carmel by the

23 Sea as a Sergeant.  At all times relevant to this action, I was employed by the Bureau of Firearms

24 as a Special Agent.  My supervisor at the Bureau of Firearms, Lee Carega, requested that I

25 investigate Plaintiff for possible violation of 18 U.S.C. § 992(g)(9) because he is a prohibited

26 person.

27      2.      As part of my investigation, I conducted searches using the Automated Firearms

28 Systems (AFS), Armed Prohibited System (APS), Domestic Violence Restraining Order System

                                         1

1    (DVROS), Assault Weapons Registry (AWR), Automated Criminal History System (ACHS),

2    Wanted Persons System (WPS), and Mental Health Firearms Prohibited System (MHPS), and

3    obtained copies of the 1996 criminal matter, including the police report regarding Plaintiff's 1996

4    arrest. My search revealed that between plaintiff's 1996 conviction for battery and January 2011,

5    Plaintiff attempted to purchase a firearm on at least eight occasions. Plaintiff was denied

6    purchase on seven occasions because of his battery conviction. On each occasion that Plaintiff

7    was denied purchase, he was issued a letter from the California Department of Justice informing

8    Plaintiff that he is a prohibited person. I obtained Plaintiff's application for purchase of firearms

9    in January 2011. In that application, Plaintiff failed to identify his residence as required and

10   failed to identify his prior criminal convictions. I also obtained a part of the civil deposition

11   transcript in the mandamus case in which Plaintiff admitted owning firearms. Based on the facts

12   and evidence uncovered during my investigation, I prepared a request for search warrant of

13   Plaintiff's residence and vehicles. Ms. Granger did not assist in preparing or prepare the search

14   warrant. Ms. Granger did not review the request for search warrant. Chief Lindley did not assist

15   in preparing, prepare or review the request for search warrant.

16       3.    On October 4, 2011, the search warrant was issued by Tulare County Judge Hillman.

17       4.    On October 13, 2011, the search warrant of Plaintiff's residence and vehicles was

18   executed. I was present. Ms. Granger did not order or direct the search of Plaintiff's home or

19   seizure of his firearms. The search of Plaintiff's home uncovered more than 30 firearms and over

20   4,000 rounds of ammunition. In addition, a January 30, 2011 letter from the Department of

21   Justice notifying Plaintiff that he was prohibited from owning or purchasing firearms was found

22   in Plaintiff's gun safe. Following the search, I arrested Plaintiff. At no time did Ms. Granger

23   direct me to arrest Plaintiff. At no time did Chief Lindley direct me to arrest Plaintiff.

24

25

26

27

28

2

1'

2        I declare under penalty of perjury that the foregoing is true and correct.  Executed this 27th

3    day of October, 2015, at Carmel by the Sea, California.

4

5                                  Luke Powell

6    SA2013309877
     32261925
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                3

# _James v. Granger, et al._

## USDC, Eastern District
## Case No. 1:13-cv-0983-AWI-SKO

# EXHIBIT DX3

Case 1:13-cv-00983-AWI-SKO   Document 73-2   Filed 11/04/15   Page 17 of 59

STEPHEN LINDLEY                                                September 23, 2015
JAMES vs. GRANGER                                                          1–4

## Page 1

```
 1              UNITED STATES DISTRICT COURT
 2              EASTERN DISTRICT OF CALIFORNIA
 3
 4    SCOTT R. JAMES,
 5            Plaintiff,
 6        vs.             CASE NO. 1:13-cv-00983-AWI-SKO
 7    KIMBERLY GRANGER, an
      individual; STEVE LINDLEY,
 8    an individual,
 9            Defendants.
10    -----------------------------
11
12
13
14
15
16                  DEPOSITION OF
17                  STEPHEN LINDLEY
18
19
20              September 23, 2015
21                  12:48 p.m.
22
23              2151 River Plaza Drive
                    Suite 300
24              Sacramento, California
25      JENNIFER SCHUMACHER, CSR No. 9763
```

## Page 2

```
 1              APPEARANCES OF COUNSEL
 2
 3    For the Plaintiff Scott R. James:
 4        HERR PEDERSEN & BERGLUND
          BY:  RON STATLER, Esq.
 5        100 Willow Plaza, Suite 300
          Visalia, California 93291
 6        (559) 636-0200
          Rstatler@hpblaw.net
 7
 8    For the Defendants Kimberly Granger and Steve Lindley:
 9        STATE OF CALIFORNIA
          DEPARTMENT OF JUSTICE
10        BY:  CATHERINE WOODBRIDGE, Esq.
          1300 I Street, Suite 1101
11        Sacramento, California 94244
          (916) 445-8216
12        Catherine.woodbridge@doj.ca.gov
13
      For the Bureau of Firearms:
14
15        STATE OF CALIFORNIA
          DEPARTMENT OF JUSTICE
16        CIVIL LAW DIVISION
          BY:  ROBERT D. WILSON, Esq.
17        1300 I Street, Suite 125
          Sacramento, California 94244
18        (916) 327-7870
          Robert.wilson@doj.ca.gov
19
20    Also Present:
21        Scott James
22                  --oOo--
23
24
25
```

## Page 3

```
 1              INDEX OF EXAMINATIONS
 2    WITNESS: STEPHEN LINDLEY
 3    EXAMINATION                          PAGE
 4    MR. STATLER:                            5
 5
 6
 7                  ---oOo---
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
 1              INDEX TO EXHIBITS
 2    Exhibit           Description        Page
 3
 4    Exhibit 1      Notice of Deposition    14
 5
 6
 7                  ---oOo---
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



STEPHEN LINDLEY
JAMES vs. GRANGER
September 23, 2015
53–56

Case 1:13-cv-00983-AWI-SKO   Document 73-2   Filed 11/04/15   Page 18 of 59

**Page 53**

1 the case, who is not the district attorney, who is the
2 chief of the Bureau of Firearms over thousands of cases.
3 BY MR. STATLER:
4    Q. Did you believe Mr. James to be prohibited from
5 owning a firearm under state law at the time of the
6 search warrant?
7    MR. WILSON: Same objection. But you can
8 answer, if you know.
9    THE WITNESS: I don't believe that he was. I
10 believe that the prohibition had expired on the
11 California time frame but was still in place under
12 federal law.
13 BY MR. STATLER:
14    Q. Can you tell me if that's Title 18 of the
15 United States code?
16    A. No idea. It's a very large code.
17    Q. Yes, it is. Do you review requests from
18 Department of Justice agents seeking search warrants, do
19 you review their statements of probable cause before
20 they are submitted to the court?
21    A. Rarely.
22    Q. Okay.
23    A. Not as a chief or assistant chief.
24    Q. And sometimes you might, is that what you're
25 saying?

**Page 54**

1    A. There could always be a circumstance where it
2 would warrant my review.
3    Q. Did you review the search warrant for
4 Mr. James' house before it was executed -- or before it
5 was submitted to the court?
6    A. No, I did not.
7    Q. Did you take a look at it before it was
8 actually executed?
9    A. No, I did not.
10    Q. Have you ever actually looked at it?
11    A. No, I have not.
12    Q. All right. I think we are done here. Thank
13 you very much.
14    A. Thank you.
15    MS. WOODBRIDGE: Can I get a copy?
16    MR. STATLER: And I'll need a copy, too.
17    (The deposition concluded at 2:18.)
18            * * *
19
20
21
22
23
24
25

**Page 55**

1        DECLARATION UNDER PENALTY OF PERJURY
2
3    I, STEPHEN LINDLEY, do hereby certify under penalty
4 of perjury that I have read the foregoing transcript of
5 my deposition taken on September 23, 2015; that I have
6 made such corrections as appear noted herein in ink,
7 initialed by me; that my testimony as contained herein,
8 as corrected, is true and correct.
9
10    DATED this _____ day of _____, 2015,
11 at _____ , California.
12
13
14
15        _____

        STEPHEN LINDLEY
16
17
18
19
20
21
22
23
24
25

**Page 56**

1        REPORTER'S CERTIFICATION
2
3    I, JENNIFER SCHUMACHER, a Certified Shorthand
4 Reporter in and for the State of California, do hereby
5 certify:
6
7    That the foregoing witness was by me duly sworn;
8 that the deposition was then taken before me at the time
9 and place herein set forth; that the testimony and
10 proceedings were reported stenographically by me and
11 later transcribed into typewriting under my direction;
12 that the foregoing is a true record of the testimony and
13 proceedings taken at that time.
14
15    IN WITNESS WHEREOF, I have subscribed my name this
16 October 4, 2015.
17
18
19        _____
20        JENNIFER SCHUMACHER, CSR No. 9763
21
22
23
24
25

CASE 1:13-cv-00983-AWI-SKO   Document 73-2   Filed 11/04/15   Page 19 of 59

STEPHEN LINDLEY                                                    September 23, 2015
JAMES vs. GRANGER                                                          5-8

| Page 5 | Page 7 |
|---|---|
| 1    DEPOSITION OF STEPHEN LINDLEY<br>2    September 23, 2015<br>3    --oOo--<br>4    STEPHEN LINDLEY,<br>5  having been first duly sworn, testified as follows:<br>6<br>7    EXAMINATION<br>8  BY MR. STATLER:<br>9    Q.  Good afternoon.  My name is Ron Statler.  We<br>10  met briefly before the deposition.  Have we ever met<br>11  before we met before this deposition?<br>12    A.  I don't believe so.<br>13    Q.  That was not a good question, but you<br>14  understood it, I think.<br>15    A.  Yes.<br>16    Q.  Could you please state your full name.<br>17    A.  Stephen J. Lindley, S-t-e-p-h-e-n<br>18  L-i-n-d-l-e-y.<br>19    Q.  And what is your current occupation?<br>20    A.  I'm a special agent for the California<br>21  Department of Justice.  I'm currently assigned as the<br>22  chief of the Bureau of Firearms.<br>23    Q.  And how long have you been the chief of Bureau<br>24  of Firearms?<br>25    A.  Cumulatively five and a half, nearly six years. | 1  education.<br>2    Q.  I should say, have you been through POST<br>3  training?<br>4    A.  Yes.  Went through the POST police academy back<br>5  in 1991, and a multitude of different POST classes since<br>6  then.<br>7    Q.  And have you ever worked for -- well, I should<br>8  say before you were the chief of the Bureau of Firearms,<br>9  what was your position?<br>10    A.  I've worked through the chain at the Department<br>11  of Justice, and before that I was a police officer in a<br>12  city in Southern California.<br>13    Q.  Okay.  When did you start working with the<br>14  state?<br>15    A.  February 2001.<br>16    Q.  Thank you.  And have you always been with the<br>17  Bureau of Firearms?<br>18    A.  No.<br>19    Q.  What other divisions at the state have you<br>20  worked for?<br>21    A.  I've always been within the division of law<br>22  enforcement.  When I first got hired by the department,<br>23  I was in the California Bureau of Investigations.  I was<br>24  later assigned to the Mission support branch of regional<br>25  law enforcement, and then to the Bureau of Firearms. |
| **Page 6** | **Page 8** |
| 1    Q.  You say cumulatively.  Was there a break in<br>2  your assignment?<br>3    A.  Just between the acting assignment and then the<br>4  full promotion.<br>5    Q.  So you were initially named as an acting chief<br>6  and now you're the chief?<br>7    A.  Yes.<br>8    Q.  When were you named the actual chief?<br>9    A.  August of 2011-ish.<br>10    Q.  And what does the job of chief of Bureau of<br>11  Firearms entail?  What is your job description?<br>12    A.  We could be here a while.<br>13    Q.  In general.<br>14    A.  I oversee the operations of Bureau of Firearms,<br>15  both enforcement and in programming.<br>16    Q.  Are you a sworn police officer?<br>17    A.  Yes, I am.<br>18    Q.  Or I should say it would be peace officer; is<br>19  that correct?<br>20    A.  It could be either.<br>21    Q.  And are you an attorney?<br>22    A.  No, I'm not.<br>23    Q.  And what kind of law enforcement education have<br>24  you had?<br>25    A.  I don't quite understand, law enforcement | 1    Q.  Thank you.  And is POST training an important<br>2  component of any law enforcement officer's career?<br>3    A.  Yes, there are mandates by POST in order to<br>4  keep a peace officer certified.<br>5    Q.  Has all your conduct in dealing with Scott<br>6  James been in conformity with POST training?<br>7    MS. WOODBRIDGE:  Objection.<br>8    MR. WILSON:  If you want to ask him about some<br>9  particular provision of POST training that you have in<br>10  mind, that would be all right.  But just an overall<br>11  general question is a little bit too vague.<br>12    MR. STATLER:  Okay.<br>13    MR. WILSON:  And also there's no foundation<br>14  about his dealings with Scott James.<br>15    MR. STATLER:  Fair enough.  We'll come back to<br>16  that later.<br>17  BY MR. STATLER:<br>18    Q.  Would you agree that a reasonable law<br>19  enforcement officer should always conduct himself or<br>20  herself in conformity with POST standards?<br>21    MR. WILSON:  He's not here to answer<br>22  hypothetical questions or opinion questions.  You can<br>23  ask him what he did with respect to this matter.  That's<br>24  fine.<br>25  BY MR. STATLER: |

Page 21

1 Q. Were you aware of the issues he was raising in
2 that lawsuit?
3 A. Not that I can remember.
4 Q. At the time that you spoke to Ms. Granger, do
5 you recall if a deposition of Mr. James had been taken
6 before that?
7 MR. WILSON: You can answer that.
8 THE WITNESS: I became aware of that deposition
9 while speaking with Ms. Granger.
10 BY MR. STATLER:
11 Q. So you weren't aware of the deposition before
12 it was taken?
13 A. Not that I can remember.
14 Q. Okay. When you spoke to Ms. Granger that day,
15 were you seeking legal advice of an attorney from her?
16 MR. WILSON: Ms. Granger is the attorney for
17 the bureau. Her job was to provide legal advice on an
18 ongoing daily basis. So this is a little bit of a
19 different situation, I think, than when you might have a
20 client that goes out, you know, wanting to talk to a
21 lawyer about something that they are involved in. I
22 think the attorney-client relationship exists at all
23 times.
24 MR. STATLER: And I understand your position on
25 that. And I ordinarily don't like to meet and confer on

Page 22

1 the record like this, but we'll go ahead and discuss it.
2 I think the issue we have is that while the relationship
3 exists, not everything that happens in it is necessarily
4 going to be privileged. For one thing, if he's
5 asserting advice of counsel, then that could very well
6 lead to a breaching of the confidence. But also, we
7 have to figure out, did this involve actual legal
8 services that she was providing. I believe that her
9 testimony was that she was actually reporting to
10 Mr. Lindley.
11 MS. WOODBRIDGE: As the attorney reporting to a
12 client. The Bureau of Firearms is an entity. He's the
13 chief of it. So she would report to her client, chief.
14 MR. STATLER: Okay.
15 MS. WOODBRIDGE: She wasn't direct -- I mean,
16 we went through her employment chain of command.
17 MR. STATLER: Right.
18 MS. WOODBRIDGE: In her deposition.
19 MR. STATLER: She had given a simile that gave
20 me a different impression also, though. She had said
21 she had reported to Mr. Lindley as much as I would
22 report to Mr. Herr. So was her supervisor. That's
23 one of the reasons I was confused. I recognize that may
24 not be the actual relationship; however, there's going
25 to be some point at which the relationship is reportage

Page 23

1 that lead to action. And so we may very well have to
2 figure out very carefully how to handle this without
3 violating attorney-client privilege. But I don't know
4 that every conversation they have is necessarily
5 privileged. Otherwise, we would have a completely
6 opaque attorney general's office, which doesn't seem to
7 be possible.
8 MS. WOODBRIDGE: Well, any communication
9 between attorney and client, regardless of the matter,
10 is going to be protected by the attorney-client
11 privilege, and both parties have to keep that
12 confidential. He can't -- I mean, to my knowledge the
13 bureau hasn't waived it.
14 MR. WILSON: No, we haven't waived it. And I
15 think the challenge that we have here is that we're --
16 Mr. James has sued the chief and Kimberly, so it's all
17 about litigation. It's all privileged. So I think that
18 the best thing we can do here today is you can ask the
19 chief what he knows -- not what he's talked about, not
20 what was said between him and Kimberly Granger, but just
21 his general knowledge of the case and what transpired in
22 terms of after he learned. I think we'll make some good
23 progress there. But the conversations between the chief
24 and Ms. Granger are going to be privileged except for
25 the fact that I think she said in her deposition she

Page 24

1 informed him about the deposition with Mr. James. But
2 that will probably be the limit of it.
3 MS. WOODBRIDGE: That's correct. I allowed her
4 to testify about what she did in her course and scope of
5 employment as a deputy attorney general.
6 MR. STATLER: Okay. So understanding that, I
7 don't want there to be read into this any kind of waiver
8 of us meeting and conferring later about this.
9 MR. WILSON: No problem.
10 MR. STATLER: I do want to avoid unnecessary
11 future depositions or have them take longer than they
12 need to.
13 BY MR. STATLER:
14 Q. So Chief Lindley, did you supervise Kimberly
15 Granger in any way? Was that a part of your job at all?
16 A. It's a unique situation where she works for me
17 as far as the -- being the chief of the Bureau of
18 Firearms, but her supervision comes from the government
19 law section because I am not an attorney.
20 Q. And so what supervisorial role do you actually
21 play, recognizing you are not a lawyer?
22 A. She provides advice to me and the bureau on
23 daily activities, lawsuits, criminal issues, civil
24 issues.
25 Q. Do you have any authority over her?



Page 33

1  of that particular case.
2  BY MR. STATLER:
3    Q. Have you ever known that to happen, which might
4  be a better question?
5    A. On a ride-along.
6    Q. Yes.
7    A. Ride-alongs don't occur that often. However,
8  one of the requirements for our attorney assigned to the
9  Bureau of Firearms is they be available by telephone or
10  in person for our agents so they can ask questions.
11    Q. Is that a written policy?
12    A. I think that was an agreement between the
13  Bureau of Firearms and the government law section as far
14  as the guidelines and the job description of that
15  particular position.
16    Q. Okay. Thank you. Again, I'm sure there's
17  many, but could you give me an estimate of how many
18  search warrants you have executed?
19    MR. WILSON: I was just going to say, in
20  person?
21  BY MR. STATLER:
22    Q. Personally, yes.
23    A. That's what I was going to ask. Over the
24  course of my career, over a hundred.
25    Q. And are searches considered dangerous

Page 34

1  conditions for law enforcement officers?
2    A. Absolutely.
3    Q. In your execution of search warrants, have you
4  ever -- I'm sorry. Strike that. I'll start it over.
5    Have you ever been on a search warrant
6  execution where a peace officer had to pull his weapon?
7    A. Just pulling their weapon?
8    Q. Yes.
9    A. Yes.
10    Q. Did any of those executions ever involve shots
11  fired by either peace officers or anyone else?
12    A. Fortunately, no.
13    Q. Did you ever have to pull your weapon during a
14  search warrant execution?
15    A. Yes.
16    MR. WILSON: Can I ask what the relevance of
17  this is?
18    MR. STATLER: Well, actually, I'm pretty much
19  done with that line. I think the reason I'm asking that
20  might become clear.
21    MR. WILSON: Okay.
22  BY MR. STATLER:
23    Q. Have you ever observed people whose homes are
24  being searched being upset by the search?
25    A. Yes.

Page 35

1    Q. Is that common?
2    A. It's not uncommon.
3    Q. Are you familiar with what's known as a knock
4  and talk?
5    A. Yes.
6    Q. Can you tell me what a knock and talk is?
7    A. You knock on a person's door, you talk to them,
8  and during the course of that conversation usually you
9  ask for permission to search the residence.
10    Q. Are you familiar with something known as a
11  claim and delivery in civil law?
12    A. No.
13    Q. Are you familiar with the Civil Discovery Act
14  of the California Code of Civil Procedure?
15    A. Can't say that I am.
16    Q. Do you know what civil discovery is in a
17  lawsuit?
18    A. Yes, roughly.
19    Q. Do you understand it to be an exchange of
20  information between parties in a lawsuit, along with
21  other things?
22    A. Yes.
23    Q. Do you know if in the course of a civil
24  dispute -- I'm sorry. I'm going to strike that again.
25    Do you know if in the course of a civil

Page 36

1  litigation there are mechanisms by which the court can
2  order property to be held by third parties pending a
3  determination of whether or not one party or the other
4  can possess them?
5    A. No.
6    Q. I'm impressed that you followed that question.
7  Thank you. That was very long. I apologize.
8    But does the Department of Justice -- or have
9  you ever known the Department of Justice to send letters
10  to persons asking them to turn over any weapons that
11  they might own because they are believed to be
12  prohibited from owning them?
13    A. Not since I've been assigned to the Bureau of
14  Firearms.
15    Q. Have you ever heard of that practice being done
16  in the past?
17    A. No.
18    Q. Can knock and talks be used to ask people to
19  turn their weapons over?
20    A. They can.
21    Q. Assuming that person is believed not to be
22  allowed to own them; is that correct?
23    A. I think you have to rephrase that. You lost me
24  a little bit.
25    Q. Yeah, that was all over the place. It's

Case 1:13-cv-00983-AWI-SKO   Document 73-2   Filed 11/04/15   Page 22 of 59

Page 37

1  basically what I asked you before but making it --
2  trying to add in the extra fact.
3      If a person is believed not to be able to own a
4  firearm, can knock and talks be used to recover firearms
5  they might be in possession of?
6    A.  Yes.
7    Q.  Are they ever used for that purpose?
8    A.  Yes.
9    Q.  When would knock and talks be used as opposed
10  to a search warrant?
11    A.  When you don't have probable cause for a search
12  warrant.
13    Q.  So if there's probable cause, regardless of the
14  circumstances, you will use a search warrant; is that
15  correct?
16    A.  Are you asking me personally or every officer
17  in the state of California?
18    Q.  I'm asking for your department, the Bureau of
19  Firearms that you're the chief of.
20      MS. WOODBRIDGE:  If there's a policy.  You have
21  to assume that there would be a policy.
22      MR. STATLER:  I'm sorry.  I'll reask the
23  question.
24  BY MR. STATLER:
25    Q.  Is there a policy in the Bureau of Firearms

Page 38

1  that says if there's probable cause to get a search
2  warrant, a search warrant will be used as opposed to a
3  knock and talk to recover firearms from prohibitive
4  persons?
5    A.  I wouldn't say it's a policy, but it's a strong
6  guideline as a professional practice.
7    Q.  Can you tell me what the thought process is
8  behind the guideline?
9    A.  My thought process behind the guideline?
10    Q.  Well, is it one that you've imposed?
11    A.  Yes.
12    Q.  Did it originate with you?
13    A.  I don't know what they did before I was there,
14  but since I've been assigned to the Bureau of Firearms
15  and everyone under my chain of command, I've had
16  specific guidelines on how I like investigations
17  conducted.
18    Q.  Okay.  And just so I get an idea of -- did you
19  ever hold a position with the Bureau of Firearms that
20  did not include being the chief or the acting chief?
21    A.  Yes.
22    Q.  So before you were the chief or the acting
23  chief, was this also a guideline at the Bureau of
24  Firearms?
25    A.  Again, when it came to the teams that I

Page 39

1  commanded, yes.  And as I rose through the chain of
2  command, it encompassed more individuals.
3    Q.  Okay.  So it sounds like there may have been
4  others who were also using this guideline, but it was
5  not necessarily department -- or bureau wide?
6    A.  It's a common law enforcement practice, that if
7  you have enough information or enough probable cause, it
8  behooves you to get a search warrant as compared to
9  doing a knock and talk.  That's regardless if a person
10  is a homicide suspect, a burglar case, a check fraud
11  case, a prohibited person.
12    Q.  But does -- and I'm sorry.  I'll go ahead and
13  just give you a brief statement.  I was always under the
14  impression it was preferred to have consent to get
15  property.  Is what you're telling me only involve
16  firearms searches, or is that for any kind of search?
17    A.  Okay.  I've been in law enforcement since I was
18  19 years old.  I've been a peace officer since I was 20
19  and a half.  And during that entire time, nearly 25
20  years, if you have enough information for enough
21  probable cause, you get a search warrant.  A knock and
22  talk asking for consent is not the best practice.  One,
23  the person can say no.  And then during the time frame
24  that you have to go get that search warrant evidence
25  disappears.

Page 40

1      So the best practice in law enforcement, you
2  can probably talk to any district attorney, that if you
3  have enough probable cause to seek a search warrant,
4  seek a search warrant.  That also encompasses normally a
5  review by a district attorney or some type of
6  prosecuting attorney and a review and a signature by the
7  judge.  So you have the permission of the judge, if not ·
8  the order of the judge, to go execute that search
9  warrant and get that property from that individual based
10  on the probable cause that you presented to that judge
11  via an affidavit.
12    Q.  Okay.  You know, I'm going to go ahead and take
13  a quick break.
14      (Break.)
15  BY MR. STATLER:
16    Q.  Back on the record.  Chief Lindley, when was
17  the last time you spoke to Luke Powell?
18    A.  Professionally or personally?
19    Q.  Professionally.
20    A.  I can't think of the date.  On a professional
21  level it's been several years.  He was laid off back in
22  February of 2012.  I don't remember when he actually
23  left the department, if he left before that time, before
24  he was slated to be laid off or not.
25    Q.  When was the last time you spoke to him



Page 41

1   personally, on personal matters?
2      A.  Couple months ago.
3      Q.  So I take it you haven't spoken to him in the
4   last 24 hours?
5      A.  No, I have not.
6      Q.  When was the last time you spoke to Kimberly
7   Granger?
8      A.  I believe it was last week.
9      Q.  Do you still have professional contact with
10  her?
11     A.  She's not with the Department of Justice, so my
12  contact with her is now personal.
13     Q.  Did you discuss the case with her?  I should
14  say, I'm sorry, this case with her.
15     A.  We discussed that I was going to be attending a
16  deposition.
17     Q.  And what was the -- what did she tell you?
18     MS. WOODBRIDGE:  Was this at the settlement
19  conference we were all --
20     THE WITNESS:  No, it was a telephone
21  conversation.
22  BY MR. STATLER:
23     Q.  Thank you.  What did she tell you about -- I'm
24  sorry.  Did you talk to her about what -- the testimony
25  you were going to give today?

Page 42

1      A.  No.
2      Q.  Did she talk about testimony that you were
3   going to give today?
4      A.  No.
5      Q.  And I've asked a general question along these
6   lines, but I'm going to be a little more specific.  Did
7   you send her on the ride-along, or did you direct her to
8   be on a ride-along at Scott James' home during the
9   execution of the search warrant?
10     A.  Did I direct her to?
11     Q.  Yes.
12     A.  Not that I remember.
13     Q.  Had you directed her to attend any other
14  ride-alongs?
15     A.  Not that I remember.
16     Q.  And perhaps just to make sure we covered it, by
17  direct, I mean as her supervisor, did you tell her to go
18  on the ride-along?
19     A.  No.  Again, as I testified earlier, it's a good
20  idea for our attorney to understand what our agents do
21  out in the field.  And I have suggested both at that
22  time to Ms. Granger and to Mr. Wilson that they should
23  go out to the field with our agents and understand what
24  they do out there.
25     Q.  When you first learned that Kimberly Granger's

Page 43

1   ride-along occurred at the home of a person who was also
2   a civil litigant in a case she was handling, was that a
3   matter of concern for you as her client?
4      A.  No.
5      Q.  Did you give it any thought whatsoever?
6      A.  I did give it some thought.
7      Q.  I'm sorry?
8      A.  I did give it some thought.
9      Q.  Thank you.  Can you tell me what you were
10  thinking?
11     A.  Specifically at the time, that would be hard to
12  identify.  That it was a criminal case, and she went on
13  a ride-along.
14     Q.  Do you understand that criminal investigations
15  and civil lawsuits should be kept separate in the
16  Department of Justice?  Is that your understanding?
17     MR. WILSON:  Objection.  Lacks foundation.
18  BY MR. STATLER:
19     Q.  You can answer.
20     A.  That's not really something that I worry about.
21  I deal mainly, when it comes to enforcement operations,
22  with criminal violations.
23     Q.  Did your position include any civil litigation
24  duties, aside from being sued?
25     MR. WILSON:  Objection.  Vague and ambiguous as

Page 44

1   to duties.
2      THE WITNESS:  I was going to say, you kind of
3   need to explain that a little bit more for me to answer
4   it.
5   BY MR. STATLER:
6      Q.  You testified earlier that you have been sued
7   several times as the chief of the Bureau of Firearms.
8   But as far as the chief's job, does it involve any civil
9   litigation for the attorney general?
10     A.  I'm not quite following you.
11     MR. WILSON:  Same objection.
12  BY MR. STATLER:
13     Q.  Did you as the chief of the Bureau of Firearms
14  have any responsibilities related to civil litigation?
15     A.  That's pretty vague.  Besides, you know, being
16  the subject of most of them, you know, I leave most of
17  that to the attorneys.
18     Q.  Did you ever task any of your law enforcement
19  officers to investigate people as part of civil
20  litigation?
21     A.  No.
22     Q.  Have you ever in any other case besides
23  Mr. James?
24     A.  The reason we investigated Mr. James is because
25  he identified that he was committing a crime.  That's



Page 45

1 why I investigated him. It had nothing to do with the
2 civil litigation.
3     Q. Do you remember what crime you were actually
4 investigating Mr. James for?
5     A. Being a prohibited person that is armed with
6 firearms.
7     Q. Were there any others that you recall?
8       MS. WOODBRIDGE: Objection. Vague. Other
9 crimes, or other what?
10 BY MR. STATLER:
11    Q. Other crimes that he was identified as a
12 suspect for.
13    A. Not to my knowledge.
14      MR. WILSON: If there were other crimes, it
15 would probably be up to the DA to figure that out.
16      MR. STATLER: Thank you.
17 BY MR. STATLER:
18    Q. I take it -- strike that.
19      The communications you have with the attorneys
20 for the Bureau of Firearms, or the attorney for the
21 Bureau of Firearms, are they required to be documented
22 in any way?
23      MR. WILSON: Objection. Vague and ambiguous.
24 What kinds of conversations or what kinds of
25 communications?

Page 46

1 BY MR. STATLER:
2     Q. If you have a verbal conversation or a spoken
3 conversation with the attorney for the Bureau of
4 Firearms, is that supposed to be documented?
5       MR. WILSON: Same objection. The other thing
6 is, supposed to be documented by what authority? Are
7 you suggesting that there's a rule that every single
8 conversation has to be documented somewhere?
9       MR. STATLER: I'm not suggesting it; I'm
10 asking.
11 BY MR. STATLER:
12    Q. Is there a rule that conversations with counsel
13 are to be documented in some way?
14    A. Not to my knowledge.
15    Q. Thank you for your help.
16      MR. WILSON: I figured it out there, too.
17 BY MR. STATLER:
18    Q. And I'm sure from time to time written legal
19 advice is given by the attorneys to you; is that
20 correct?
21    A. Correct.
22    Q. And that is stored and kept, correct?
23    A. I would assume so.
24    Q. Who would be storing it?
25      MR. WILSON: Objection. Vague and ambiguous.

Page 47

1     Lacks foundation.
2 BY MR. STATLER:
3     Q. Okay. Who do you assume is keeping that
4 written advice?
5     A. It would depend what the advice is and who
6 requested that advice.
7     Q. Oh, forgive me. I'm trying to show that I'm
8 capable of reasoning here.
9       It sounds like maybe if advice is going to be
10 asked for, it might go through you from the agent to the
11 attorney and then back through you to the attorney; is
12 that correct? Or is that just one of many
13 possibilities?
14    A. There's an infinite number of possibilities.
15 Again, our attorney is made available to all of our
16 employees, all of our agents, for advice dealing with a
17 variety of different firearm issues. Not all of that
18 goes through me.
19    Q. And some of that might be verbal and some of it
20 might be written, correct?
21    A. Correct.
22    Q. And just because verbal advice is given, it's
23 not necessarily documented anywhere? Was that your
24 testimony earlier?
25    A. Yes.

Page 48

1     Q. Are you aware of Judge Kalashan?
2     A. Never heard of him.
3     Q. Do you know if Scott James' criminal case was
4 concluded?
5     A. That would be one way to put it. But yes, I
6 understand that his criminal case is no longer going
7 forward.
8     Q. Do you know how it was resolve?
9     A. Not specifically, no.
10    Q. Do you know if there was a conviction?
11    A. There was not a conviction. At least the
12 charges stemming from the DOJ investigation.
13    Q. Okay. Do you know if the evidence gathered at
14 the execution of the search warrant was allowed into
15 evidence in his criminal prosecution?
16    A. It was not allowed into evidence.
17    Q. Do you have any criticisms of that ruling?
18      MR. WILSON: I'll instruct the witness not to
19 answer that.
20      MR. STATLER: Let's take one more brief break.
21 We might be almost done.
22      (Break.)
23 BY MR. STATLER:
24    Q. Back on the record. Chief Lindley, when you
25 and Ms. Granger had the discussion that we're not



# *James v. Granger, et al.*

## USDC, Eastern District
## Case No. 1:13-cv-0983-AWI-SKO

# EXHIBIT DX4

1   KAMALA D. HARRIS, State Bar No. 146672
    Attorney General of California
2   ALBERTO L. GONZALEZ , State Bar No. 117605
    Supervising Deputy Attorney General
3   CATHERINE WOODBRIDGE GUESS, State Bar No.
    186186
4   Deputy Attorney General
    1300 I Street, Suite 125
5   P.O. Box 944255
    Sacramento, CA 94244-2550
6   Telephone: (916) 445-8216
    Fax: (916) 322-8288
7   E-mail: Catherine.Woodbridge@doj.ca.gov
    *Attorneys for Defendants Stephen Lindley and*
8   *Kimberly Granger*

9

10                    IN THE UNITED STATES DISTRICT COURT

11                   FOR THE EASTERN DISTRICT OF CALIFORNIA

12                              FRESNO DIVISION

13

14  | SCOTT R. JAMES,              | 1:13-CV-0983 AWI SKO                    |
    |------------------------------|-----------------------------------------|
15  |                  Plaintiff,  | **DECLARATION OF STEPHEN**              |
16  |         v.                   | **LINDLEY IN SUPPORT OF MOTION**        |
    |                              | **FOR SUMMARY JUDGMENT**                |
17  | **KIMBERLY GRANGER,**        | Date:        December 7, 2015           |
    |                              | Time:        1:30 p.m.                  |
18  |                              | Courtroom:   2                          |
    |                  Defendant.  | Judge:       The Honorable Anthony W.   |
19  |                              |              Ishii                      |
    |                              | Trial Date:  May 17, 2016               |
20  |                              | Action Filed: June 26, 2013             |

21

        I, Stephen Lindley, declare:
22
        1.      I am a resident of the State of California, employed by the State of California, am a
23
    Defendant in this action.
24
        2.      At all times relevant to this action, I was acting Chief and Chief of the Bureau of
25
    Firearms.  Beginning in 2010, Ms. Granger was assigned to the Bureau of Firearms to act as legal
26
    counsel for the Bureau of Firearms, including defending the Bureau of Firearms in any lawsuits.
27
    As part of her job, Ms. Granger reported to me on the status of litigation against the Bureau of
28

                                            1

1  Firearms, including providing any reports or summaries regarding law and motion and discovery.

2  Ms. Granger's job duties also include providing legal advise to agents with the Bureau of

3  Firearms when questions arise during execution of a search warrant.

4      2.    Plaintiff filed a writ of mandamus in the Superior Court of California, County of

5  Tulare challenging his prohibited status. Ms. Granger was assigned to handle the defense of the

6  writ on behalf of the State of California/Bureau of Firearms. Ms. Granger provided a summary of

7  the information obtained from Plaintiff's deposition in the mandamus matter. The State of

8  California considers Plaintiff's conviction is a misdemeanor crime of domestic violence for

9  purposes of 18 U.S.C. § 992(g)(9). The State of California considers Plaintiff a prohibited person

10  unless and until a court deems otherwise. Ms. Granger provided me a summary of the

11  information obtained from Plaintiff's deposition in the writ of mandamus case.

12      3. When the Bureau of Firearms learns that a prohibited person is in possession of firearms,

13  it investigates. If the prohibited person admits possession of firearms in violation of the law, the

14  Bureau of Firearms seeks a search warrant. It has never been the policy of the Bureau of

15  Firearms to send a letter to a prohibited person known to be in possession of firearms and request

16  voluntary relinquishment.

17      4.    When I learned that a prohibited person admitted possessing firearms, I notified

18  Special Agent in Charge John Marsh who is in charge of operation and enforcement for the

19  Northern California area of the Bureau of Firearms that a prohibited person admitted being in

20  possession of firearms. I did not investigate Plaintiff for criminal prosecution or violation of 18

21  U.S.C. § 992(g)(9). I did not assist in preparing, prepare or review the request for search warrant.

22  I did not order or direct the search of Plaintiff's home or seizure of his firearms. I did not arrest

23  Plaintiff nor did I direct the Bureau of Firearms to arrest Plaintiff. At no time did I participate in

24  the criminal prosecution of Plaintiff.

25      5.    At no time did I single out Plaintiff for disparate treatment.

2

Declaration - Lindley  (1:13-CV-0983 AWI SKO)

1

2       I declare under penalty of perjury that the foregoing is true and correct.  Executed this 29

3 day of October, 2015, at Sacramento, California.

4

5

6                   Stephen Lindley

SA2013309877

7 DecLindley.doc

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3

# _James v. Granger, et al._

## USDC, Eastern District
## Case No. 1:13-cv-0983-AWI-SKO

# EXHIBIT DX5

Case 1:13-cv-00983-AWI-SKO Document 73-2 Filed 11/04/15 Page 30 of 59

KIMBERLY JEAN GRANGER Volume 1                                    January 27, 2015
JAMES vs. GRANGER                                                        1—4

## Page 1

```
1              UNITED STATES DISTRICT COURT
2              EASTERN DISTRICT OF CALIFORNIA
3
4   SCOTT R. JAMES,
5              Plaintiff,
                                    CASE NO.
6        vs.                1:13-cv-00983-AWI-SKO
7   KIMBERLY GRANGER, an
    individual,
8
              Defendant.
9
    --------------------------
10
11
12
13
14              DEPOSITION OF
15          KIMBERLY JEAN GRANGER
16                VOLUME 1
17
18            January 27, 2015
19               8:52 a.m.
20
21          2151 River Plaza Drive
                Suite 300
22          Sacramento, California
23
          SHARON CABELLO, CSR No. 3080
24
25
```

## Page 2

```
1          APPEARANCES OF COUNSEL
2
3   For the Plaintiff Scott R. James:
4      DOOLEY, HERR, PEDERSEN & BERGLUND BAILEY
       RON STATLER, ESQ.
5      100 Willow Plaza, Suite 300
       Visalia, CA 93291
6      559.636.0200
       rstatler@dhlaw.net
7
8   For the Defendant Kimberly Granger:
9      STATE OF CALIFORNIA
       OFFICE OF THE ATTORNEY GENERAL
10     CATHERINE GUESS, Deputy Attorney General
       1300 I Street, Suite 1101
11     Sacramento, CA 94244-2550
       916.445.8216
12     catherine.woodbridge@doj.ca.gov
13
14  Also Present:
15     Scott James
       Robert Molden, Special Agent
16
17              --oOo--
18
19
20
21
22
23
24
25
```

## Page 3

```
1            INDEX OF EXAMINATIONS
2   WITNESS: KIMBERLY JEAN GRANGER
3   EXAMINATION                              PAGE
4   By MR. STATLER                             4
5
6              --oOo--
7
8         INFORMATION REQUESTED
9                None
10
11    WITNESS INSTRUCTED NOT TO ANSWER
12               None
13
14             --oOo--
15
16          INDEX TO EXHIBITS
17  Exhibit      Description            Page
18  Exhibit 4   Notice of Taking Deposition Upon
19              Oral Examination           5
20
21             --oOo--
22
23
24
25
```

## Page 4

```
1    DEPOSITION OF KIMBERLY JEAN GRANGER
2            January 27, 2015
3                --oOo--
4        KIMBERLY JEAN GRANGER,
5   Having been first duly sworn, testified as follows:
6              EXAMINATION
7   BY MR. STATLER:
8      Q.  Good morning.
9      A.  Good morning.
10     Q.  Kimberly, as you know I'm Ron Statler, sitting
11  with me is Scott James, and we are here for your
12  deposition.
13         I'm going to show you a document.  If you could
14  take a look at it real quick and let me know if you have
15  ever seen that before?
16     A.  Yes, I have.
17     Q.  Can you tell me what it is?
18     A.  It's the Notice of Deposition.
19     Q.  And can you go ahead and give it to the court
20  reporter and we will go ahead and mark that as
21  Exhibit 1.
22         MS. GUESS:  Would you mind if we did it next in
23  order?  We had three exhibits yesterday, that would be
24  Exhibit 4.
25         MR. STATLER:  Oh, sure.
```



Case 1:13-cv-00983-AWI-SKO   Document 73-2   Filed 11/04/15   Page 31 of 59

KIMBERLY JEAN GRANGER Volume 1
JAMES vs. GRANGER

January 27, 2015
81–84

Page 81

1  a Sheriff's office. The Sheriff's office reviews the
2  application, they also submit their prints for a
3  background investigation that's conducted by the
4  Department of Justice. The Department of Justice sends
5  the results of that background investigation to the
6  issuing agency with respect to whether or not they are
7  clear to have the CCW. Then it is up to the issuing
8  agency as to whether or not to issue that CCW, whether
9  or not someone has a good cause or a good moral
10  character for the issuance of that CCW.
11      Q.  At the time the search warrant was issued were
12  you as familiar with that process as you are today?
13      A.  Yes.
14      Q.  And at the time you first spoke to Agent Powell
15  were you as familiar with that process as you are today?
16      A.  Yes.
17      Q.  Accounting for the fact that you are more
18  experienced now, of course, but basically you had the
19  same degree of familiarity?
20      A.  Yes.
21      Q.  Thank you. And I believe at this time that is
22  all I have.
23      MS. GUESS:  Okay.
24      MR. STATLER:  Reading and signing as per State
25  Code as we did yesterday?

Page 82

1      MS. GUESS:  Can you email her a copy to review?
2      THE COURT REPORTER:  Are you ordering a copy?
3      MS. GUESS:  Yes, I will order a copy.
4      THE COURT REPORTER:  Yes.
5      (The deposition concluded at 11:24 a.m.)
6              * * *
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 83

DECLARATION UNDER PENALTY OF PERJURY

    I, KIMBERLY JEAN GRANGER, do hereby certify under
penalty of perjury that I have read the foregoing
transcript of my deposition taken on January 27, 2015;
that I have made such corrections as appear noted herein
in ink, initialed by me; that my testimony as contained
herein, as corrected, is true and correct.

    DATED this _____ day of _____, 2015,
at _____ , California.


    _____
    KIMBERLY JEAN GRANGER

Page 84

REPORTER'S CERTIFICATION

    I, SHARON CABELLO, a Certified Shorthand Reporter
in and for the State of California, do hereby certify:

    That the foregoing witness was by me duly sworn;
that the deposition was then taken before me at the time
and place herein set forth; that the testimony and
proceedings were reported stenographically by me and
later transcribed into typewriting under my direction;
that the foregoing is a true record of the testimony and
proceedings taken at that time.

    IN WITNESS WHEREOF, I have subscribed my name this
February 2, 2015.


    Sharon Cabello
    _____
    SHARON CABELLO, CSR No. 3080



KIMBERLY JEAN GRANGER Volume 1    January 2... KIMBERL...
Case 1:13-cv-00983-AWI-SKO    Document 73-2    Filed 11/04/15    Page 32 of 59
JAMES vs. GRANGER                                              JAMES v...

Page 5

1        MS. GUESS:  It just makes it easier if we go to
2    trial.
3        MR. STATLER:  Agreed.
4        So that would be Exhibit 4.  Thank you.
5        (Plaintiff's Exhibit 4 was marked
6        for identification.)
7    BY MR. STATLER:
8    Q.  And could you give me your full name including
9    your middle?
10    A.  Kimberly Jean Granger.
11    Q.  And you spelled it for the court reporter so I
12    won't ask you to do that.  For purposes of this
13    litigation are you using your work address, I believe;
14    is that correct?
15    A.  Yes.
16    Q.  Can you go ahead and give that for the record?
17    A.  1300 I Street, the letter I, Sacramento,
18    California 95814.
19    Q.  And that's the address of what?
20    A.  The California Attorney General's office,
21    Department of Justice.
22    Q.  And you work on the 17th floor I believe you
23    said?
24    A.  Yes, sir.
25    Q.  Thank you.  I know you have taken many

Page 6

1    depositions in the past.  Can you tell me if you have
2    ever given a deposition before?
3    A.  I was deposed once.
4    Q.  And what was that in?
5    A.  In the context of a medical malpractice
6    lawsuit.
7    Q.  As a party?
8    A.  Yes.
9    Q.  And you are an attorney; is that correct?
10    A.  Yes.
11    Q.  And rather than asking for an estimate of how
12    many depositions you have taken in the past, how long
13    have you been an attorney?
14    A.  I received my Bar approval in November of 1999,
15    so I've been an attorney for approximately 15 years.
16    Q.  Thank you.  And over the course of that time
17    have you been employed by the Attorney General's office
18    the entire time?
19    A.  No, sir, I have not.
20    Q.  When did you start with the Attorney General's
21    office?
22    A.  January of 2006.
23    Q.  And where did you work before that?
24    A.  The Fifth District Court of Appeals in Fresno.
25    Q.  Oh.  Were you clerking?

1    A.  No, I was a staff attorney for Justice Re...
2    Wiseman.
3    Q.  Excellent.  And you said you testified as...
4    party at a previous deposition in a malpractice...
5    Were you the plaintiff?
6    A.  Yes.
7    Q.  Have you been a party to any other law...
8    A.  No.
9    Q.  And I know this is a very familiar proces...
10    you, but I'm going to go ahead and go through...
11    admonitions.  It's important to remember that...
12    under oath, what you say here is just as sole...
13    would be as if you were in court testifying.  D...
14    understand that?
15    A.  Yes.
16    Q.  The basic ground rules for a deposition...
17    important that you understand my questions.
18    don't answer a question if you don't understa...
19    It's my job to ask you good ones, and if I don'...
20    know.  I'll reask it, I'll try to find a good way to...
21    reask it.  Will you do that for me?
22    A.  Yes.
23    Q.  Please do not guess or speculate, but I...
24    entitled to your best estimate if you don't have...
25    exact answer for me.  Are you comfortable w...

1    difference between a guess and an estimate?
2    A.  Yes.
3    Q.  Please make all your answers verbal as op...
4    to uh-huh or huh-uh or a nod of the head; otherw...
5    court reporter will get very mad at us.
6        Please wait until I -- will you do that for me?
7    A.  Yes.
8    Q.  Please wait until I am finished with my
9    questions -- which you are doing so far beautifull...
10    so that the court reporter will be able to get
11    everything down and also give your attorney an...
12    opportunity to make any objections should she d...
13    do so.  Will you do that for me?
14    A.  Yes.
15    Q.  Okay.  Please answer each question fully...
16    completely knowing full well that if you change y...
17    testimony later, as you will be given an opportun...
18    do after the deposition is over, then I will have t...
19    opportunity to comment on those changes.  Will...
20    that?
21    A.  Yes.
22    Q.  Thank you.  You are represented by legal...
23    counsel in this deposition.  Could you please id...
24    your attorney.
25    A.  Catherine Woodbridge Guess.



**Page 13**

1 BY MR. STATLER:
2   Q. And, I'm sorry, for the deponent, do you
3 consider Peter Krause your lawyer for purposes of this
4 litigation?
5   A. No. He was my supervisor during the course of
6 the James versus State of California case.
7   Q. Thank you. Marc Leforestier, is he your
8 attorney for purposes of this litigation?
9   A. No. He is my supervisor for the purposes of
10 the James versus State of California cases, there were
11 multiple ones.
12   Q. Douglas Woods, is he your attorney for purposes
13 of this litigation?
14   A. No. He is a supervisor in relation to my work
15 on the James versus California cases.
16   Q. Thank you. You did mention some other names,
17 but it sounds like those were names that you seem to
18 focus on so we'll go with those. But if other names
19 come up that there might be an issue about, we'll --
20 we'll hash that out as they are brought up.
21     As I understand it, you were counsel of record
22 -- well, let's not be too formal here.
23     Were you counsel of record for the State
24 Attorney General's Office and the State of California in
25 the mandamus case that Scott James brought regarding

**Page 14**

1 whether was convicted of an MCDD?
2   A. Yes, I was the attorney assigned to handle that
3 case.
4   Q. And just for purposes of the record, MCDD
5 refers to a Misdemeanor Crime of Domestic Violence.
6   A. I believe it may be conviction. "C" could be
7 for conviction, Misdemeanor Conviction of Domestic
8 Violence.
9   Q. I have seen it both ways, which is frustrating.
10 But, yeah, either way.
11     And do you recall when you first discovered
12 that Scott James had purchased firearms -- well, let's
13 go back farther than that.
14     Do you recall what conviction the State
15 considered to be his MCDD?
16   A. It was a battery conviction, a 242 Penal Code
17 Section violation.
18   Q. Do you remember when that conviction happened?
19   A. I believe it was in 1996 or '97.
20   Q. Just to make it easy, I will represent to you
21 it was in '96.
22   A. Okay.
23   Q. And do you remember when you first discovered
24 that Scott James had purchased firearms after his
25 conviction in '96?

---

1   A. I recall that in the Complaint itself Mr. Jame
2 had indicated he had attempted to purchase firea
3 that those firearms purchases had been denied b
4 Department of Justice.
5   Q. Yes. And did you have any other occasion
6 you discovered that Scott James had purchased
7 after his conviction?
8   A. Yes.
9   Q. When was that?
10   A. When I received the Complaint from -- on i
11 case I asked for the background information for
12 Mr. James' DROS purchases and the basis for h
13 so that I could become familiar with the case, be
14 all I had was the Complaint.
15   Q. Sure.
16   A. And so part of that workup would be -- from
17 DROS unit would be any records, electronic reco
18 his attempted purchases, as well as any purchas
19 had been completed.
20   Q. And what did you discover when reviewing
21 regarding the past purchases of firearms by Mr. J
22   A. That some purchases had been completed
23   MS. GUESS: For clarity purposes can you
24 us what DROS is?
25   THE WITNESS: Oh, I'm sorry, D-R-O-S, all

---

1 capital letters, it stands for a Dealer's Record of
2 Sale. And that's the electronic process by which
3 dealers communicate to the Department of Justic
4 someone is attempting to purchase a firearm.
5 BY MR. STATLER:
6   Q. Thank you. Did you ever contact an agent
7 the Department of Justice and inform them that S
8 James had testified under oath that he owned gu
9   MS. GUESS: Objection, attorney-client
10 privilege. To the extent that it is specifically
11 relevant to this lawsuit I will allow her to answer.
12   THE WITNESS: Upon receiving Mr. James
13 admission during his deposition that he was in
14 possession of several long guns and handguns,
15 report to my chain of command that Mr. James l
16 admitted to current possession of those firearms
17 that would be Chief Stephen Lindley, the Chief o
18 Bureau of Firearms.
19 BY MR. STATLER:
20   Q. And what prompted you to do so?
21   A. The fact that Mr. James was considered a
22 prohibited person being in possession of those fi
23   Q. But you were aware that he had filed a ma
24 case to have that determined conclusively by a
25 were you not?

---

1   A. I was,
2 until a Judg
3   Q. And h
4 report a crim
5   MS. G
6 her life?
7 BY MR. ST
8   Q. In the
9 Lindley, had
10 report a crin
11   A. In the
12 just in my r
13 down the s
14   Q. In ge
15   A. Five
16   Q. Yeah
17 memory, yo
18   A. I rem
19 there was a
20 traveling.
21   I conta
22 Departmen
23 hiding behi
24 at dark.
25   There

---

1 sort of road
2 are probabl
3 report to lav
4   Q. Had
5 to report a
6 deposition l
7   A. No.
8   Q. Did y
9   A. I mad
10   Q. And
11   A. It wa
12 discussion
13   Q. Oh,
14 agent nam
15   A. Yes.
16   Q. Actu
17 Lindley abo
18   A. I beli
19 deposition
20 day and to
21 Mr. James
22   Q. So a
23 say it was
24 July 26, 20
25   A. No, t




Page 13

1  BY MR. STATLER:
2      Q.  And, I'm sorry, for the deponent, do you
3  consider Peter Krause your lawyer for purposes of this
4  litigation?
5      A.  No.  He was my supervisor during the course of
6  the James versus State of California case.
7      Q.  Thank you.  Marc Leforestier, is he your
8  attorney for purposes of this litigation?
9      A.  No.  He is my supervisor for the purposes of
10  the James versus State of California cases, there were
11  multiple ones.
12      Q.  Douglas Woods, is he your attorney for purposes
13  of this litigation?
14      A.  No.  He is a supervisor in relation to my work
15  on the James versus California cases.
16      Q.  Thank you.  You did mention some other names,
17  but it sounds like those were names that you seem to
18  focus on so we'll go with those.  But if other names
19  come up that there might be an issue about, we'll --
20  we'll hash that out as they are brought up.
21          As I understand it, you were counsel of record
22  -- well, let's not be too formal here.
23          Were you counsel of record for the State
24  Attorney General's Office and the State of California in
25  the mandamus case that Scott James brought regarding

Page 14

1  whether was convicted of an MCDD?
2      A.  Yes, I was the attorney assigned to handle that
3  case.
4      Q.  And just for purposes of the record, MCDD
5  refers to a Misdemeanor Crime of Domestic Violence.
6      A.  I believe it may be conviction.  "C" could be
7  for conviction, Misdemeanor Conviction of Domestic
8  Violence.
9      Q.  I have seen it both ways, which is frustrating.
10  But, yeah, either way.
11          And do you recall when you first discovered
12  that Scott James had purchased firearms -- well, let's
13  go back farther than that.
14          Do you recall what conviction the State
15  considered to be his MCDD?
16      A.  It was a battery conviction, a 242 Penal Code
17  Section violation.
18      Q.  Do you remember when that conviction happened?
19      A.  I believe it was in 1996 or '97.
20      Q.  Just to make it easy, I will represent to you
21  it was in '96.
22      A.  Okay.
23      Q.  And do you remember when you first discovered
24  that Scott James had purchased firearms after his
25  conviction in '96?

Page 15

1      A.  I recall that in the Complaint itself Mr. James
2  had indicated he had attempted to purchase firearms, and
3  that those firearms purchases had been denied by the
4  Department of Justice.
5      Q.  Yes.  And did you have any other occasion which
6  you discovered that Scott James had purchased firearms
7  after his conviction?
8      A.  Yes.
9      Q.  When was that?
10      A.  When I received the Complaint from -- on this
11  case I asked for the background information for
12  Mr. James' DROS purchases and the basis for his denial
13  so that I could become familiar with the case, because
14  all I had was the Complaint.
15      Q.  Sure.
16      A.  And so part of that workup would be -- from the
17  DROS unit would be any records, electronic records of
18  his attempted purchases, as well as any purchases that
19  had been completed.
20      Q.  And what did you discover when reviewing those
21  regarding the past purchases of firearms by Mr. James?
22      A.  That some purchases had been completed.
23          MS. GUESS:  For clarity purposes can you tell
24  us what DROS is?
25          THE WITNESS:  Oh, I'm sorry, D-R-O-S, all

Page 16

1  capital letters, it stands for a Dealer's Record of
2  Sale.  And that's the electronic process by which
3  dealers communicate to the Department of Justice that
4  someone is attempting to purchase a firearm.
5  BY MR. STATLER:
6      Q.  Thank you.  Did you ever contact an agent of
7  the Department of Justice and inform them that Scott
8  James had testified under oath that he owned guns?
9          MS. GUESS:  Objection, attorney-client
10  privilege.  To the extent that it is specifically
11  relevant to this lawsuit I will allow her to answer.
12          THE WITNESS:  Upon receiving Mr. James'
13  admission during his deposition that he was in
14  possession of several long guns and handguns, I did
15  report to my chain of command that Mr. James had
16  admitted to current possession of those firearms.  And
17  that would be Chief Stephen Lindley, the Chief of the
18  Bureau of Firearms.
19  BY MR. STATLER:
20      Q.  And what prompted you to do so?
21      A.  The fact that Mr. James was considered a
22  prohibited person being in possession of those firearms.
23      Q.  But you were aware that he had filed a mandamus
24  case to have that determined conclusively by a Judge,
25  were you not?



Case 1:13-cv-00983-AWI-SKO Document 73-2 Filed 11/04/15 Page 35 of 59

KIMBERLY JEAN GRANGER Volume 1                                    January 27, 2015
JAMES vs. GRANGER                                                        17–20

Page 17

1      A.  I was, but he was still considered prohibited
2   until a Judge decided to the contrary.
3      Q.  And had you ever contacted law enforcement to
4   report a crime before that?
5      MS. GUESS:  Objection, vague.  At any time in
6   her life?
7   BY MR. STATLER:
8      Q.  In the five years prior to contacting Chief
9   Lindley, had you ever contacted law enforcement to
10  report a crime?
11     A.  In the context of my work as an attorney, or
12  just in my neighborhood seeing something strange walk
13  down the street?
14     Q.  In general.
15     A.  Five years prior to that time?
16     Q.  Yeah.  Or if that's too long, let's go in
17  memory, you know, to the best of your recollection.
18     A.  I remember making a phone call to CHP when
19  there was a fire on the side of the road when I was
20  traveling.
21         I contacted the West Sacramento Police
22  Department within the last year regarding somebody
23  hiding behind the mailboxes when I walked my mother out
24  at dark.
25         There may have been another call to CHP on some

Page 18

1   sort of road accident, to report an accident, but those
2   are probably the only three times I have ever made a
3   report to law enforcement.
4      Q.  Had you ever contacted law enforcement officers
5   to report a crime based on testimony that you heard in a
6   deposition before that?
7      A.  No.
8      Q.  Did you request that they investigate it?
9      A.  I made no request, I just simply reported it.
10     Q.  And that call was to Chief Lindley, correct?
11     A.  It wasn't a phone call, it was an in-person
12  discussion.
13     Q.  Oh, thank you, okay.  Did you ever speak to an
14  agent named Luke Powell?
15     A.  Yes.
16     Q.  Actually, may I ask when you spoke to Chief
17  Lindley about Scott James?
18     A.  I believe I drove home that evening after the
19  deposition with Mr. James, and I went to work the next
20  day and told him.  So whatever the next day was after
21  Mr. James' deposition in the mandamus action.
22     Q.  So assuming my memory is correct, and I will
23  say it was July 25th of 2011, it would have happened on
24  July 26, 2011; is that correct?
25     A.  No, that would have been the day before the

Page 19

1   deposition.  You said -- the deposition was when?
2      Q.  July 25th.
3      A.  Oh, okay, the day after.  If your
4   representation is correct -- it was the day after his
5   deposition.
6      Q.  Right.  I was just trying to get the date of
7   the deposition in.
8          And do you remember when you spoke to Agent
9   Powell?
10     A.  It may have been the day -- that day or the
11  next day.
12     Q.  Do you remember if you called him or he called
13  you?
14     A.  I do not.
15     Q.  Before Scott James' mandamus case had you been
16  -- had you represented the Bureau of Firearms in any
17  civil matters regarding a citizen's ability to own a
18  firearm?
19     A.  No.  I'm sorry, could you repeat that question?
20     Q.  That was very long.  Have you been in any cases
21  regarding MCDDs and representing the State before Scott
22  James' case?
23     A.  It's not a yes or no answer, if I may explain.
24     Q.  Sure.
25     A.  In the context of my being the attorney for the

Page 20

1   Bureau of Firearms I am frequently contacted by
2   attorneys regarding why their client was denied a gun
3   purchase.  A lot of times they are related to a
4   misdemeanor crime of domestic violence, because they
5   look in the Penal Code and the Penal Code says the State
6   prohibition is 10 years.
7          So they say it has been 10 years and one day,
8   why isn't he clear?  And then I have to explain to them
9   that there is a Federal prohibition, that's a lifetime
10  prohibition.  I provide them usually with the Federal
11  Code Section and any cases interpreting that.  And so, I
12  don't know -- that's in my work as the attorney for the
13  Bureau that I have had conversations with attorneys.
14         But as far as representing the Bureau in an
15  action where somebody is challenging our decision on a
16  MCDD, this is the first and only one that I have done.
17     Q.  Thank you.
18     A.  Does that make sense?
19     Q.  Yes, it does.  At least I believe it does.
20     A.  Okay.
21     Q.  When did you first get the transcript from
22  Scott James' deposition?
23     A.  I don't recall when I received the official
24  transcript.
25     Q.  Did you get an advanced copy of it?



Page 21

1    A. I'm not certain if I received an advanced copy
2  of it. I just asked for -- I remember asking the court
3  reporter for an electronic version, and I think -- it
4  was weird. They have like an on-line system where you
5  can maybe get access to the electronic version, and I
6  remember I had problems, I had to call whoever the court
7  reporter was to figure out how to access the on-line
8  version. But then at some point I did get the hard copy
9  version, but I don't recall when that was specifically.
10    Q. Before you spoke to Chief Lindley about Scott
11  James' testimony had you spoken to anybody else about
12  whether you should report it?
13    A. No.
14    Q. When Scott James admitted during his deposition
15  that he owned guns was there anything about his answer
16  that you considered to be evasive?
17    A. He couldn't identify how many guns that he had.
18    Q. Did you consider his testimony about owning --
19  whether or not he owns guns to be evasive?
20    A. He admitted that he owned guns, he just didn't
21  know how much -- how many or what types.
22    Q. Was there anything about his answer that led
23  you to believe he was not being honest about whether he
24  owned guns?
25    A. Oh, no, he owned, possessed firearms, that was

Page 22

1  clear.
2    Q. Did you ask him if he was willing to turn
3  weapons over to the Government during the deposition?
4    A. I did not.
5    Q. Did you ask him if he was willing to turn
6  weapons over to the Government at any time after the
7  deposition?
8    A. I did not.
9    Q. Did you ask his attorney, be it me or anybody
10  else, if he would turn weapons over to the Government or
11  any third parties during the deposition?
12    A. I did not.
13    Q. And did you ask his attorney, be it me or
14  anybody else, if he would turn those weapons over to the
15  Government by a third person after the deposition?
16    A. I did not.
17    Q. Had Mr. James offered to do so, was there any
18  reason which would have militated against allowing him
19  to do so?
20    A. He never offered.
21    Q. If you had asked and he agreed was there any
22  reason that would have militated against allowing him to
23  do so and seizing them under a warrant?
24    MS. GUESS: Objection, speculation. If you can
25  guess about everybody's speculative decision.

Page 23

1    THE WITNESS: I cannot.
2  BY MR. STATLER:
3    Q. Did you have any reason to suspect he would
4  have refused to do so?
5    MS. GUESS: I'm going to object as vague. Can
6  you --
7    Well, do you understand the question?
8    THE WITNESS: You want me to speculate why
9  Scott may or may not have given up the weapons?
10  BY MR. STATLER:
11    Q. No, I'm not asking that. I am asking did you
12  have any reason to suspect he would have refused to turn
13  his weapon over to the Government or to a third party
14  who was authorized to hold them pending a resolution of
15  the case?
16    A. I don't know what Mr. James would have done.
17    Q. What did Scott James' petition actually ask the
18  Judge to determine?
19    A. Whether or not he was prohibited from owning or
20  possessing a firearm based on his 242 conviction, as
21  well as whether or not his Penal Code Section 1203.4
22  expungement relieved any sort of prohibitions.
23    Q. Okay.
24    A. I think he was asking for a mandamus that the
25  State of California be ordered to allow him to own and

Page 24

1  possess a firearm.
2    Q. Very good. Do you factually dispute that at
3  the time the petition was filed that while the State
4  said Mr. James had been convicted of a misdemeanor crime
5  of domestic violence, he claimed that he had not been?
6    A. Yes, I dispute that. I believe that he -- that
7  the State of California considered him to be prohibited
8  from owning and possessing firearms.
9    Q. I asked a bad question. Actually, you've
10  already testified to know what I asked, so.
11    A. Should we have it read back so that it's clear?
12    Q. Yes, let's do that.
13    (Record read by the reporter as follows:
14    "Q. Do you factually dispute that at the time
15      the petition was filed that while the State
16      said Mr. James had been convicted of a
17      misdemeanor crime of domestic violence, he
18      claimed that he had not been?
19    "A. Yes, I dispute that. I believe that he --
20      that the State of California considered him
21      to be prohibited from owning and possessing
22      firearms.")
23    THE WITNESS: I guess it was a poorly worded
24  question and a misunderstood answer.
25    I agree that was the dispute that was the basis



Page 29

1   assigned to kind of run the show at it?
2       A.  He was in charge of -- yeah, he was the lead on
3   the search warrant.
4       Q.  Okay, thank you.
5           Had you spoken to Luke Powell about Scott James
6   between the first time you spoke to him on the 26th or
7   27th of July and -- actually, you've already said you
8   did, so I guess I should say about how long before the
9   search did you speak to Agent Powell about coming along?
10      A.  I didn't speak with him about coming along.
11      Q.  Oh, I'm sorry, I thought you said that he and
12  Blake Graham had invited you.
13      A.  I guess I am confused with the time period.
14  Yes, they did invite me, Luke had called me.  But I
15  spoke to Luke between talking to him after the
16  deposition and before he had called me to invite me to
17  attend the search warrant execution.
18      Q.  About how many times did you speak to him about
19  Scott James before you knew that you had been invited to
20  on on the search?
21      A.  I was just one time to forward him and inform
22  him that I had received the official copies of the
23  transcript.
24      Q.  Oh, so basically you just called him and said I
25  have got the transcript, you want to see it?  Is that

Page 30

1   what happened?
2       A.  Yes, I told him that I had the official
3   transcript.  I can't remember when that came in, but
4   whenever I did receive it I told him that I had the
5   official one that was signed by the court reporter,
6   verified by the court reporter, and that I could forward
7   him a copy of it, should he need it.
8       Q.  Did you end up forwarding him a copy of it?
9       A.  Yes, I did.
10      Q.  The whole thing?
11      A.  I can't recall.  I think I would have given him
12  the whole thing and told him most likely the page and
13  line numbers that were applicable.
14      Q.  Okay.  And --
15      A.  Because it was a fairly long deposition, so
16  there were only certain parts of it that were applicable
17  with respect to Mr. James' admitted firearm ownership,
18  possession.
19      Q.  Sure.  And do you have an approximate timeframe
20  of how long it was before you got the transcript?
21      A.  I don't recall, Mr. Staler, I'm sorry.
22      Q.  Okay.  I knew you had said that there were no
23  actual dates that you could remember, I just wanted to
24  know if you had the approximate timeframe.
25      A.  The usual timeframe.  I don't think I paid --

Page 31

1   the State of California doesn't normally pay for a rush.
2       Q.  Okay.
3       A.  So it would have been whatever it was on their
4   timeframe.
5       Q.  When you spoke to Agent Powell did you inform
6   him that there was a civil matter pending in which
7   Mr. James' legal ability to own a firearm was the
8   subject?
9       A.  I explained to him the basis upon which I had
10  obtained Mr. James' deposition and his admission that he
11  had firearms.
12      Q.  Can you tell me what that means as far as the
13  basis?
14      A.  I told him that Mr. James had admitted to
15  firearms possession during the deposition that I was
16  taking with respect to his lawsuit against the State of
17  California regarding his ability to own and possess
18  firearms.
19      Q.  So you did tell him that Scott was suing the
20  State for a determination of whether or not he could own
21  guns?
22      A.  Yes.
23      Q.  Are you aware that Agent Powell testified that
24  he didn't, that you did not say that?
25      A.  I'm not aware of that, no.

Page 32

1       Q.  Had you spoken to Luke Powell prior to speaking
2   to him about Scott James?
3       A.  I'm sorry, what?
4       Q.  Did you know Agent Powell prior to talking to
5   him about Scott James' testimony?
6       A.  No, I did not.
7       Q.  And did you ever have dealings with him other
8   than in this case -- excuse me, strike that.
9           Did you ever deal with Luke Powell in any cases
10  other than Mr. James' case, that you recall?
11      A.  I'm sorry, I need to go back to the prior
12  question.  Your prior question was had I had any
13  communications with Luke Powell prior to the James case?
14  Is that correct?
15      Q.  Yes.
16      A.  I'm sorry, I had never met him in person, but I
17  had received phone calls, as agents do call me from the
18  field.  And so he did call me from the field.  I'm not
19  sure if it was prior to or before Mr. James' case, but I
20  had had phone calls with him in my context as being the
21  Bureau's attorney.  When agents are executing search
22  warrants sometimes they will call me from the field.  I
23  did receive several calls from Mr. -- sorry, from
24  Special Agent Powell as well as other special agents
25  with the Bureau.  I don't know, Mr. Statler, if they



Page 33

1  were before or after Mr. James' case because I just
2  don't recall.
3      Q.  That's fine.
4      A.  But I had not met Luke Powell in person until
5  the day the search warrant was executed at Mr. James'
6  house.
7      Q.  What did you believe would happen to any
8  firearms that were found in Scott James' home during the
9  search?
10     A.  The agents would seize the firearms.
11     Q.  If it turns out that Scott James had prevailed
12 in the mandamus case and the writ was issued, did you
13 believe the firearms would be returned to him?
14     A.  I didn't know what would happen.
15     Q.  Were those firearms returned to him?
16     A.  I don't know.  I hope they weren't.
17     Q.  Are there any means that the State of
18 California uses to try to gain control of firearms other
19 than executing search warrants?
20     MS. GUESS:  Objection, vague.
21     MR. STATLER:  Yeah, that is vague, I will
22 reask.
23     Q.  Are you aware of any mechanism available to the
24 State, other than the execution of the search warrant,
25 for securing Mr. James' firearms pending determination

Page 34

1  of a lawsuit regarding his ability to own them?
2      A.  In Mr. James' case, no, the search warrant was
3  the most appropriate way to obtain the possessions from
4  Mr. James because he had admitted to possessing those
5  firearms.
6      There are other ways in which agents do obtain
7  firearms from individuals in cases that they are unable
8  to obtain a search warrant.  And in that circumstance
9  they do do a knock on the door of the private person's
10 last known address, an attempt to gain consent to
11 retrieve the firearms.
12     Q.  Are there any written communications that might
13 be sent to try to secure firearms pending the
14 determination of a right to own them?
15     A.  The only time that a communication is sent to
16 someone informing them that they are a prohibited person
17 is when they attempt to purchase a firearm and they are
18 denied because they are a prohibited person.  A letter
19 is sent to the dealer to inform them that the sale
20 should not go through.  And a letter is sent to the
21 individual, which I believe Mr. James received at least
22 three or four of them, indicating that they are a
23 prohibited person and the purchase would not be approved
24 by the Department of Justice.
25     The Department of Justice does not send letters

Page 35

1  to people who are in known possession of firearms to ask
2  them to relinquish those firearms.
3      Q.  So if someone honestly states that they own
4  firearms, there is no effort to retrieve them short of
5  executing a search warrant; is that your testimony?
6      A.  We do not typically get calls from people
7  saying I am a prohibited person in possession of
8  firearms.
9      Q.  But do you get calls from people saying, I've
10 got firearms, I'm being told I can't own them, what do I
11 do?
12     A.  I have not received any of those phone calls.
13     Q.  To the best of your knowledge has the State of
14 California ever received any phone calls along those
15 lines?
16     A.  I can't say whether or not anybody has received
17 those phone calls.  It's possible, but I don't believe
18 that it frequently happens, if it were to happen.
19     MS. GUESS:  Have you ever been advised that
20 that has happened?
21     THE WITNESS:  No.  Thank you, Catherine, I have
22 not.
23     MR. STATLER:  Thank you.
24     THE WITNESS:  I have never had anybody call me
25 to say, Kimberly, someone has just told me that they are

Page 36

1  in possession of weapons and they are a prohibitive
2  person, what should we do?
3      And even if that did happen -- even if somebody
4  did call I suspect that the people would not bring it to
5  my attention, they would go directly to the enforcement
6  section of the Bureau of Firearms.  They would report
7  that to a peace officer, not the Bureau's attorney.
8      Q.  Unless they came to know of it through a
9  lawsuit it would come to you, would it not, or someone
10 in your office, an attorney for the State?
11     MS. GUESS:  Objection, vague.
12     THE WITNESS:  Yeah, I'm not seeing -- if there
13 was another case just like Mr. James?
14 BY MR. STATLER:
15     Q.  Yes.
16     A.  Yes, had there been another case just like
17 Mr. James?  No.
18     I know you did not give this admonition, but is
19 it all right if I take a quick restroom break?
20     Q.  Absolutely.  Let's go ahead and take five.
21     A.  I just need a few minutes, thank you.
22     (Break.)
23 BY MR. STATLER:
24     Q.  Back on the record.  You had testified
25 earlier -- I'm not trying to read back quotes to you,



Page 37

1  I'm not trying to misstate your testimony. But you had
2  said something about attorneys would occasionally call
3  and you would speak to them about their client's ability
4  to own a firearm; is that correct?
5      A. Yes.
6      Q. And were any of those calls from attorneys
7  about people who had already purchased firearms and
8  gotten them and now were being denied?
9      A. No. At least they didn't reveal that to me.
10 They were just calling about a specific denial and
11 wanted to know why their client had been denied.
12     Q. Okay. Did you have an obligation to report
13 Scott James' testimony?
14     A. As part of my duties as the attorney for the
15 Bureau of Firearms I reported my activities and what I
16 learned during the deposition to both my chain of
17 command at the Governmental Law Section and as well as
18 the Bureau of Firearms.
19     Q. And what is the source of this duty?
20     A. I have a chain of command that I report to so
21 they wanted to know what I had learned during the
22 deposition, what had happened during the deposition, how
23 the deposition went.
24     Q. I see. Were you aware at the time the search
25 warrant was executed that a Motion For Summary Judgment

Page 38

1  had been filed by Mr. James in his mandamus case?
2      A. I don't recall the time period. It may have
3  been.
4      Q. Had you -- we touched on this a little earlier.
5  But prior to meeting Agent Powell for purposes of
6  observing the search, had you spoken to him since you
7  had sent him the transcript of the testimony?
8      A. No.
9      Q. Did Special Agent Graham tell you why he was
10 inviting you on the search?
11     A. No, other than to be an observer. Like I said,
12 they had called me from the field about questions in the
13 past, they thought it would be good that I observed the
14 execution of a search warrant.
15     Q. Had you ever observed the execution of a search
16 warrant before?
17     A. No.
18     Q. Do you know if attorneys for the -- do
19 attorneys for the Attorney General's Office generally
20 accompany agents on the execution of a search warrant?
21     A. I don't know what other attorneys in other
22 sections do or do not do. The sections that I had
23 worked in for the Attorney General's Office, the
24 Governmental Law Section and the Employment
25 Administrative Mandate Section, were not typically

Page 39

1  involved in cases where search warrants were executed.
2  There are other sections within the AG's office where
3  criminal investigations are handled, they may accompany,
4  and likely do accompany, agents on the execution of
5  search warrants, but I don't know specifically of
6  anything.
7      Q. Did it ever bother you that a search had not
8  occurred in Mr. James' case until a couple of months
9  after you had called Agent Powell?
10     A. No.
11     Q. Were you aware that it hadn't happened before
12 you were invited along? Does that make sense?
13     A. I was told when the search was happening. I
14 was too busy with other things to -- I did not keep tabs
15 on when the search or if a search was going to happen.
16     Q. So did you ever inquire as to why a search had
17 not happened before it had occurred?
18     A. No.
19     Q. Did you ever tell anyone that a search needed
20 to happen at any time?
21     A. No.
22     Q. Did you ask to go on the search?
23     A. No.
24     Q. And what was your role as observer at the
25 search?

Page 40

1      A. To observe the execution of a search and answer
2  any agent questions that they had during the execution
3  of the search warrant.
4      Q. Were you asked any questions on this search?
5      A. Yes.
6      Q. Do you recall what they were?
7      A. I was asked about the presence of a slot
8  machine on Mr. James' property and whether or not that
9  should be seized. Because we weren't sure -- the agents
10 weren't sure if it was an illegal slot machine, so they
11 wanted to know whether or not that should be seized.
12     I was asked about the documents that Mr. James
13 would have signed in the context of attempting to
14 purchase firearms and where he may have purchased the
15 firearms.
16     Q. Any other questions?
17     A. Not that I can recall, no.
18     Q. Now, forgive me, I'm going to have to ask you
19 some questions about the interplay between these
20 different departments to make sure I'm going down an
21 appropriate road here.
22     Because you were part of an administrative
23 mandamus section, I believe you testified, and then
24 another section of your office? Or am I wrong?
25     A. I don't think you are going to head down the



Page 45

1  the evidence?
2     A. I had been called as a witness to testify. I
3  was represented by an attorney from the Employment
4  Section who then appeared on my behalf in order to quash
5  the subpoena. But I was present in Tulare County in the
6  event that the motion had not been quashed -- or the
7  subpoena had not been quashed. So I was present in the
8  event my testimony was needed, but I never entered the
9  Court room -- or the Courthouse.
10    Q. Thank you. I'm sorry, I have to find my place.
11    A. That's okay.
12    Q. Was there any link between your presence at the
13  execution of the search warrant and your defense of the
14  State in Mr. James' mandamus case?
15    A. I don't know what you mean by "link." I
16  thought of them as two separate actions.
17    Q. If something had been found at the -- and I
18  believe that answers my question, thank you.
19        If something had been found at this search that
20  was relevant to Scott James' Motion for Summary
21  Judgment, would that have been presented to the Court?
22        MS. GUESS: Objection, speculation.
23  BY MR. STATLER:
24    Q. Was something found at the search that was
25  relevant to -- or that you considered to be relevant to

Page 46

1  Mr. James' mandamus case?
2     A. No. I had his testimony at the deposition,
3  that was all I needed.
4     Q. So was your presence at the search part of what
5  might be called career development? I don't know if
6  that term make sense to you, but career development with
7  AG's office?
8     A. No. It was just being present for what agents
9  in my section do, in my bureau do, being -- it wasn't
10  a --
11    Q. I'm sorry, let me ask -- that may have sounded
12  pejorative. I meant as in training and familiarization
13  with what you were doing.
14    A. I was on site to provide advice to the agents
15  in the execution of the warrant. That's what it was.
16  Whether it was -- usually I would be on the phone with
17  them, or whether I was in person, that's why I was
18  there.
19    Q. So would you be considered a law enforcement
20  officer while you were there?
21    A. I'm not a peace officer.
22    Q. Did you advise the agents as to any parts of
23  Mr. James' house that should be searched?
24    A. No, the search warrant was expressed to what
25  could be served.

Page 47

1     Q. I'm sorry, by that I mean did you ever say to
2  an officer, Search over here or search that drawer?
3     A. No, I did not.
4     Q. Or anything along those lines.
5     A. No, I did not.
6     Q. And you were the only attorney that was
7  present; is that correct?
8     A. Correct. I don't believe any of the peace
9  officers are attorneys or the agents that were there are
10  attorneys.
11    Q. How many days from the day the search warrant
12  was executed -- let me start that over. I'm sorry.
13        How many days after the execution of the search
14  warrant was your opposition to Mr. James' Motion for
15  Summary Judgment due to be filed?
16    A. I don't recall.
17    Q. Do you remember if you filed that opposition on
18  time?
19    A. Yes, I did.
20    Q. Do you know why it might take two and a half
21  months to execute a search warrant?
22    A. I understand why there may have been a delay in
23  Mr. James' case, yes.
24    Q. Why might that have been?
25    A. Special Agent Powell had surgery.

Page 48

1     Q. And how many agents are there, as far as you
2  know, with the Department of Justice?
3     A. At that time within the State of California,
4  maybe 30.
5     Q. I'm going to take a quick break for a
6  discussion with my client real quick.
7     A. Okay.
8     Q. And we'll be right back.
9        Or if you want to get up and stretch your legs,
10  that's fine.
11        (Break.)
12  BY MR. STATLER:
13    Q. Back on the record. Do you know somebody by
14  the name Tracy Lynn Miller?
15    A. I'm not certain if that's Mr. James' ex-wife's
16  name or not.
17    Q. I will represent to you that it is.
18    A. Okay.
19    Q. Does that refresh your memory?
20    A. Yes.
21    Q. Did she -- did you ever speak to her?
22    A. Yes.
23    Q. How many times?
24    A. Maybe three times.
25    Q. And did you contact her -- did you have




Case 1:13-cv-00983-AWI-SKO   Document 73-2   Filed 11/04/15   Page 41 of 59

KIMBERLY JEAN GRANGER Volume 1                    January 27, 2015
JAMES vs. GRANGER                                         61–64

Page 61

1  condition, I will object to those and we will conclude
2  the deposition.
3       MR. STATLER: Understood. And I would -- my
4  only response is that under ordinary circumstances that
5  would be an ordinary foundational question; however,
6  because of the very personal nature of this, and the
7  very understandable effect it has on Ms. Granger, I'm
8  going to ask the question in a far more targeted way.
9       Q. At the time of your discussions with Agent
10  Powell through the execution of the search warrant, were
11  you on any medications that would affect your judgment?
12      A. No.
13      Q. Thank you. I'm very happy to put that behind
14  us.
15          When Jim Miller called you what information did
16  you give him?
17      A. I told him that I had no control over the
18  criminal prosecution and that he needed to talk to the
19  D.A. I told him Ms. Kaelble's name, the phone number
20  for the Tulare County District Attorneys' Office. I
21  said that in relation to any concerns he had with the
22  custodial arrangement that he needed to talk to a family
23  law attorney with respect to anything with that. I
24  couldn't help him with anything advice wise with respect
25  to that.

Page 62

1       Q. Thank you. Are you aware how long Mr. James
2  and Tracy Miller stayed married after the incident that
3  resulted in his 1996 conviction?
4       A. I am not.
5          MS. GUESS: Objection, relevance.
6  BY MR. STATLER:
7       Q. But I believe you answered the question.
8       A. I don't.
9       Q. Were you aware when you spoke to Mr. Miller
10  that his home was under a search warrant at the
11  timeframe you had a conversation with him?
12      A. Mr. Miller's home?
13      Q. Yes.
14      A. No, I had no knowledge of that.
15      Q. I want to make sure I understand the State of
16  California's position on searching for firearms. Did
17  you testify that the State of California does not do --
18  or reword that.
19          Does the State of California ever try to
20  get weapons back in a manner other than a search
21  warrant?
22          MS. GUESS: Objection, asked and answered.
23          THE WITNESS: Yes.
24  BY MR. STATLER:
25      Q. I believe you testified that sometimes there's

Page 63

1  something along the lines of a -- they go to a home and
2  knock; is that correct?
3       A. Agents execute -- they conduct investigations
4  of armed prohibited persons. Part of those
5  investigations can either result in a search warrant or
6  they will be in -- if they are unable to obtain a search
7  warrant then they do a knock on the door to secure or
8  obtain consent from the individual to retrieve or to
9  seize their firearms.
10      Q. And when do they do the visit without a search
11  warrant?
12      A. When they are unable to obtain the search
13  warrant.
14      Q. So --
15      A. The preferred method for agents to seize
16  firearms is with a search warrant. If they are unable
17  to obtain a search warrant then they go to the person's
18  home in Order to obtain consent from the individual to
19  seize their firearms.
20      Q. So the State of California's preferred method
21  of searches is through a warrant, not through consent?
22      A. For armed prohibited persons investigations
23  where someone is known to be armed and also known to be
24  in possession of firearms, the Chief's position is to
25  obtain a search warrant in those circumstances.

Page 64

1          If they are unable to obtain a search warrant,
2  then they do a knock and try to obtain consent.
3       Q. I'm sorry, you said the Chief's position?
4       A. Chief Lindley, that is the directive that he
5  has given his agents.
6       Q. Is that a written directive?
7       A. I don't know.
8       Q. I'm sorry, you told me his first name.
9       A. Stephen Lindley.
10      Q. With a ph?
11      A. ph.
12      Q. How did you come to know of this position?
13      A. From working with him.
14      Q. So it was told to you verbally?
15      A. Yes, I heard it on many occasions.
16      Q. Have you ever seen it --
17      A. No.
18      Q. -- written down?
19      A. No.
20      Q. Do you know how long this has been -- strike
21  that.
22          Is Chief -- is this position held by anybody
23  else that you know of?
24      A. As long as I have been at the Bureau that has
25  been the position of the Bureau. That where we know



Case 1:13-cv-00983-AWI-SKO   Document 73-2   Filed 11/04/15   Page 42 of 59

KIMBERLY JEAN GRANGER Volume 1
JAMES vs. GRANGER

January 27, 2015
65–68

Page 65

1 somebody is armed and prohibited, the preferred method
2 of seizing those firearms is by search warrant.
3     If they are unable to obtain a search warrant
4 then they do a knock and talk and try to get consent.
5     And I am only speaking, Mr. Staler, with
6 respect to the Bureau of Firearms. I have no knowledge
7 base as to what other law enforcement agencies do in the
8 State of California, I am only speaking with reference
9 to the Bureau of Firearms.
10    Q. Understood. And has Chief Lindley been in his
11 position the entire time you have been with the Bureau
12 of Firearms?
13    A. He was Acting Chief when I first became the
14 Firearms Deputy Attorney General. He was then elevated
15 upon Harris's inauguration to Chief.
16    MS. GUESS: Just for clarity, she has been
17 inaugurated twice.
18    THE WITNESS: Oh, I'm sorry. Her first
19 inauguration.
20 BY MR. STATLER:
21    Q. Okay, thank you. So have you ever been
22 assigned to the Bureau of Firearms when Chief Lindley
23 was not either the Chief or the Acting Chief?
24    A. I have not -- I have not worked under anybody
25 other than Chief Lindley either as an acting Chief or

Page 66

1 the full Chief.
2    Q. Who is Chief Lindley's immediate supervisor?
3    A. Director Larry Wallace, W-a-l-l-a-c-e. He is
4 the Director of the Division of Law Enforcement under
5 which the Bureau of Firearms reports.
6    Q. Do you know if this is Larry Wallace's
7 position?
8    A. I don't know.
9    Q. Do you know if this is -- and, I'm sorry, I
10 still don't know how to pronounce the Attorneys
11 General's first name. Is it Kamala or Kamala? I hear
12 it both ways on the news.
13    A. I only refer to her as Ms. Harris or AG Harris,
14 General Harris.
15    Q. Then we'll go with that. I was going to say
16 her first name and last name. Do you know if this is
17 General Harris's position?
18    A. I don't.
19    Q. And do you know if the person who was either
20 the Chief or Acting Chief immediately preceding Chief
21 Lindley held the same position?
22    A. I don't know, I didn't work for the Bureau at
23 that time.
24    Q. But have you heard anyone say that that's been
25 our position since a year, or since so and so was in

Page 67

1 office?
2    A. Not that I have heard, no.
3    Q. Thank you. I have asked a similar question,
4 but I don't think I have actually asked this question.
5    Well, actually, before I go down that road,
6 forgive me, let me just ask this. Are you back at work
7 for the Attorney General's office?
8    MS. GUESS: I represented that you were on
9 maternity leave.
10    THE WITNESS: Oh, yes.
11 BY MR. STATLER:
12    Q. Okay, thank you.
13    MS. GUESS: That's why we did not do
14 depositions until January.
15    THE WITNESS: I see, okay.
16 BY MR. STATLER:
17    Q. Are you currently involved in any cases, civil
18 cases, be it in mandamus or some other civil basis, for
19 determination of whether somebody has an MCDD?
20    A. No. As the Bureau's attorney I now -- all the
21 cases where the Bureau is now a defendant in those cases
22 are assigned to Governmental Law -- to attorneys in the
23 Governmental Law Section, and I supervise the handling
24 or I'm their -- they have their own supervisors still
25 within the Governmental Law Section but I supervise

Page 68

1 their handling of the Firearms cases. So any cases that
2 now come in are all handled by Government Law, DAG.
3 Some of those cases involve MCDD challenges with respect
4 to the expungement of the 1203.4, which is being
5 litigated federally. So there are challenges to MCDD as
6 it relates to the 1203.4 arena. Those are being handled
7 by DAGs in the Governmental Law Section with whom I work
8 and provide information to.
9    Q. Okay.
10    A. But there are other cases. I don't know if
11 they are mandamus cases or just regular Complaints,
12 Civil Complaints.
13    Q. Do you have an idea of how many there are?
14    A. I think there's three, and they are all pending
15 the determination in the Enos matter, Enos v. Holder
16 case.
17    Q. Yes. Lots of things are pending on Enos.
18    A. Yes.
19    Q. And do any of those involve people who have
20 purchased a firearm but are now being told they can
21 purchase no more or cannot own them anymore?
22    A. I don't know the specifics. All I know is that
23 it's in relation to a denial of the purchase on the
24 basis of their MCDD which they are challenging because
25 they have a 1203.4 expungement.



Page 73

1  spoke with Luke Powell at his direction, then I heard
2  the search warrant was being executed. I had nothing to
3  do with the warrant. I had nothing to do with the
4  criminal case at that point. So I was not reviewing
5  this case for a criminal case, I was reviewing it in the
6  context of his civil litigation.
7      Q. But what I'm trying to figure out is there
8  appears to have been lots of indicators that he had
9  firearms in his possession at the time that the case was
10 filed, but you didn't report that he might be in
11 possession of weapons until after his deposition.
12     A. I didn't tie the CCW to being -- I think you
13 had produced it in the context of the discovery
14 responses, but I didn't tie that into current weapons
15 ownership. I can see where you would, but I had not
16 tied that in at that time.
17     I didn't know whether it had been, you know,
18 revoked, because they can be revoked on the computer and
19 maybe the person still retains the paper copy. I had no
20 information about the CCW. That's not issued by the
21 Department of Justice.
22     Q. And but you did have evidence of several
23 purchases of firearms in just the last few years since I
24 believe 2006 or 2007. Was there any reason to believe
25 that he had gotten rid of all of those firearms at that

Page 74

1  point?
2      A. I didn't know if he still had those firearms.
3  People exchange firearms, people obviously obtain many
4  other firearms during the course of a year. I don't
5  know whether or not he still had those firearms at the
6  time of the deposition.
7      Q. So --
8      A. And my concern initially was not that -- my
9  concern going into the deposition was not that he had
10 possession of the weapons, my concern was why we had
11 allowed him -- why DOJ had approved those weapons
12 purchases to go through.
13     Q. Okay.
14     A. And I think Mr. Matsumoto explained during his
15 deposition why that had occurred. That there was a
16 short time period during which Mr. James' 10-year state
17 prohibition had lapsed. When there was a very short
18 time period, maybe a year, that once we were audited by
19 the Federal's National Instant Check System, the NICS
20 Group, where they had said where somebody has a 242
21 conviction, and there is an arrest for a 273.5, and the
22 victim is a domestic relationship, those are considered
23 MCDDs.
24     Because at the time the Bureau was only
25 considering somebody who had been convicted of a 273.5

Page 75

1  as being an MCDD. And NICS came in and did their audit
2  and they said, no, people who have a 242 with a 273
3  arrest with a domestic relationship victim should be
4  banned under MCDD.
5      So that is why during that time period
6  Mr. James was apparently able to purchase firearms that
7  were approved by the Bureau. So that was what my
8  concern was going into the deposition as to why we had
9  allowed -- and trying to find out from my client why
10 that had occurred. Mr. Matsumoto explained that to you
11 I believe in his deposition, as well.
12     Q. Yes.
13     A. Okay. So that's what I was trying to get
14 information about when did he purchase them, what
15 happened during that timeframe for those. It was during
16 that part of his deposition where Mr. James then
17 admitted to still retaining those firearms as well as an
18 unknown number of long guns.
19     Q. Yes, okay.
20     A. Okay? And then I reported that information to
21 my chain of command, once he had provided that
22 information to me while represented by counsel and under
23 oath.
24     Q. But I am confused because there was testimony
25 earlier that -- I'm not going to call it a duty, but

Page 76

1  because of your job you feel you need to let the agents
2  know when somebody owns firearms.
3      A. That's not what I said.
4      Q. When somebody who is prohibited is in
5  possession of firearms. I'm sorry if I am misstating --
6      MS. GUESS: I'm going to object that misstates.
7  Are you asking her a question?
8      MR. STATLER: Yes.
9      MS. GUESS: To the extent you can explain your
10 answer about what your job was, why you reported it.
11     MR. STATLER: I'm sorry, I'm not asking that
12 question, I was prefacing it.
13     Q. You felt -- you testified earlier you had some
14 kind of obligation to report Scott to the agents because
15 he had testified he owned firearms, but I'm trying --
16 because he had fired arms and was prohibited.
17     Is that not what you testified? I'm sorry,
18 then I am going to have to ask you to explain it.
19     A. As the Bureau's attorney in the context of
20 representing the Bureau in a lawsuit brought by
21 Mr. James I reported what happened during the
22 deposition, everything that happened during the
23 deposition to my chain of command at the Government Law
24 Section, as well as everything that happened in the
25 deposition to Chief Lindley, just in reporting in the



Page 77

1 context of my representation of my client what had
2 occurred.
3      Once I had made that report to them of what had
4 occurred, just as I am sure you would tell Mr. Her what
5 is going to happen and what I said during my deposition
6 today, the Chief made a decision to have an
7 investigation begun on Mr. James as being an armed
8 prohibited person.
9    Q. And, I'm sorry, who is John Marsh?
10    A. John Marsh was at the time the Special Agent in
11 Charge, so he would be above -- so you have a Special
12 Agent, then you have a Special Agent Supervisor, you
13 have a Special Agent in Charge, there is two of them,
14 one for Northern California, one no Southern California.
15 Then there's an Assistant Chief of Enforcement, an
16 Assistant Chief of Program, and then you have the Chief
17 Steve Lindley.
18      So Mr. Marsh at that time I believe held the
19 position of Special Agent in Charge of the Northern
20 California office. So he would have been Blake Graham's
21 supervisor.
22    Q. Okay. And did you ever speak to Mr. Marsh
23 about this, about the deposition testimony?
24    A. Mr. James' deposition testimony?
25    Q. Yes.

Page 78

1    A. I don't know whether it came up in conversation
2 because he was asking about the warrant. I may have, I
3 may not have, I don't know. He would have knowledge of
4 the warrant because he would know what his agents are
5 doing.
6    Q. I will represent to you that --
7      Actually, I think we have it.
8      SCOTT JAMES: It would be all in there. You
9 want me to find it?
10 BY MR. STATLER:
11    Q. Did you speak to him the day after the
12 deposition?
13    A. John Marsh?
14    Q. Yes.
15    A. I may have. Maybe Chief Lindley had told me to
16 talk to John Marsh about it since he would have to find
17 an agent.
18    Q. Do you recall if that was very early that
19 workday that you spoke to Chief Lindley?
20    A. I would have reported to him what had happened
21 as soon as I, you know, got in he would have wanted to
22 know about my travel, so likely.
23    Q. The reason I am asking about John Marsh is the
24 Bureau of Firearms Investigation Report said the
25 investigation was requested by John Marsh.

Page 79

1    A. That would -- he would be the Special Agent in
2 Charge. There was no Assistant Chief at the time of
3 Enforcement, so he would have been just under Chief
4 Lindley, so he would have made the assignment likely to
5 the Fresno office to conduct the investigation.
6      It may have been that Chief Lindley had told
7 him to start the investigation, I may have -- Chief
8 Lindley may have asked me to ask John to give him the
9 information that I had learned. But it's not
10 unreasonable that the assignment would have come from
11 Special Agent in Charge Marsh.
12    Q. Okay, thank you.
13    A. As I am sure you are aware, the police
14 departments and law enforcement agencies have very
15 regimented chains of command, so --
16    Q. Yes, I know.
17    A. -- assignments come from very specific areas or
18 people.
19    Q. And you said John Marsh was at that time
20 filling that position. Is he in a different position
21 now?
22    A. At some point after that he was elevated to
23 Assistant Chief of the Bureau of Firearms. He is now
24 currently the Chief of the Bureau of Investigation
25 within the Division of Law Enforcement at the Attorney

Page 80

1 General's office.
2    Q. Okay, thank you. And to the best of your
3 knowledge would the investigation begin with the initial
4 phone call or conversation with a reporting party?
5    A. I'm sorry, what?
6    Q. Well, the documents indicate that the
7 investigation started the day after at 9:00 a.m., which
8 seems very fast to me. I'm trying to figure out why it
9 would start that quickly.
10    MS. GUESS: Objection, foundation, speculation.
11 If you know.
12    THE WITNESS: When the Chief makes an order for
13 an investigation, they follow that order.
14 BY MR. STATLER:
15    Q. Okay. And that's Chief Lindley?
16    A. Yes.
17    Q. Okay. I think we are getting close, but I
18 would like to take a few minutes just to make sure, if
19 that's all right.
20      (Break.)
21    MR. STATLER: Back on the record.
22    Q. Ms. Granger, can you describe to me the steps a
23 person goes through to get a CCW?
24    A. I believe they fill out an application with
25 their local agency, whether it be a Police Department or



# *James v. Granger, et al.*

## USDC, Eastern District
## Case No. 1:13-cv-0983-AWI-SKO

# EXHIBIT DX6

1  KAMALA D. HARRIS, State Bar No. 146672
   Attorney General of California
2  ALBERTO L. GONZALEZ , State Bar No. 117605
   Supervising Deputy Attorney General
3  CATHERINE WOODBRIDGE GUESS, State Bar No.
   186186
4  Deputy Attorney General
     1300 I Street, Suite 125
5    P.O. Box 944255
     Sacramento, CA 94244-2550
6    Telephone:  (916) 445-8216
     Fax:  (916) 322-8288
7    E-mail:  Catherine.Woodbridge@doj.ca.gov
   *Attorneys for Defendants Stephen Lindley and*
8  *Kimberly Granger*

9                 IN THE UNITED STATES DISTRICT COURT

10              FOR THE EASTERN DISTRICT OF CALIFORNIA

11                          FRESNO DIVISION

12

| | |
|---|---|
| **SCOTT R. JAMES,** | 1:13-CV-0983 AWI SKO |
| Plaintiff, | **DECLARATION OF KIMBERLY GRANGER IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |
| v. | Date:        December 7, 2015 |
| **KIMBERLY GRANGER,** | Time:        1:30 p.m. |
| | Courtroom:  2 |
| Defendant. | Judge:       The Honorable Anthony W. Ishii |
| | Trial Date:   May 17, 2016 |
| | Action Filed:  June 26, 2013 |

I, Kimberly Granger, declare:

1.     I am a resident of the State of California, employed by the State of California, am a

Defendant in this action.

2.     At all times relevant to this action, I was a Deputy Attorney General for the State of

California.  Beginning in 2010, I was assigned to the Bureau of Firearms to act as legal counsel

for the Bureau of Firearms, including defending the Bureau of Firearms in any lawsuits.   As part

of my job, I reported to Chief Lindley on the status of litigation against the Bureau of Firearms,

including providing any reports or summaries regarding law and motion and discovery.  My job

                                    1

1 │ duties also included providing legal advice to agents with the Bureau of Firearms when questions

2 │ arise during execution of a search warrant.

3 │       3.    On February 15, 2011, Plaintiff filed a writ of mandamus in the Superior Court of

4 │ California, County of Tulare challenging his prohibited status. I was assigned to handle the

5 │ defense of the writ on behalf of the State of California/Bureau of Firearms. The State of

6 │ California considers Plaintiff's conviction of battery a misdemeanor crime of domestic violence

7 │ for purposes of 18 U.S.C. § 992(g)(9). The State of California considers Plaintiff a prohibited

8 │ person unless and until a court deems otherwise. As part of the litigation process, I took the

9 │ deposition of Plaintiff on July 25, 2011. I provided a summary of the information obtained from

10 │ Plaintiff's deposition to Chief Lindley, my client, including Plaintiff's admission that he

11 │ possessed firearms in violation of federal law.

12 │       4.    When the Bureau of Firearms learns that a prohibited person is in possession of

13 │ firearms, it investigates. If the prohibited person admits possession of firearms in violation of the

14 │ law, the Bureau of Firearms seeks a search warrant.

15 │       5.    I did not investigate Plaintiff for criminal prosecution or violation of 18 U.S.C. §

16 │ 992(g)(9). I did not assist in preparing or prepare the search warrant of Plaintiff's residence and

17 │ vehicles. I did not review the request for search warrant. I did not order or direct the search of

18 │ Plaintiff's home or seizure of his firearms. I did not arrest Plaintiff nor did I direct the Bureau of

19 │ Firearms to arrest Plaintiff.

20 │       6.    I was called by the Tulare County District Attorney as a witness in Plaintiff's criminal

21 │ matter arising out of the search and recovery of multiple weapons and ammunition.

22 │       7.    At no time did I single out Plaintiff for disparate treatment.

23 │       I declare under penalty of perjury that the foregoing is true and correct. Executed this 27th

24 │ day of October, 2015, at Bakersfield, California.

25 │ 

26 │       Kimberly Granger

27 │ SA2013309877
28 │ 32261876

2

# *James v. Granger, et al.*

## USDC, Eastern District
## Case No. 1:13-cv-0983-AWI-SKO

# EXHIBIT DX7

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA


| | | |
|---|---|---|
| SCOTT R. JAMES, | ) | |
| | ) | |
|       Plaintiff, | ) | |
| | ) | |
|   vs. | ) | CASE NO.: |
| | ) |   1:13-CV-00983-AWI-SKO |
| KIMBERLY GRANGER, an | ) | |
| individual; STEVE LINDLEY, an | ) | |
| individual, | ) | |
| | ) | |
|       Defendants. | ) | |


DEPOSITION OF LUKE POWELL


The following deposition was given on the 22nd day of September 2015, commencing at the hour of 12:55 p.m., before, Susan C. Stevenson, a Certified Shorthand Reporter, License Number 9760.

The witness personally appeared at 80 Garden Court, Suite 270, Monterey, California  93940.

1

```
STATE OF CALIFORNIA    )
                       ) ss.
COUNTY OF MONTEREY     )
```

1
2
3

4    The witness in the foregoing deposition

5    appeared before me, SUSAN C. STEVENSON, Certified

6    Shorthand Reporter No. 9760 for the State of California.

7    Said witness then and there at the time and

8    place previously stated testified under penalty of

9    perjury given on said day.

10    The testimony of the witness and all the

11    questions and remarks requested by counsel were taken by

12    me in shorthand at the time and place therein named and

13    thereafter, under my direction, transcribed into

14    longhand.

15    I further certify that I am not of counsel or

16    attorney for either or any of the parties to said

17    deposition, nor in any way interested in the outcome of

18    the cause named in said caption, and that I am not

19    related to any party thereto.

20    IN WITNESS WHEREOF, I have hereunto set my hand

21    this 1ST day of October , 2015

22
23
24    CERTIFIED SHORTHAND REPORTER
25    FOR THE STATE OF CALIFORNIA

51

10

1 about the testimony -- about the deposition you're to
2 give today?
3     A. Just with the -- the counselor.
4     Q. And I don't want to hear about anything that
5 you spoke about with your lawyers, but did you speak
6 with anybody else about it?
7     A. No, sir.
8     Q. And I know before the deposition you greeted
9 Mr. James, but I'm going to ask this question anyway.
10     Are you aware of a gentleman named Scott
11 James?
12     A. Yes, sir.
13     Q. Do you remember when you first heard of
14 Mr. James?
15     A. Yes, sir.
16     Q. And can you tell me about who you heard about
17 him from?
18     A. My supervisor, Lee Careaga, when I worked for
19 the California Department of Justice. He assigned me
20 the case.
21     Q. How do you spell Mr. Careaga's name?
22     A. It's been a while. C-a-r-e-a -- maybe it's
23 i-a-g-a.
24     Q. Thank you.
25     A. Okay. Sorry.

12

1 firearms was involved in some type of civil deposition
2 the day before. And Mr. James made incriminating
3 statements at the deposition.
4     The DAG gave that information to our chief
5 who then handed it down to the chain of command. And it
6 ended up on my desk.
7     Q. Just so I have an idea of the process it went
8 through, you say it came from -- it was your testimony
9 that it was handed down from the chief to you?
10     A. So it would have gone through two people
11 between that. So chief to the SIC, which is supervisor
12 in charge. Then from the supervisor in charge, it would
13 go to my supervisor, which was Keith Careaga. And then
14 from Careaga, assigned it to me.
15     Q. By chief, did you mean Steven Lindley?
16     A. Yes, sir.
17     Q. And was he the accounting chief at the time
18 or do you recall?
19     A. I do not recall that.
20     Q. And who was the -- did you say SIC?
21     A. Yes.
22     John Marsh.
23     Q. You had mentioned that you were told about --
24 that incriminating statements were made in the
25 deposition; is that correct?

11

1     Q. But it's with a "C", as best you can recall?
2     A. Yes, sir.
3     Q. Okay. We'll go from there, if we need to.
4     And do you remember when that happened?
5     A. It's going to be July of 2011. The date --
6 specific date, I don't know. It was like 25th, 26th.
7 Somewhere around there.
8     Q. Okay.
9     Late July?
10     A. Yes, sir.
11     Q. And do you remember what he told you about
12 Mr. James?
13     A. It was a case being handed down from
14 Sacramento for me to investigate.
15     Q. Where were you based?
16     A. Fresno. Sacramento is our headquarters.
17 Sorry.
18     Q. Excellent. Thank you.
19     And did you -- did he tell you anything about
20 Mr. James, specifically?
21     A. No.
22     Q. Can you remember what he told you about the
23 case?
24     A. Yes.
25     So the deputy attorney general assigned to

13

1     A. Yes, sir.
2     Q. Were you told what the incriminating
3 statement were about, at that point?
4     A. I don't think so.
5     Q. Now, once you were told about the case by
6 Mr. Careaga, or as I should say once you were assigned
7 the case by Mr. Careaga, who did you speak to next about
8 it?
9     A. I don't recall how I got a copy of the court
10 transcripts, whether it came from email or as a fax, but
11 the Sacramento office then faxed me down a portion of
12 the court transcription from the civil deposition.
13     I read through it. I saw what they were
14 talking about.
15     And then I called another supervisor at the
16 Sacramento office, Blake Graham, just for some advice on
17 the case.
18     And then I called Ms. Granger directly.
19     Q. And, I'm sorry, the name of the gentleman you
20 said, Blake?
21     A. Blake Graham, G-r-a-h-a-m.
22     Q. And what kind of advice would you have wanted
23 from Mr. Graham -- or what kind of advice did you want
24 from Mr. Graham, I should ask?
25     A. I just needed clarification on some things

4 (Pages 10 to 13)

1  that I -- I don't remember if it was that first day or
2  somewhere in the first week that I talked to supervisor
3  Graham. But he is our firearms expert for the state so
4  he knows the DROS process better than anybody else --
5  that's D-R-O-S, dealer record of sales. I apologize.
6  He knows that process better than anybody at the state.
7      So I needed to clarify with him exactly
8  the -- the certain charging sections that we were
9  looking at for this type of case.
10      Q. Okay.
11      And so you may have spoken to him before or
12  after Ms. Granger?
13      A. Yes, sir.
14      Q. Okay.
15      Do you remember how the conversation went
16  when you first spoke to Ms. Granger? That's a bad way
17  to ask that question. I'm sorry. I'll ask it again.
18      Do you remember the -- what you first spoke
19  to Ms. Granger about with this case?
20      A. Yes.
21      Q. What -- what came up in that first
22  conversation?
23      A. It was very brief, maybe five minutes at the
24  most.
25      I explained that I already got a copy of

15

1  court transcripts; I've read the transcripts. I just
2  confirmed with her that her accounts of what the
3  transcript said were accurate and, I guess, complete.
4      She verified what Mr. James had stated under
5  sworn testimony. And that was it.
6      Q. Did she tell you anything about the civil
7  case?
8      A. She did not.
9      Q. Were you aware that it was a civil case at
10  the time -- well, it was a deposition so I imagine you
11  might have been -- but were you aware that it was a
12  civil case at the time?
13      A. No. I assumed that. I guess I could figure
14  that out on my own, but we didn't talk about that at
15  all.
16      Q. So the nature of the case did not -- excuse
17  me.
18      The nature of the case that gave rise to this
19  testimony was not discussed in that first conversation?
20      A. You are correct.
21      Q. About how long -- did you ever talk to
22  Ms. Granger about the case again?
23      A. Not during my investigation, no. That was
24  it, that one five-minute conversation.
25      Q. When do you remember speaking to Ms. Granger

1  again about Scott James?
2      A. The next time I remember talking to her was
3  the day of the search warrant, or maybe the day before
4  the search warrant. That's about it.
5      Q. Okay.
6      Before we skip that far ahead, about how many
7  pages of transcripts did you receive from -- with
8  Mr. James's testimony on it?
9      A. I don't -- I don't remember the exact number.
10  I know it wasn't the entire transcripts from that day,
11  it was just a portion of it. I'm going to guess maybe
12  15 pages. Somewhere around there.
13      Q. Okay.
14      And -- oh, and we'll get back to that
15  question later. I'm going to write it down though.
16      Well, I'm going to have the court reporter
17  mark this as Exhibit 2.
18      (Exhibit 2 was marked for identification.)
19      MR. STATLER: I probably should have shown it
20  to you first, but...
21      (Witness reviews document.)
22      BY MR. STATLER:
23      Q. All right.
24      Sergeant Powell, hopefully took a look at the
25  document that was just handed to him.

17

1      Do you recognize that document?
2      A. Yes, sir.
3      Q. Can you tell me what it is?
4      A. It's a copy of the search warrant I authored
5  and the return.
6      Q. Do you remember when you authored the search
7  warrant?
8      A. October of that year, 2011.
9      Q. You -- and I want to make sure I've got
10  this -- I'm sorry.
11      So it was authored in October?
12      A. Yes, sir.
13      Q. Okay.
14      And between the conversations you first had
15  in late June and early October --
16      MS. GUESS: Objection. Mistakes testimony.
17  He said July.
18      MR. STATLER: I'm sorry. What did you I say?
19      MS. GUESS: June.
20      MR. STATLER: Oh, my apologize.
21      Q. Between those first conversations you had
22  between late July and early October, when you authored
23  this document, do you recall having any conversations
24  about the case of Mr. James or the investigation of
25  Mr. James?

5 (Pages 14 to 17)

18

1    MS. GUESS: I'm going to object that it's
2  vague as to whom.
3    Are you referring to anyone or with
4  Ms. Granger?
5    MR. STATLER: With anyone.
6    THE WITNESS: So this is -- yes. So this
7  would be an ongoing investigation that we would discuss
8  with our team, the team that I worked on.
9    BY MR. STATLER:
10    Q. So recognizing that you already gave
11  testimony to this effect, I'm just going to go ahead and
12  ask for clarity.
13    Were any of those conversations with
14  Ms. Granger?
15    A. No.
16    Q. Were any of them with Chief Lindley?
17    A. No.
18    Q. Were any of them with Mr. Careaga?
19    A. Yes.
20    Q. How about Mr. Marsh?
21    A. No, sir.
22    Q. Do you recall anyone else you had a
23  discussion with during that timeframe about Scott James?
24    A. The only other person that I would have
25  talked to would have been supervisor Graham.

19

1    Q. Ah. Thank you. Yes, supervisor Graham.
2    And were -- what steps did you take to -- or
3  did you take any steps -- let me ask it that way -- did
4  you take any steps to determine whether or not Scott
5  James owned firearms between -- during that time,
6  between late July and early October?
7    A. Did I take steps to confirm that?
8    Q. Yes.
9    A. Yes, sir.
10    Q. And how did you go about that?
11    A. Do you mind if I just refer to my search
12  warrant as we talk about it?
13    Q. Please do.
14    A. Okay.
15    (Witness reviews document.)
16    THE WITNESS: The reason why I want to refer
17  to the search warrant is because it gives like a
18  chronological order of what I did.
19    BY MR. STATLER:
20    Q. Certainly.
21    A. So upon receiving, basically, the case file
22  on July 26th, which was a Tuesday, I was given
23  information that Mr. James had made incriminating
24  statements the day prior, so that Monday.
25    I reviewed the court transcripts. Confirmed

20

1  with supervisor Graham up in Sacramento that I was
2  looking at these possible violations here, the --
3  against the Federal Brady Act, 18 U.S.C. 922, subsection
4  (g)(9).
5    And then on Thursday of that week I did
6  computer research on Mr. James, criminal history check,
7  checked the automated firearms systems.
8    Q. And, I'm sorry, that was on the 28th?
9    A. Yes, sir.
10    And through the automated firearm system
11  check I determined that he had three handguns registered
12  to him. The possession of those three firearms would
13  have been would have been a violation of U.S -- 18
14  U.S.C. 922, subsections (g)(9).
15    Conducted a DMV check on Mr. James. Saw that
16  he had two vehicles registered to him. And this address
17  off of South Mooney Boulevard in Visalia.
18    Through the criminal history check, I found
19  that he had two convictions. One for carrying a loaded
20  weapon in public and one for 242 battery.
21    Q. Can you tell from your notes if that also
22  happened on July 28th?
23    A. Yes, sir. This would have been all that same
24  day.
25    Q. Thank you.

21

1    A. I checked the arm for the person system,
2  which is a state maintained database. And those results
3  showed that -- that he attempted to purchase firearms
4  eight times since his prohibition in 1996.
5    Seven of those attempts were denied. One
6  attempt had successfully taken place. And that was for
7  the Kimber .45 caliber handgun.
8    And then on that same day I went down to the
9  Big 5 store in Visalia to get a copy of the DROS, Dealer
10  Record of Sales form, and the ATF 4473 forms.
11    Do you want me the keep going?
12    Q. No. I --
13    A. I'm almost done with my investigation.
14    Q. Yeah. Let's go ahead and go and complete it.
15    A. Once I got a copy of those two forms from the
16  Big 5 store in Visalia I did a drive-by of Mr. James's
17  residence. First I checked the location at 4216 South
18  Mooney Boulevard in Visalia and determined that was a
19  UPS store.
20    And then I drove by his residence at 630 West
21  Cherry and witnessed a silver Mercedes in the driveway,
22  which I got the license plate and ran it and it came
23  back to a female, Tasha Tayian, T-a-y-i-a-n. I'm sure I
24  got that wrong, I apologize. But the registration of
25  that license plate came back to his UPS store, Post

6 (Pages 18 to 21)

**22**

1 Office Box.
2    Q.   Thank you.
3        And, again, that was all on the 28th?
4    A.   Yes.
5    Q.   Or that last part, I should say?
6    A.   Yes. Through the 28th, correct.
7    Q.   What is the next date you have -- that you
8 recall or can recall that you took action in this
9 investigation?
10    A.   The next date I have documented in my
11 paperwork would be in early October.
12    Q.   Do you recall taking any steps in the
13 investigation between July 28th and authoring the search
14 warrant?
15    A.   Yes, sir.
16        So what I would have done between that time
17 is write -- actually writing the search warrant; writing
18 my report, which is going to be a separate document as
19 well; going to get copies of all the dealer record of
20 sales transactions. There was eight prior transactions
21 from Sacramento. Trying to locate the Federal firearms
22 licensing dealer, so the guns stores where he attempted
23 these transactions at, and get copies from the stores as
24 well.
25        Continuing to do drive-bys to verify

**23**

1 additional cars at the house and see if I could place
2 Mr. James at the residence on Cherry in Visalia.
3        I contacted Visalia Police Department to get
4 a copy of the original arrest report for the domestic
5 battery.
6        I think that's almost all of it that I can
7 remember, off the top of my head.
8    Q.   Do you recall from reviewing the deposition
9 transcript if you could discern that Mr. James was
10 represented by an attorney at the time?
11    A.   I do not recall that.
12    Q.   Were you told by Ms. Granger that he was
13 represented by an attorney at the time?
14    A.   I was not told and I did not ask.
15    Q.   Did anyone tell you that he was represented
16 by an attorney at the time?
17    A.   The whole civil case, I had nothing to do
18 with it. That didn't concern me one bit.
19        I was only focusing on the criminal aspect of
20 this.
21    Q.   Okay.
22        And the investigation that Mr. James -- and,
23 forgive me, I'm going to have to rely on you here. It
24 sounds to me like it was a very busy investigation those
25 first couple of days.

**24**

1    Q.   Was there an urgency in the investigation
2 that you felt at the time?
3    A.   No, sir.
4        We -- I'm also working numerous other cases
5 at the same time. So when time permits I'll do one case
6 at a time or certain areas of the case at a time. And
7 that's exactly what this shows.
8        The reason why I did some work on a Tuesday
9 and didn't do anything on a Wednesday, but then started
10 up again on Thursday was because I was working on other
11 cases at the time.
12    Q.   Certainly that is going to happen at any job.
13    A.   Sure.
14    Q.   But it was over two months before the search
15 warrant was authored; is that correct?
16    A.   Completed, yes.
17        I write it the entire time; so throughout the
18 time, I'm typing paragraphs at a time.
19    Q.   So what was -- was there a reason it took
20 over two months to complete the search warrant's
21 authorship?
22    A.   Yes.
23        I was hurt. I got hurt at work.
24    Q.   Oh. And the nature of your injury?
25    A.   Knee. I tore a cartilage in one of my knees.

**25**

1    Q.   Thank you.
2        And were you ever directed to get on the
3 search warrant of Scott James?
4    A.   Like to hurry it up, is that what you mean?
5    Q.   Or to get it done.
6    A.   No.
7        We have -- we have our own due diligence to
8 get your cases done in a timely manner, but there's no
9 timeline put on -- put on this case specifically. No.
10    Q.   Okay.
11        So from that testimony, I take it that
12 Kimberly Granger never asked you to get the search
13 warrant done; is that correct?
14    A.   You are correct.
15    Q.   Did Steven Lindley ever ask you to get the
16 search warn done by a certain date?
17    A.   No, sir.
18    Q.   When did you first discover that Scott James
19 was involved in litigation with the State of California?
20 I'm sorry. That assumes that you discovered that.
21        But did you, at some point, learn that Scott
22 James was suing the State of California about his right
23 to own firearms?
24    A.   I just learned of this lawsuit just a couple
25 of weeks ago.

**7 (Pages 22 to 25)**

# *James v. Granger, et al.*

## USDC, Eastern District
## Case No. 1:13-cv-0983-AWI-SKO

# EXHIBIT DX8

## Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT
 2       FOR THE EASTERN DISTRICT OF CALIFORNIA
 3                  FRESNO DIVISION
 4
 5   SCOTT R. JAMES,
 6              Plaintiff,
 7   vs.
                      Case No. 1:13-CV-0983 AWI SKO
 8   KIMBERLY GRANGER,
 9              Defendants.
10   -------------------------
11
12
13
14
15         VIDEOTAPED DEPOSITION OF
16              SCOTT RAY JAMES
17
18            January 26, 2015
19              1:51 p.m.
20
21       2151 River Plaza Drive, Suite 300
22           Sacramento, California
23
24
25     Reported by Coleen Dalton, CSR No. 5755
```

## Page 2

```
 1           APPEARANCES OF COUNSEL
 2   For Plaintiff:
 3        HERR PEDERSEN BERGLUND
          RON STATLER, ESQ.
 4        100 Willow Plaza, Suite 300
          Visalia, California 93291
 5        559.636.0200
          rstatler@dhlaw.net
 6
     For Defendant KIMBERLY GRANGER:
 7
          DEPARTMENT OF JUSTICE
 8        OFFICE OF THE ATTORNEY GENERAL
          CATHERINE WOODBRIDGE GUESS, DAG
 9        1300 I Street, Suite 1101
          Sacramento, California 95814
10        916.445.8216
          catherine.woodbrige@doj.ca.gov
11
     Also Present:
12
          Daniel Bruun, Videographer
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
 1              INDEX OF EXAMINATION
 2   WITNESS:  SCOTT RAY JAMES
 3   EXAMINATION                              PAGE
 4   BY MS. GUESS................................  6
 5
 6
 7
 8
 9
10
11
12                    * * *
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
 1              INDEX TO EXHIBITS
 2    EXHIBITS                             MARKED
 3  Exhibit 1   Tulare Superior Court Register    62
              of Actions, VCM031983-96, People
 4            vs. James, Scott Ray
 5  Exhibit 2   Memo dated 4-7-10 to Scott James  62
              from Brian DeCuir, Director,
 6            Public Safety Training
              Department, College of the
 7            Sequoias
 8  Exhibit 3   Letter dated 2-15-12 to Ron       73
              Statler from Kimberly Granger
 9
10
                    * * *
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



Page 121

```
 1            REPORTER'S CERTIFICATION
 2
 3            I, Coleen Dalton, Certified Shorthand Reporter,
 4    in and for the State of California, do hereby certify:
 5
 6            That the foregoing witness was by me duly
 7    sworn; that the deposition was then taken before me at
 8    the time and place herein set forth; that the testimony
 9    and proceedings were reported stenographically by me and
10    later transcribed into typewriting under my direction;
11    that the foregoing is a true record of the testimony and
12    proceedings taken at that time.
13
14            IN WITNESS WHEREOF, I have subscribed my name:
15    February 2, 2015.
16
17
18
19                      Coleen Dalton
20            Coleen Dalton, CSR No. 5755
21
22
23
24
25
```

Page 122

```
 1            DEPOSITION ERRATA SHEET
 2
 3
 4    Our Assignment No. 255136
 5    Case Caption:  James vs. Granger
 6
 7
 8        DECLARATION UNDER PENALTY OF PERJURY
 9            I declare under penalty of perjury that I have
10    read the entire transcript of my Deposition taken in the
11    captioned matter or the same has been read to me, and
12    the same is true and accurate, save and except for
13    changes and/or corrections, if any, as indicated by me
14    on the DEPOSITION ERRATA SHEET hereof, with the
15    understanding that I offer these changes as if still
16    under oath.
17        Signed on the ___ day of _____ 20___.
18
19
20
21        _____
22            SCOTT RAY JAMES
23
24
25
```

Page 123

```
 1            DEPOSITION ERRATA SHEET
 2    Page No. _____ Line No.____ Change to:_____
 3    Reason for change:_____
 4    _____
 5    Page No. _____ Line No.____ Change to:_____
 6    Reason for change: _____
 7    _____
 8    Page No. _____ Line No.____ Change to:_____
 9    Reason for change: _____
10    _____
11    Page No. _____ Line No.____ Change to:_____
12    Reason for change: _____
13    _____
14    Page No. _____ Line No.____ Change to:_____
15    Reason for change: _____
16    _____
17    Page No. _____ Line No.____ Change to:_____
18    Reason for change: _____
19    _____
20    Page No. _____ Line No.____ Change to:_____
21    Reason for change: _____
22    _____
23
24    SIGNATURE:  _____ Date _____
25            SCOTT RAY JAMES
```

Page 124

```
 1            DEPOSITION ERRATA SHEET
 2    Page No. _____ Line No.____ Change to:_____
 3    Reason for change: _____
 4    _____
 5    Page No. _____ Line No.____ Change to:_____
 6    Reason for change: _____
 7    _____
 8    Page No. _____ Line No.____ Change to:_____
 9    Reason for change: _____
10    _____
11    Page No. _____ Line No.____ Change to:_____
12    Reason for change: _____
13    _____
14    Page No. _____ Line No.____ Change to:_____
15    Reason for change: _____
16    _____
17    Page No. _____ Line No.____ Change to:_____
18    Reason for change: _____
19    _____
20    Page No. _____ Line No.____ Change to:_____
21    Reason for change: _____
22    _____
23
24    SIGNATURE:  _____ Date _____
25            SCOTT RAY JAMES
```



Case 1:13-cv-00983-AWI-SKO   Document 73-2   Filed 11/04/15   Page 58 of 59

SCOTT RAY JAMES                                                    January 26, 2015
JAMES vs. GRANGER                                                        81–84

Page 81

1  your criminal appearances?
2     A   Not that I can recall.
3     Q   Did you ever --
4     A   She was under subpoena.
5     Q   Did you ever hear her testify in your criminal
6  matter?
7     A   No.
8     Q   Do you have any information that she applied
9  for the search warrant of your home that occurred back
10 in October of 2011?
11    A   All of the information on the search warrant,
12 it's all black and white.  All it states basically is
13 that Agent Luke Powell got the information the following
14 day or two days later after my deposition in July from
15 Ms. Granger.  He had testified that he had gotten parts
16 of the transcript like two days after my deposition.
17    Q   Is it your understanding that Ms. Granger
18 prepared the search warrant?
19    A   Prepared it for a magistrate, no.  That was all
20 done by Luke Powell.
21    Q   Have you seen a copy of your transcript from
22 July of 2011?
23    A   Yes.
24    Q   And during that deposition in July of 2011, did
25 you admit that you were in possession of firearms?

Page 82

1     A   Yes, I did.
2     Q   What was the ultimate conclusion or resolution
3  of that criminal case against you for the assault rifle?
4     A   They --
5        MR. STATLER:  Counsel, I'm sorry.  Scott,
6  listen to the question and answer the question.
7  Because --
8  BY MS. GUESS:
9     Q   Conclusion or resolution.  The ultimate one.
10 Not all the hearings.  Just what happened.
11    A   Case was dismissed based on 1538.5, motion to
12 suppress.
13    Q   Okay.  Do you recall when it was dismissed?
14    A   February 8, 2013.
15    Q   Who was the DA on the case, if you recall?
16    A   Supervising DA Afreen Kaelble.
17    Q   Did she ever advise you that Ms. Granger was
18 working with the DA's office on your criminal case?
19    A   I had a conversation approximately 12:00 today
20 with her.
21    Q   With who?
22    A   Afreen Kaelble.
23    Q   And what was your conversation?
24    A   I wanted to know if there was any -- what
25 transpired between Ms. Granger and the Tulare County

Page 83

1  DA's office.
2     Q   What did she tell you, if anything?
3     A   She couldn't recall a whole lot, but that she
4  had spoke to Ms. Granger a couple times regarding my
5  criminal case.
6     Q   Did she tell you what the nature of the call --
7  or the conversation was?
8     A   She couldn't really elaborate, and it was like
9  last minute for her, so she hadn't had enough time to
10 think about it.
11    Q   Is that what she told you --
12    A   Yes.
13    Q   -- "I haven't had enough time to think about
14 it"?
15    A   She doesn't have anything with her, any records
16 or anything like that.
17    Q   Did she ever represent to you that
18 Kimberly Granger is the one who advised the Tulare
19 County District Attorney to file charges against you?
20    A   No.
21    Q   Do you have any information that
22 Kimberly Granger was responsible for the Tulare County
23 District Attorney filing criminal charges against you?
24    A   I'm working on it, and I'll let you know as
25 soon as I know.

Page 84

1     Q   That's not my question and --
2     A   I know.
3     Q   -- you can go ahead and answer it.
4        MR. STATLER:  Let me go through the steps here.
5  Object as nonresponsive, and we reserve the right to
6  move to strike.
7        MS. GUESS:  Okay.  Can you read the question
8  again?
9        (Record read)
10       THE WITNESS:  No.
11 BY MS. GUESS:
12    Q   Do you have any information that she was
13 working for the district attorney -- Kimberly Granger
14 was working for the Tulare County District Attorney's
15 Office at the time these criminal charges were brought
16 against you?
17    A   No.
18    Q   And again, when I refer to the criminal
19 charges, it's the assault weapon charge.
20       Is that your understanding?
21    A   Yes.
22    Q   Did Mr. Powell testify at your criminal
23 hearing?
24    A   Yes.
25    Q   How many times did you hear him testify?



Page 85

1    A    I believe just the one time. There might have
2   been a hearing prior to that that didn't go through. I
3   think it was just the one time, and that would have been
4   on that February 3rd day.
5    Q    When you had your deposition taken in the writ
6   matter, who did you think that Ms. Granger was
7   representing?
8    A    The Department of Justice, Attorney General.
9    Q    Are you aware of any other people that have
10  filed a writ on the same issue that you filed your writ
11  on?
12   A    I don't know. I'm not sure about that. Not
13  really, no.
14   Q    Are you aware of any other people where
15  Ms. Granger has acted as the attorney for the Department
16  of Justice on a writ matter, any writ matter?
17   A    Yes.
18   Q    Who?
19   A    Calguns. And I think --
20   Q    Is that a person or a business?
21   A    That's the association, Calguns. And then also
22  I think there's another one with the NRA, National Rifle
23  Association.
24   Q    And it's your understanding Ms. Granger acted
25  as the attorney for the Department of Justice?

Page 86

1    A    My understanding is that she represents that
2   Bureau of Firearms portion and is always litigating with
3   these two different associations over gun rights or
4   violations.
5    Q    Are you aware of Ms. Granger acting as a
6   defense attorney for the Department of Justice on any
7   other writ petitions regarding possession or purchase of
8   firearms?
9    A    Nobody personally that I know.
10   Q    Was there only one criminal action brought
11  against you as a result of that search that took place
12  in October of 2011?
13   A    I believe so, but in the report that
14  Luke Powell had filed, he also stated that he fired it
15  off to the fed -- the feds.
16   Q    To your knowledge, have any criminal charges
17  been brought against you by the federal government?
18   A    No.
19   Q    Have you reviewed the second amended complaint
20  that was filed in the lawsuit we're here on today?
21   A    Briefly.
22   Q    I'm going to read to you an allegation on
23  page 4 at paragraph 14 that states:
24       "Ms. Granger" -- this is regarding the search
25  in 2011.

Page 87

1       "Ms. Granger was on scene to supervise the
2       search and obtain statements and information
3       from Mr. James to use in this civil case."
4       What information do you possess that
5   Ms. Granger was supervising the search?
6    A    Probably any type of records for this suit that
7   we were in the process of, anything that -- any denial
8   letters or anything like that is what I understand that
9   they were looking for.
10   Q    Do you have any facts that Ms. Granger was
11  supervising the search of your home in October of 2011?
12   A    Other than just the neighbor that I believe we
13  provided, to where she was talking -- they overheard her
14  talking to the agents, and she was excited and says,
15  yes, we got him.
16   Q    Which neighbor was that?
17   A    Bill -- you have the list, I believe.
18       MR. STATLER: I don't recall.
19       THE WITNESS: Okay. He's no longer there, but
20  I provided his -- like all his new -- it would have
21  probably been the first round of discovery. I think we
22  had two.
23  BY MS. GUESS:
24   Q    Bill McCarty?
25   A    There you go.

Page 88

1    Q    McCartney, who lived at 2505 South Johnson
2   Street, Visalia?
3    A    Yes.
4    Q    He told you he heard Ms. Granger speaking?
5    A    Yes.
6    Q    Okay. My question is, what facts do you have
7   that she was supervising the search?
8    A    I don't really have any.
9    Q    And what facts do you have that Ms. Granger was
10  at your home to obtain statements to use in the civil
11  case?
12   A    Other than the correlation between her and
13  Agent Powell communicating to obtain the search warrant
14  and for them both to be at the summary judgment hearing
15  in November, the day he filed the return of the search
16  warrant.
17   Q    Did you ever hear Ms. Granger directing the
18  agents how or where to search your home?
19   A    I heard some talk about what to look for, what
20  they're looking for, but again, it was loud. I had my
21  dogs going berzerk, and then my back was to a lot of
22  them.
23   Q    My question is, did you hear Ms. Granger
24  directing Agent Powell where to search your home?
25   A    At one time I saw -- no, but then at one time I

